*Electronically Filed*

CIVIL ACTION NO. 20-CI-003067

JEFFERSON CIRCUIT COURT
DIVISION NINE (9)
JUDGE JUDITH MCDONALD BURKMAN

CHELSEY NAPPER, Individual

-and-

CODY ETHERTON, Individual

-and-

CHELSEY NAPPER, Legal Guardian,
  Mother and Next Friend of Minor, Z.F.

-and-

CHELSEY NAPPER, Legal Guardian,
  Mother and Next Friend of Minor, B.E.                                        PLAINTIFFS

vs.

LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT
  ex rel. Greg Fischer, in his official capacity as Mayor,

     SERVE:     Mayor Greg Fisher
                 Metro Hall
                 527 West Jefferson Street 4th Floor
                 Louisville, KY 40202

  -and-

LOUISVILLE METRO POLICE DEPARTMENT

     SERVE:     Interim Chief of Police, Yvette Gentry
                 633 West Jefferson Street
                 Louisville, Kentucky 40202

     SERVE:     Hon. Michael O'Connell, County Attorney
                 Jefferson Hall of Justice
                 600 West Jefferson Street
                 Louisville, KY 40202

  -and-

DETECTIVE BRETT HANKISON
c/o attorney Carol Petitt
7600 W. Highway 146 Suite #100

Pee Wee Valley, KY 40056
In his Official and Individual Capacities

-and-

DETECTIVE MYLES COSGROVE
c/o attorney Kent Wicker
2100 Waterfront Plaza
325 W. Main St.
Louisville, KY 40202
In his Official and Individual Capacities

-and-

DETECTIVE JONATHAN MATTINGLY
  c/o attorney Kent Wicker
  2100 Waterfront Plaza
  325 W. Main St.
  Louisville, KY 40202
In his Official and Individual Capacities

-and-

DETECTIVE ANTHONY JAMES
633 West Jefferson Street
Louisville, KY 40202
In his Official and Individual Capacities

-and-

DETECTIVE MIKE NOBLES
633 West Jefferson Street
Louisville, KY 40202
In his Official and Individual Capacities

-and-

DETECTIVE MIKE CAMPBELL
633 West Jefferson Street
Louisville, KY 40202
In his Official and Individual Capacities

-and-

LT. SHAWN HOOVER
633 West Jefferson Street
Louisville, KY 40202
In his Official and Individual Capacities

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000002 of 000140

AMC : 000002 of 000037

-and-

CHIEF STEVE CONRAD (Ret.)
9208 Whitegate Ct.
Louisville, KY 40222
In his Official and Individual Capacities

-and-

LT. JERRY HUCKLEBERRY
633 West Jefferson Street
Louisville, KY 40202
In his Official and Individual Capacities

DETECTIVE JOSHUA JAYNES
633 West Jefferson Street
Louisville, KY 40202
In his Official and Individual Capacities                    DEFENDANTS

---

## FIRST AMENDED COMPLAINT

Plaintiffs, by their undersigned attorneys of record, allege as follows:

## STATEMENT OF CLAIMS

1.      Plaintiffs seek money damages and equitable relief from Defendants for violating their constitutional rights, and injunctive relief to prevent injury to themselves in the future. They also bring forward supplemental claims for violations of Kentucky state law.

2.      Plaintiffs were the victims of and injured by the use of excessive force by Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell and Hoover in violation of the First, Fourth, and Fourteenth Amendment to the U.S. Constitution and Kentucky state tort laws.

3.      Plaintiffs were the victims of and injured by the failure of Defendants Louisville Metro Police Department (LMPD) and Louisville/Jefferson County Metro Government (LouMetro) to properly train and supervise Defendants Hankison, Cosgrove, Mattingly, James,

3

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000003 of 000140

AMC : 000003 of 000037

Nobles, Campbell, Hoover and Jaynes to follow LMPD Standard Operating Procedures (SOP), including but not limited to, SOP 8.1 Chapter: Field Operations, Subject: Search Warrants, and other SOPs related to use of deadly force and/or excessive force, *inter alia*.

4.      Plaintiffs were the victims of and injured by the failure of Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell, Hoover and Jaynes to follow LMPD Standard Operating Procedures (SOP), including but not limited to, SOP 8.1 Chapter: Field Operations, Subject: Search Warrants, and SOPs related to use of deadly force and/or excessive force, *inter alia*.

5.      Plaintiffs bring suit under U.S. Const. amends. I, IV & XIV; 42 U.S.C. §§ 1983, 985(3) & 1988; and state law giving rise to claims for negligence, negligence per se, ultrahazardous activities, assault and intentional infliction of emotional distress.

### JURISDICTION

6.      This Court has jurisdiction over the federal claims in this Complaint pursuant to *Testa v. Katt*, 330 U.S. 386 (1947) and because all acts complained of herein occurred in Louisville, Jefferson County, Kentucky, and various state law claims are alleged, this Court has general jurisdiction pursuant to Ky. Rev. Stat. § 23A.010.

7.      This action arises under various state law claims and the United States Constitution as applied by 42 U.S.C. § 1983 to persons acting under color of state law and by 42 U.S.C. § 1985(3) to persons conspiring to deprive any person "of the equal protection of the laws, or of equal privileges and immunities under the laws."

### VENUE

8.      Venue is proper in this Court pursuant to Ky. Rev. Stat. § 452.460 as Defendants are residents of Louisville, Jefferson County, Kentucky, and/or work in Louisville, Jefferson County, Kentucky, and the acts or occurrences giving rise to these claims occurred in this jurisdiction.

4

## PARTIES

9.      Plaintiff Chelsey Napper was at all times relevant herein a resident of Louisville, Jefferson County, Kentucky.

10.     Plaintiff Cody Etherton was at all times relevant herein a resident of Louisville, Jefferson County, Kentucky.

11.     Plaintiff, Minor Z.F., was at all times relevant herein a resident of Louisville, Jefferson County, Kentucky.

12.     Plaintiff, Minor B.E., was at all times relevant herein a viable fetus under the laws of the Commonwealth of Kentucky and entitled to all pertinent rights, privileges and protections relevant hereto and a resident of Louisville, Jefferson County, Kentucky.

13.     Defendant Louisville/Jefferson Country Metro Government operates the Louisville Metro Police Department (LMPD), a law enforcement agency, and is a municipality capable of being sued under Kentucky law  (collectively referenced hereinafter as "Municipal Defendants").

14.     Defendant Louisville/Jefferson Country Metro Government is the legal entity responsible for the operation and administration of the LMPD.

15.     Plaintiffs base all applicable and appropriate claims as to Defendant City of Louisville and the LMPD on the doctrine of municipal liability pursuant to *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978), and on state-law principles of respondeat superior and/or other forms of vicarious liability.

16.     Defendant Detective Brett Hankison was, at all times relevant, an officer of LMPD. He is sued in his personal, official, and individual capacities.

17.     Defendant Detective Myles Cosgrove was, at all times relevant, an officer of

5

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000005 of 000140

AMC : 000005 of 000037

LMPD. He is sued in his personal, official, and individual capacities.

18.     Defendant Detective Jonathan Mattingly was, at all times relevant, an officer of LMPD. He is sued in his personal, official, and individual capacities.

19.     Defendant Detective Anthony James was, at all times relevant, an officer of LMPD. He is sued in his personal, official, and individual capacities.

20.     Defendant Detective Mike Nobles was, at all times relevant, an officer of the LMPD. He is sued in his personal, official, and individual capacities.

21.     Defendant Detective Mike Campbell was, at all times relevant, an officer of the LMPD. He is sued in his personal, official, and individual capacities.

22.     Defendant Lt. Shawn Hoover was, at all times relevant, an officer of the LMPD. He is sued in his personal, official, and individual capacities

23.     Defendant Detective Joshua Jaynes was, at all times relevant, an officer of the LMPD. He is sued in his personal, official, and individual capacities.

24.     Defendant Lt. Jerry Huckleberry was, at all times relevant, an officer of the LMPD. He is sued in his personal, official and individual capacities.

25.     Defendant Chief Steve Conrad (Retired) was, at all relevant times herein, the Chief of Police of the LMPD. He is sued in his personal, official and individual capacities.

26.     All individual Defendant law enforcement officers, agents and/or employees were, at all times relevant to this Complaint, working as on or off duty licensed Kentucky peace officers acting under color of state law and within the scope and course of their official duties and employment as officers with the LMPD Narcotics Criminal Interdiction Unit (CID), the Chief of Police or otherwise within the LMPD.

## FACTS

6

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000006 of 000140

AMC : 000006 of 000037

27.     On or about March 13, 2020, at approximately 0040 hours or 12:40 a.m., Plaintiffs were asleep in their apartment located at 3003 Springfield Drive Unit 3, Louisville, Kentucky 40214.

28.     Plaintiff Minor Z.F. was 5 years old.

29.     Plaintiff Chelsey Napper was almost seven (7) months pregnant with Plaintiff Minor B.E.

30.     Plaintiff Cody Etherton was awakened by a loud commotion outside the front of the apartment.

31.     As Plaintiff Cody Etherton rose from his bed to see what was the matter, when he walked down the hall pieces of drywall flew into his eye as simultaneously he heard gunshots.

32.     Multiple bullets entered the Plaintiffs' apartment.

33.     One bullet came very near Plaintiff Cody Etherton's head.

34.     Plaintiff Cody Etherton dropped to the floor.

35.     Plaintiff Cody Etherton crawled back to his bedroom to see about the pregnant Plaintiff Chelsey Napper and little Z.F.

36.     All Plaintiffs experienced great fear and emotional distress and were subjected to unreasonable risk of death.

37.     After a few minutes when Plaintiff Cody Etherton heard what he believed to be the police coming to their rescue and the gunfire had stopped, he (very cautiously) walked to the front of his apartment.

38.     Plaintiff Cody Etherton saw the police through his window and stepped out of his front door clad only in his red gym shorts in which he had been sleeping.

7

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000007 of 000140

AMC : 000007 of 000037

39.     After Plaintiff Cody Etherton had taken just a few steps, the police cursed at him and ordered him back into his apartment. He complied.

40.     Once back in his apartment, Plaintiff Cody Etherton noticed the glass of the sliding glass door at the rear of his apartment was broken and he walked down his hall toward it.

41.     When Plaintiff Cody Etherton reached the broken sliding glass door—with shards of glass still falling—he recognized the unmistakable red dots of laser gunsights shining on him.

42.     Several members of law enforcement were standing outside the back of Plaintiff Cody Etherton's sliding glass door with guns pointed at him and they were yelling at him to show them his hands.

43.     Plaintiff Cody Etherton reacted by running away from the sliding glass door back to the bedroom.

44.     Plaintiff Cody Etherton was again at that moment unreasonably subjected to risk of death by the Defendants.

45.     Plaintiff Cody Etherton heard law enforcement members talking into a radio to be on the lookout for a white male at the rear of the building wearing only red gym shorts.

46.     Plaintiff Cody Etherton believes he was the referenced white male wearing only red gym shorts for whom the police were notifying each other to be on the lookout.

47.     Plaintiff Cody Etherton believes that the Defendants and their unknown, unnamed law enforcement colleagues believed they were at the back of Unit 4 (Taylor and Walker's apartment immediately next door) when they laser sighted Etherton at his broken sliding glass door.

48.     Plaintiff Cody Etherton retreated to his bedroom where he and the other Plaintiffs hid in fear for almost ninety (90) minutes until Sergeants Jason Vance, Chris Lane and Jeremy

8

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000008 of 000140

AMC : 000008 of 000037

Ruoff arrived on scene at approximately 0149 hours or 1:49 a.m. to check on the Plaintiffs.

49.    Unbeknownst to the Plaintiffs the Defendants were executing simultaneous search warrants that night at another address on Elliott Avenue and 3003 Springfield Drive Unit 4.

50.    The occupants of 3003 Springfield Drive Unit 4 were Breonna Taylor and Kenneth Walker.

51.    The Affidavit for Search Warrant executed by Defendant Detective Joshua Jaynes (Exhibit 1) which was made part of the Search Warrant itself (Exhibit 2) as if fully set forth therein requested a "No-Knock" method of entry to the premises.

52.    Jaynes made no specific reference to any "exigent circumstances" which would require the Search Warrant be executed outside the hours of 0800 and 2200 as set forth in LMPD SOP 8.1.19.

53.    Jefferson (County) Circuit Court Judge Mary Shaw signed the Affidavit for Search Warrant at 12:37 p.m., March 2, 2020.

54.    Jefferson (County) Circuit Court Judge Mary Shaw authorized the Search Warrant by her signature dated 3/13/2020.

55.    Lt. Jerry Huckleberry approved the "No-Knock" warrant requested by Defendant Jaynes and then was negligent in all supervision and follow-up with respect to training and protocol pursuant to LMPD Standard Operating Procedures.

56.    The individual Defendants decided to actually knock on the door of Unit 4 when serving the Search Warrant despite requested and being approved for "No-Knock" entry into the premises.

57.    Defendants LouMetro and LMPD failed to train and supervise the individual Defendants with respect to unilaterally changing their minds to knock instead of enter via "No-Knock" in the middle of an operation.

9

Filed 20-CI-003067 11/04/2020 David L. Nicholson, Jefferson Circuit Clerk

58. Deviating from the "No-Knock" method of entry "on the fly" was a violation of LMPD SOP and evidence of lack of training and supervision and endangered the lives of all individual Defendants as well as the Plaintiffs.

59. LMPD SOP 8.1 covers the topic of "Search Warrants" within the chapter "Field Operations" (Exhibit 3).

60. LMPD SOP 8.1.12 required Defendant Detective Joshua Jaynes to write "No-Knock" on the top of the warrant copy returned to the Legal Advisor's Office.

61. Upon information and belief Exhibit 2 was provided by LMPD pursuant to an open records request. It was also made publicly available on LMPD's internet website. "No-Knock" is not written at the top.

62. LMPD SOP 8.1.13 requires a Risk Assessment Matrix (RAM) (LMPD form #05-0016) be completed prior to the service of all search warrants.

63. None of the Defendants completed a RAM for the Search Warrant (Exhibit 2) to be served at 3003 Springfield Drive Unit 4 on the night of March 13, 2020.

64. LMPD Special Investigations Division (SID), Public Integrity Unit (PIU) officers interviewed every Defendant and other officer involved or witnessing or responding to the chaos at 3003 Springfield Drive Unit 4 in the early morning hours of March 13, 2020, after the incident and again on or about May 19, 2020.

65. Multiple witnesses (SWAT, responding officers and co-Defendants) informed the PIU interviewers that they never saw or were never shown or presented with a RAM for the Springfield Drive Unit 4 Search Warrant.

66. SWAT Commanding Officers Lt. Dale Massey, Sgts. Brandon Hogan, Michael Burns and Joel Casse were interviewed (Exhibit 4) after the night of March 13, 2020.

67. Lt. Massey stated that "SWAT operations and CID operations were completely

10

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000010 of 000140

AMC : 000010 of 000037

opposite of each other."

68.    Lt. Massey stated that the Defendants and CID never provided SWAT with a Risk Assessment Matrix, which SWAT in turn could not and did not serve. In other words, CID did not provide SWAT with a RAM for Springfield Drive.

69.    Lt. Massey noted that LMPD policy requires CID to provide SWAT with all RAMs whether SWAT is utilized or not.

70.    Lt. Massey "stated [that] he had heard CID and SWAT weren't communicating effectively."

71.    Lt. Massey stated that CID should not have served the "No-Knock" warrant without SWAT.

72.    Sgt. Casse during his interview said that CID was planning to try to serve too many warrants simultaneously that night (March 13, 2020). He advised CID that it was not practical or possible.

73.    If CID had given SWAT prior knowledge of the Springfield, Sgt. Casse said, then "SWAT would have advised it was not a good idea to execute the warrant at that time without advance planning and contingencies in place."

74.    Sgt. Casse stated that SWAT was never briefed the night of March 12-March 13 about the Springfield location, but rather only about Elliott Avenue. According to Sgt. Casse, SWAT was never provided any documentation regarding Springfield, such as a RAM or Search Warrant Operations Plan (SWOP) (LMPD #-5-0025).

75.    Sgt. Casse stated that he believed there was a disconnect between the goals and objectives of SWAT and CID.

76.    Sgt. Casse stated that "SWAT rarely does simultaneous warrants anymore and their practice is to clear one structure then move on to the next and have surveillance conducted

11

on the other targets until they arrive."

77.      Lt. Massey corroborated this statement on his own when he stated: "had SWAT known about the Springfield address they would have advised CID to watch the location until SWAT was available to help serve the warrant."

78.      Lt. Massey stated that SWAT should have been briefed on the Springfield address.

79.      Sgt. Casse outlined the conflicting internal policies of LMPD. He stated: "SWAT is focused with the preservation of life while CID appeared to have a fear concerning the loss of evidence because of the methods used."

80.      Sgt. Burns and others reiterated that "SWAT has gone away from conducting simultaneous warrants because of the depletion of resources and inherent danger."

81.      The "Summary of Events" Investigative Report compiled by the LMPD SID PIU (Exhibit 5) makes clear that Defendant Hankison was "obviously unaware of pertinent information pertaining to the target location. In investigators experience in law enforcement the warrant briefing should have provided a layout of the target location for tactical/safety reasons."

82.      Defendant Mattingly was the on-scene commander at 3003 Springfield during the events in question and the "Incident Commander (IC)" for purposes of LMPD SOP 8.1.17.

83.      As the IC at the scene, Defendant Mattingly was responsible for implanting and following the Incident Command System (ICS) pursuant to LMPD SOP 8.1.17.

84.      Defendant IC Mattingly was responsible for conducting a briefing with all of the Defendants serving the Search Warrant upon 3003 Springfield Drive Unit 4.

85.      Said briefing was to include a review of operations and procedures that the Defendants would follow, an analysis of conditions at the premises utilizing maps, charts and diagrams, tactics and equipment to be used in the event of forced entry, and a pre-planned

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000012 of 000140

AMC : 000012 of 000037

hospital route.

86.     Only when Defendant Mattingly himself was shot in the leg by Kenneth Walker did his LMPD co-Defendants at the chaotic scene discover that the "pre-planned" hospital route was blocked by a gate. Officers on the radio urged EMS to ram or drive through that gate.

87.     The "Summary of Events" mentioned in paragraph 76 above makes clear the finding that Defendant Hankison was not briefed on the conditions or layout of the premises being raided.

88.     Defendant Mattingly was not properly trained or supervised by LMPD and LouMetro to properly execute LMPD SOP 8.1 or to serve as Incident Commander.

89.     LMPD SOP 8.1.19 states clearly that "Officers may not seek a 'no-knock' search warrant merely to prevent the destruction of evidence."

90.     Defendant Joshua Jaynes stated in paragraph 15 of his Affidavit for Search Warrant (Exhibit 2) that "The Affiant is requesting a No-Knock entry to the premises due to the nature of how these drug traffickers operate. These drug traffickers have a history of attempting to destroy evidence, have cameras on the location that compromise Detectives once an approach to the dwelling is made, and have a history of fleeing from law enforcement."

91.     Jaynes directly violated LMPD SOP 8.1.19 by requesting "No-Knock" to prevent destruction of evidence.

92.     LMPD SOP 8.1.19 further reads: "All 'no-knock' warrants will be served by the SWAT Team."

93.     SWAT did not serve the Search Warrant upon 3003 Springfield Avenue Unit 4.

94.     The individual Defendants belonging to CID served the Search Warrant upon 3003 Springfield Avenue Unit 4.

95.     The individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles,

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000013 of 000140

AMC : 000013 of 000037

Campbell, and Hoover knew or should have known their collective actions in service of the "No-Knock" Search Warrant upon were in violation of LMPD SOP 8.1.19.

96.   The actions of individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell, and Hoover thus constituted a conspiracy under 42 U.S.C. §1985(3) to directly or indirectly deprive the Plaintiffs of the equal protection of the laws, or of equal privileges and immunities under the laws.

97.   LMPD and LouMetro failed to properly train and supervise individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell, and Hoover to prevent them from attempting to serve a "No-Knock" warrant without SWAT thereby subjecting the Plaintiffs to an unreasonable risk of death.

98.   LMPD and LouMetro acted with deliberate indifference to the internal conflicting goals and policies of SWAT and CID which resulted in the deadly events of March 13, 2020, and which subjected the Plaintiffs to terror and an unreasonable risk of death.

99.   LMPD and LouMetro acted with deliberate indifference to the ongoing and persistent violation of internal LMPD SOPs by CID which resulted in the deadly events of March 13, 2020, and which subjected the Plaintiffs to terror and an unreasonable risk of death.

100.   LMPD and LouMetro allowed such a climate of selective at-will violations of LMPD SOPs to exist and persist that it became the defacto policy of LMPD and LouMetro for Officers to selectively follow SOPs and other policies of LMPD and LouMetro.

101.   Said defacto climate of lax supervision and enforcement of policies and procedures of LMPD and LouMetro resulted in the deadly events of March 13, 2020, and subjected the Plaintiffs to terror and an unreasonable risk of death.

102.   LMPD and LouMetro negligently failed to train and monitor individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell, Hoover and Jaynes. This

14

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000014 of 000140

AMC : 000014 of 000037

failure constituted a policy, practice, or custom under *Monell v. New York City Department of Social Services.*

103.   "The Fourth Amendment, made applicable to the States by the Fourteenth, *Ker v. California*, 374 U.S. 23, 30 (1963), provides in pertinent part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . .'" *Soldal v. Cook County*, 506 U.S. 56, 61 (1992).   See also *Commonwealth v. Wasson*, 842 S.W.2d 487 (Ky. 1993).

104.   "In addition, we have emphasized that 'at the very core' of the Fourth Amendment "stands the right of a man to retreat into his own home." *Silverman v. United States*, 365 U.S. 505, 511 (1961). *See also Oliver v. United States*, 466 U.S. 170, 178-179 (1984); *Wyman v. James*, 400 U.S. 309, 316 (1971); *Payton v. New York*, 445 U.S. 573, 601 (1980)." *Soldal*, 506 U.S. at 61.

105.   The Plaintiffs "have a right not to be shot or shot at unless they are perceived as posing a threat to officers or others." *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006).

106.   The Plaintiffs were not a threat to the Defendants.

107.   The Plaintiffs were unarmed.

108.   The Plaintiffs' Unit 3 at 3003 Springfield Drive was not the target of the Search Warrant (Exhibit 2).

109.   The Plaintiffs were victims of excessive force used by the Defendants. *See also* Ky. Rev. Stat. § 431.025.

110.   "The Fourth Amendment's prohibition against unreasonable seizures protects citizens form excessive force by law enforcement officers." *Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

111.   "[T]he Fourth Amendment requires the amount of force to be objectively

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000015 of 000140

AMC : 000015 of 000037

reasonable under the totality of the particular circumstances." *Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386 (1989)).

112.    The Defendants' conduct the night of March 13, 2020, violated the Plaintiffs' clearly established constitutional right under *Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017).

113.    The Defendants' conduct the night of March 13, 2020, was required under the Fourth and Fourteenth Amendments to be articulable for a reason and thoughtful—not random, arbitrary and capricious. *Terry v. Ohio*, 392 U.S. 1 (1968).

114.    The failure of LMPD and LouMetro to train and supervise the individual Defendants with respect to the individual Defendants' securing the Search Warrant and its execution at 3003 Springfield Drive Unit 4 and the wild gunfight which ensued were random, arbitrary and capricious and lacking in thoughtfulness clearly violated the Fourth and Fourteenth Amendment rights of the Plaintiffs.

115.    Evidence of the unconstitutional LMPD and LouMetro training and supervision of the individual Defendants is seen in the policy of LMPD to teach its officers, including but not limited to the individual Defendants, that they are "An Avenger who carries out God's wrath" as told in the book of Romans from the Christian Bible.  See Exhibit 6.

116.    There is no secular purpose served by using Christian scripture as a basis for police training. *See Stone v. Graham*, 449 U.S. 39 (1980).  See also *Edwards v. Aguillard*, 462 U.S. 576 (1987) .

117.    The police training materials' reference to the Book of Romans cannot be characterized as "ceremonial deism." *Unified School Dist. v. Newdow*, 542 U.S. 1 (2004).  *See also American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook*, 375 F.3d 484 (6th Cir. 2004)

118.    Consequently, these police training manuals violated the Establishment Clause of

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000016 of 000140
AMC : 000016 of 000037

the First Amendment, as incorporated by the Due Process Clause of the Fourteenth Amendment.

119.    Wholly apart from violating constitutional prohibitions on an establishment of religion, police training materials resting explicitly on sectarian doctrine cannot shield LMPD or LouMetro from municipal liability under 42 U.S.C. §§ 1983 and 1985. Rather, such materials represent the very sort of policy, pattern of practice, or custom that gives rise to municipal liability.

120.    Individual police conduct in reliance upon such constitutionally flawed police training materials gives rise, of its own accord, to liability under 42 U.S.C. §§ 1983 and 1985.

121.    Exhibit 7 is the Spring 2017 LMPD Firearms Training Section presentation.

122.    The last page of Exhibit 7 is Exhibit 6 which shows the "Thin Blue Line" American Flag or the "Blue Lives Matter Flag" or the "anti-Black Lives Matter Flag" commonly associated with police solidarity against outside forces perceived as exigent threats and commonly associated with white Christian nationalism. See Exhibit 8 for further explanation.

123.    LMPD and LouMetro negligently failed to train and supervise its employees and officers, including but not limited to the individual Defendants, by providing firearms training alongside religious indoctrination as white Christian nationalists in violation of the Establishment Clause of the First Amendment as well as the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

124.    Explicit endorsement of Christian scripture and the Thin Blue Line flag, especially in concert with each other, gives rise to an inference that the individual and municipal Defendants intended to deprive Plaintiffs, directly or indirectly, of the equal protection of the laws, or of equal privileges and immunities under the law.

125.    The actions of the individual and municipal Defendants thus constituted a conspiracy under 42 U.S.C. §1985(3) to directly or indirectly deprive the Plaintiffs of the equal

17

protection of the laws, or of equal privileges and immunities under the laws

126.    LMPD and LouMetro as a matter of policy (as defined by *Monell*) knowingly approved of and recklessly trained its employees and officers, including but not limited to the individual Defendants, that they were above secular laws, the laws of the United States and the laws of the Commonwealth of Kentucky because they were members of the "Thin Blue Line" and servants of God and avengers carrying out His wrath upon wrongdoers as foretold in the Bible.

127.    All Defendants were state actors acting under color of state law.

## COUNT I
### 42 U.S.C. § 1983 (Fourth and Fourteenth Amendments – Excessive Force)
### Individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell, and Hoover

128.    All previous paragraphs are incorporated herein by reference as though fully set forth.

129.    Plaintiffs make a claim under 42 USC § 1983 for violation of the Fourth Amendment of the U.S. Constitution.

130.    "The Fourth Amendment's prohibition against unreasonable seizures protects citizens form excessive force by law enforcement officers." *Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

131.    Excessive force is evaluated by an objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386 (1989).

132.    " [T]he Fourth Amendment requires the amount of force to be objectively reasonable under the totality of the particular circumstances." *Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386 (1989)).

133.    The individual Defendants' use of force against Plaintiffs was not reasonable

18

under the circumstances and was excessive.

134.    The individual Defendants' excessive use of force was motivated  purposefully by religion and racism.

135.    Wherefore, as a direct and proximate result of the actions of individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell and Hoover, Plaintiffs have suffered damages in an amount meeting or exceeding the statutory threshold necessary for the jurisdiction of this Court.

### COUNT II
### 42 U.S.C. §§ 1983 and  1985: LouMetro, LMPD and Chief Conrad

136.    All previous paragraphs are incorporated herein by reference as though fully set forth.

137.    Municipal bodies are liable for constitutional violations under 42 U.S.C. §§ 1983 and 985 when execution of its official policy or custom deprives an individual of its rights protected under the Constitution. *Monell*, 436 U.S. at 694-95.

138.    The deficiency in training of the individual Defendants by LouMetro and LMPD actually caused the police officers' indifference to Plaintiffs safety, rights, privileges and immunities under law. *Canton v. Harris*, 489 U.S. 378, 379 (1989).

139.    The failure of LouMetro and LMPD to train the individual Defendants in all relevant respects concerning search warrants, LMPD SOPs, excessive force and that Officers are avengers of God bringing His wrath is reckless, intentional or grossly negligent with respect to the constitutional rights of persons with whom the police come into contact such as the Plaintiffs. *Canton v. Harris*, 489 U.S. 378, 379 (1989) (citing *Monell*).

140.    Such municipal liability exists where a city fails to properly train, supervise, and discipline its employees amounting in a deliberate indifference to one's constitutional rights. *See*

19

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000019 of 000140

AMC : 000019 of 000037

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989); *Pembaur v. Cincinnati*, 475 U.S. 469

(1986); *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989); *Brown v. Chapman*, 814

F.3d 447, 463 (6th Cir. 2016) ("[W]e have interpreted *City of Canton v. Harris* "as recognizing

at least two situations in which inadequate training could be found to be the result of deliberate

indifference." *Cherrington v. Skeeter,* 344 F.3d 631, 646 (6th Cir.2003). " 'One is failure to

provide adequate training in light of foreseeable consequences that could result from the lack of

instruction,' as would be the case, for example, if a municipality failed to instruct its officers in

the use of deadly force," and a second is " 'where the city fails to act in response to repeated

complaints of constitutional violations by its officers.' " *Id.* (quoting *Brown v. Shaner,* 172 F.3d

927, 931 (6th Cir.1999) ).")*Brown v. Chapman*, 814 F.3d 447 (6th Cir. 2016); *Cherrington v.*

*Skeeter*, 344 F.3d 631 (6th Cir. 2003); *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992)

*Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985); *Wellington v. Daniels*, 717 F.2d 932,

936 (4th Cir. 1983).

141.    At all times relevant, Defendant LouMetro and the LMPD had a duty to properly

train, supervise, and discipline their employees and agents such as individual Defendants.

142.    Defendants LouMetro and LMPD breached that duty, in part, by:

   a.  Improperly training, authorizing, encouraging or directing officers on proper use of force.
   b.  Failing to investigate allegations of excessive force.
   c.  Failing to discipline officers for violations of policy related to excessive force.
   d.  Training officers they are Biblical "avengers who carry out God's wrath"
   e.  Improperly training, authorizing, encouraging or directing officers to obtain search warrants
   f.  Improperly training, authorizing, encouraging or directing officers to implement and adhere to LMPD SOP 8.1 Chapter: Field Operations, Subject: Search Warrants
   g.  Improperly training, authorizing, encouraging or directing officers in CID and SWAT to resolve conflicting policies and goals and allowing a condition of internal conflicting CID and SWAT policies to persist to the point of death and unreasonable risk of

20

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000020 of 000140

AMC : 000020 of 000037

death the Plaintiffs on the night of March, 13, 2020

143.    The unreasonable risk of death to innocent bystanders such as Plaintiffs and other injuries were foreseeable consequences that could result from the lack of instruction, training and supervision of the individual Defendants by LouMetro and LMPD. *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) .

144.    The policy, pattern of practice, or custom of condoned misconduct is tacitly or overtly sanctioned, as evidenced by the conduct of individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell, Hoover and Jaynes and the Defendant entities' failure to train, supervise, investigate, and discipline any of the officers involved in this incident (other than Hankison).

145.    The transparent effort to shift blame to Defendant Hankinson notwithstanding, Defendants LouMetro and LMPD violated Plaintiffs' constitutional rights.

146.    This unconstitutional behavior of individual Defendants is carried out pursuant to a policy, pattern of practice, or custom, whether formal or informal. It therefore violates the constitutional rights of persons situated such as the Plaintiffs.

147.    Defendants LouMetro, LMPD and Chief Steve Conrad failed to take sufficient remedial actions to end this policy, pattern of practice, or custom within the LMPD, CID and SWAT.

148.    The condoning of misconduct, and the failure to end this policy, pattern of practice, or custom were a proximate cause of the injuries suffered by Plaintiffs.

149.    Wherefore, as a direct and proximate cause of the actions of the Defendants, Plaintiffs have suffered damages in an amount meeting or exceeding the statutory threshold necessary for this Court to exercise jurisdiction over this case.

### COUNT III
### 42 U.S.C. § 1983 (Fourth Amendment – Duty to Intervene)

21

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000021 of 000140

AMC : 000021 of 000037

**Individual Defendants Hankison, Cosgrove, Mattingly,
James, Nobles, Campbell, and Hoover**

150.   All previous paragraphs are incorporated herein by reference as though fully set forth.

151.   Plaintiffs bring this claim under 42 USC § 1983 for violation of the Fourth Amendment of the U.S. Constitution.

152.   Defendant Hankison's use of force against Plaintiffs was excessive.

153.   Defendants Cosgrove, Mattingly, James, Nobles, Campbell and Hoover had a duty to intervene and protect Plaintiffs but failed to do so in violation of *Putman v. Gerloff*, 639 F.2d 415 (8th Cir. 1981). *Barton v. City of Lincoln Park*, No. 17-1073, at *7 (6th Cir. Mar. 1, 2018) ("the officer may be liable where the officer supervised the offending officer or owed the plaintiff a duty of protection. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Generally, a police officer will be liable for breaching a duty of protection when "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Id.* (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).")Wherefore, as a direct and proximate result of individual Defendants Cosgrove, Mattingly, James, Nobles, Campbell and Hoover's actions or inactions, Plaintiffs have suffered damages in an amount meeting or exceeding the statutory threshold necessary for this Court to exercise jurisdiction over this case..

**COUNT IV**

**Intentional Torts: Assault, Battery, False Arrest, False Imprisonment, Intentional
Infliction of Emotional Distress
against Individually-named Defendants**

154.   All previous paragraphs are incorporated herein by reference as though fully set forth.

22

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000022 of 000140

AMC : 000022 of 000037

155. All of the individual Defendants named in this Complaint are employees, deputies and/or agents of municipalities.

156. All acts of the individual Defendants alleged above were conducted within the scope of the Defendants' employment or duties.

157. The actions of the individual Defendants were willful, malicious and in violation of the known rights of Plaintiff.

158. On March 13, 2020, Defendant Hankison committed assault and battery upon Plaintiffs when he intentionally pointed and fired his loaded gun at Plaintiffs, and inflicted bodily harm by causing drywall fragments, wood splinters and/or broken glass to hit Plaintiff Cody Etherton several times.

159. On March 13, 2020, individual Defendants committed assault against Plaintiffs by engaging in a gunfight outside their apartment causing bullets to enter Plaintiffs' apartment and causing emotional pain and suffering and great fear of imminent physical injury.

160. Defendant Hankison, without probable cause or articulated suspicion, wildly and randomly shot his gun into Plaintiffs' apartment.

161. The individual Defendants falsely imprisoned Plaintiffs in their apartment. Plaintiff's false imprisonment continued for approximately two hours as the individual Defendants attempted to clean up the chaotic mess they created while failing to check on the safety and well-being of the Plaintiffs.

162. All Plaintiffs remained cowering and falsely imprisoned in their apartment after Plaintiff Cody Etherton was ordered to go back inside.

163. At all times, Plaintiffs knew that they were imprisoned by the individual Defendants.

23

164.    Defendants' conduct was intentional and done through the assertion of legal authority over Plaintiffs.

165.    Defendants' extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiffs.

166.    Wherefore, as a direct and proximate cause of the actions of Defendants, Plaintiff has suffered damages in an amount meeting or exceeding the statutory threshold necessary for this Court to exercise jurisdiction over this case..

### COUNT V
**Negligence: Negligent Hiring, Negligent Retention, Negligent Supervision, Negligent Infliction of Emotional Distress, Negligence Per Se and Strict Liability against LMPD, LouMetro and Individual Defendants**

167.    All previous paragraphs are incorporated herein by reference as though fully set forth.

168.    All of the individual Defendants named in this Complaint are employees, deputies and/or agents of municipalities.

169.    All acts of the individual Defendants alleged above were conducted within the scope of the Defendants' employment or duties.

170.    Defendants LouMetro and LMPD owed a duty of care to Plaintiffs to exercise reasonable care in hiring, retaining, and supervising its employees.

171.    Defendants LouMetro and LMPD knew or should have known of Defendant Hankison's and Defendant Mattingly's dangerous character based on prior complaints of excessive force violations and/or background checks including psychological evaluations.

172.    Defendants LouMetro and LMPD knew or should have known of the conflicting CID and SWAT internal policies and goals with respect to sanctity of life versus preservation of evidence, including the failure of CID officers, including but not limited to the individual

24

Filed          20-CI-003067     11/04/2020        David L. Nicholson, Jefferson Circuit Clerk

Defendants, to follow LMPD Standard Operating Procedures with respect to procurement of search warrants, "No-Knock" warrants, the role of SWAT in service thereof, and the use of excessive force.

173.  Defendants LouMetro and LMPD breached their duty of care to Plaintiffs by failing to properly supervise, provide training, and take remedial measures, such as discharge or reassignment, against their employees to ensure the safety of Plaintiffs.

174.  Defendants LouMetro and LMPD breached their duty of care to ensure the safety of Plaintiffs by failing to properly supervise, provide training, and take remedial measures to stop training and/or teaching LMPD officers, including but not limited to the individual Defendants, that they are avengers who carry out God's wrath according to the book of Romans in the Christian Bible and they are not acting in the service of the "Thin Blue Line" or "Blue Lives Matter" political and/or White Christian Nationalist movement.

175.  Defendants Chief Steve Conrad (Ret.), Lt. Jerry Huckleberry and Defendant Mattingly were superior officers to Defendants Jaynes, Hankison and the other individual Defendants.  Each owed Plaintiffs a duty of care to properly supervise Defendants Jaynes and Hankison and the other individual Defendants with respect to procurement and implementation of the search warrant process according to LMPD SOP, especially SOP 8.1, as well as the mandatory involvement of SWAT in serving a "No-Knock" warrant and the use of excess force considering the foreseeable consequences thereof.

176.  All individual Defendants breached their duty of care by not properly supervising *each other* the night of March 13, 2020, when they negligently served a search warrant in the absence of SWAT and in violation of LMPD SOP 8.1 when the Plaintiffs where subjected to unreasonable risk of death and injury.

177.  All individual Defendants acted in an objectively unreasonable fashion. They

25

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000025 of 000140

AMC : 000025 of 000037

Filed          20-CI-003067     11/04/2020      David L. Nicholson, Jefferson Circuit Clerk

engaged in ultrahazardous activity as contemplated and defined by the Kentucky Supreme Court in *Randall v. Shelton*, 293 S.W.2d 559 (Ky. Ct. App. 1956) by firing their guns into and at the Plaintiffs apartment for no legitimate reason toward the Plaintiffs. Accordingly, they are strictly liable.

178.   As a result of Defendants' negligent acts, Plaintiffs reasonably feared for their safety and have suffered severe emotional distress.

179.   Wherefore, as a direct and proximate cause of the actions of Defendants, Plaintiff has suffered damages in an amount meeting or exceeding the statutory threshold necessary for this Court to exercise jurisdiction over this case..

**COUNT VI**
**42 U.S.C. § 1985(3)**
**(Fourth and Fourteenth Amendment – Conspiracy**
**and Duty to Intervene)**
**Individual Defendants Hankison, Cosgrove, Mattingly,**
**James, Nobles, Campbell, and Hoover**

180.   All previous paragraphs are incorporated herein by reference as though fully set forth.

181.   Plaintiffs bring this claim under 42 USC § 1985(3) for violations of the Fourth and Fourteenth Amendments of the U.S. Constitution.

182.   Individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell, and Hoover knew or should have known their collective actions in service of the "No-Knock" Search Warrant the night of March 13, 2020, were in violation of LMPD SOP 8.1.19 thus rising to the level of conspiracy under 42 U.S.C. §1985(d) to directly or indirectly deprive the Plaintiffs of the equal protection of the laws, or of equal privileges and immunities under the laws.

183.   Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell and Hoover had a duty to intervene with *each other* and protect Plaintiffs but failed to do so in

Filed          20-CI-003067     11/04/2020      David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000026 of 000140

AMC : 000026 of 000037

Filed        20-CI-003067     11/04/2020        David L. Nicholson, Jefferson Circuit Clerk

violation of *Barton v. City of Lincoln Park,* No. 17-1073, at *7 (6th Cir. Mar. 1, 2018) ("the officer may be liable where the officer supervised the offending officer or owed the plaintiff a duty of protection. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Generally, a police officer will be liable for breaching a duty of protection when "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Id.* (citing *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994)).").

184.    Wherefore, as a direct and proximate result of individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell and Hoover's actions or inactions, Plaintiffs have suffered damages in an amount meeting or exceeding the statutory threshold necessary for this Court to exercise jurisdiction over this case..

**COUNT VII**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985(3)**
**(First and Fourteenth Amendments – Establishment Clause)**
**Individual Defendants Hankison, Cosgrove, Mattingly,**
**James, Nobles, Campbell, and Hoover**

185.    All previous paragraphs are incorporated herein by reference as though fully set forth.

186.    Plaintiffs bring this claim under 42 USC § 1983 and 42 USC § 1985(3) for violations of the First Amendment prohibition against establishment of religion.

187.    There is no secular purpose served by using Christian scripture as a basis for police training. *See Stone v. Graham*, 449 U.S. 39 (1980). See also *Edwards v. Aguillard*, 462 U.S. 576 (1987) .

188.    The LMPD training materials' reference to the Book of Romans cannot be characterized as "ceremonial deism." *Unified School Dist. v. Newdow*, 542 U.S. 1 (2004). *See*

Filed        20-CI-003067     11/04/2020        David L. Nicholson, Jefferson Circuit Clerk
06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000027 of 000140

AMC : 000027 of 000037

*also American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook*, 375 F.3d 484 (6th Cir. 2004)

189.    Consequently, these police training manuals violated the Establishment Clause of the First Amendment, as incorporated by the Due Process Clause of the Fourteenth Amendment.

190.    Wholly apart from violating constitutional prohibitions on an establishment of religion, police training materials resting explicitly on sectarian doctrine cannot shield LMPD or LouMetro from municipal liability under 42 U.S.C. §§ 1983 and 1985. Rather, such materials represent the very sort of policy, pattern of practice, or custom that gives rise to municipal liability.

191.    Individual police conduct in reliance upon such constitutionally flawed police training materials gives rise, of its own accord, to liability under 42 U.S.C. §§ 1983 and 1985.

192.    Individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell, and Hoover knew or should have known their collective actions in service of the "No-Knock" Search Warrant the night of March 13, 2020, motivated by religious and racist purposes and training as avengers of God bringing His wrath were in violation of the First Amendment Establishment Clause thus rising to the level of conspiracy under 42 U.S.C. §1985(d) to directly or indirectly deprive the Plaintiffs of the equal protection of the laws, or of equal privileges and immunities under the laws.

193.    Wherefore, as a direct and proximate result of individual Defendants Hankison, Cosgrove, Mattingly, James, Nobles, Campbell and Hoover's actions or inactions, Plaintiffs have suffered damages in an amount meeting or exceeding the statutory threshold necessary for this Court to exercise jurisdiction over this case.

**COUNT VIII**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985(3)**
**(First and Fourteenth Amendments – Establishment Clause)**

28

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000028 of 000140

AMC : 000028 of 000037

Filed          20-CI-003067      11/04/2020        David L. Nicholson, Jefferson Circuit Clerk

## Municicpal Defendants LouMetro and LMPD

194.    All previous paragraphs are incorporated herein by reference as though fully set forth.

195.    Plaintiffs bring this claim under 42 USC § 1983 and 42 USC § 1985(3) for violations of the First Amendment prohibition against establishment of religion.

196.    There is no secular purpose served by using Christian scripture as a basis for police training. *See Stone v. Graham*, 449 U.S. 39 (1980).  See also *Edwards v. Aguillard*, 462 U.S. 576 (1987) .

197.    The LMPD training materials' reference to the Book of Romans cannot be characterized as "ceremonial deism." *Unified School Dist. v. Newdow*, 542 U.S. 1 (2004). *See also American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook*, 375 F.3d 484 (6th Cir. 2004)

198.    Consequently, these police training manuals violated the Establishment Clause of the First Amendment, as incorporated by the Due Process Clause of the Fourteenth Amendment.

199.    Wholly apart from violating constitutional prohibitions on an establishment of religion, police training materials resting explicitly on sectarian doctrine cannot shield LMPD or LouMetro from municipal liability under 42 U.S.C. §§ 1983 and 1985. Rather, such materials represent the very sort of policy, pattern of practice, or custom that gives rise to municipal liability.

200.    Municipal policy under *Monell*  in reliance upon such constitutionally flawed police training materials gives rise, of its own accord, to liability under 42 U.S.C. §§ 1983 and 1985.

201.    Municipal Defendants LouMetro and LMPD knew or should have known their collective and official policy and customs in training Officers to be motivated by religious and

29

06173379-81C7-4619-BBA3-656CFAC3EDA4 : 000029 of 000140

AMC : 000029 of 000037

racist purposes and training Officers as avengers of God bringing His wrath were in violation of

the First Amendment Establishment Clause thus rising to the level of conspiracy under 42 U.S.C.

§1985(d) to directly or indirectly deprive the Plaintiffs of the equal protection of the laws, or of

equal privileges and immunities under the laws.

202.    Wherefore, as a direct and proximate result of Municipal Defendants official

policies, customs, actions or inactions, Plaintiffs have suffered damages in an amount meeting or

exceeding the statutory threshold necessary for this Court to exercise jurisdiction over this case.

**COUNT IX**
**§§ 1, 2, 10, and 14 of the Bill of Rights**
**of the Kentucky Constitution), Right Privacy**
**and Negligence Per Se**
**Individual Defendants Hankison, Cosgrove, Mattingly,**
**James, Nobles, Campbell, and Hoover**

203.    All previous paragraphs are incorporated herein by reference as though fully set

forth.

204.    Plaintiffs bring this claim under Ky. Rev. Stat. § 431.025 and Ky. Rev. Stat. §

446.070 for violations of §§ 1, 2, 10, and 14 of the Bill of Rights of the Kentucky Constitution.

205.    Ky. Rev. Stat. § 431.025(3) reads "No unnecessary force or violence shall be used

in making an arrest."

206.    Ky. Rev. Stat. § 431.025(3) reads "an" arrest.

207.    Ky. Rev. Stat. § 431.025(3) does not say "THE" arrest being theoretically

discussed in subsections (1)) and (2) above.

208.    "An" arrest contemplates there may be innocent bystanders while "an" arrest is

being made and their safety and security is contemplated by the prohibition against "unnecessary

force or violence."

209.    Plaintiffs were subjected to an unreasonable risk of death and injured physically

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000030 of 000140

AMC : 000030 of 000037

Filed          20-CI-003067      11/04/2020      David L. Nicholson, Jefferson Circuit Clerk

and emotionally by individual Defendants' in making an arrest.

210.            Black's Law Dictionary (10th ed. 2014) defines "warrant" as "[a] writ directing or authorizing someone to do an act, esp. one directing a law enforcer to make an arrest, a search, or a seizure." Black's also defines "arrest" as "1. [a] seizure or forcible restraint, esp. by legal authority. 2. The taking or keeping of a person in custody by legal authority, esp. in response to a criminal charge." *Commonwealth v. Tapp*, 497 S.W.3d 239, 243 (Ky. 2016).

211.            Ky. Rev. Stat. § 446.070 allows "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

212.            Ky. Rev. Stat. §446.070 establishes negligence per se against individual Defendants by violation of Ky. Rev. Stat. § 431.025(3).

213.            Plaintiffs' right to privacy under the Kentucky Constitution as established and recognized by the Kentucky Supreme Court in *Commonwealth v. Wasson*, 842 S.W.2d 487 (Ky. 1993) was violated by use of excessive force in making an arrest by the shooting of guns into Plaintiffs' apartment in violation of Ky. Rev. Stat. § 431.025(3) pursuant to the negligence per se under Ky. Rev. Stat. § 446.070.

214.            Plaintiffs' rights under §§ 1, 2, 10, and 14 of the Bill of Rights of the Kentucky Constitution were violated by use of excessive force in making an arrest by the shooting of guns into Plaintiffs' apartment in violation of Ky. Rev. Stat. § 431.025(3) pursuant to the negligence per se under Ky. Rev. Stat. § 446.070

215.            Wherefore, as a direct and proximate result of individual Defendants'actions or inactions, Plaintiffs have suffered damages in an amount meeting or exceeding the statutory threshold necessary for this Court to exercise jurisdiction over this case.

## COUNT X
### §§ 1, 2, 10, and 14 of the Bill of Rights

Filed          20-CI-003067      11/04/2020      David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000031 of 000140

AMC : 000031 of 000037

### of the Kentucky Constitution), Right Privacy
### and Negligence Per Se
### Municipal Defendants LouMetro and LMPD

216.   All previous paragraphs are incorporated herein by reference as though fully set forth.

217.   Plaintiffs bring this claim under Ky. Rev. Stat. § 431.025 and Ky. Rev. Stat. § 446.070 for violations of §§ 1, 2, 10, and 14 of the Bill of Rights of the Kentucky Constitution.

218.   Ky. Rev. Stat. § 431.025(3) reads "No unnecessary force or violence shall be used in making an arrest."

219.   Ky. Rev. Stat. § 431.025(3) reads "an" arrest.

220.   Ky. Rev. Stat. § 431.025(3) does not say "THE" arrest being theoretically discussed in subsections (1)) and (2) above.

221.   "An" arrest contemplates there may be innocent bystanders while "an" arrest is being made and their safety and security is contemplated by the prohibition against "unnecessary force or violence."

222.   Plaintiffs were subjected to an unreasonable risk of death and injured physically and emotionally by Municipal Defendants' failure to train and supervise individual Defendants in making an arrest and using excessive force.

223.   Black's Law Dictionary (10th ed. 2014) defines "warrant" as "[a] writ directing or authorizing someone to do an act, esp. one directing a law enforcer to make an arrest, a search, or a seizure." Black's also defines "arrest" as "1. [a] seizure or forcible restraint, esp. by legal authority. 2. The taking or keeping of a person in custody by legal authority, esp. in response to a criminal charge." *Commonwealth v. Tapp*, 497 S.W.3d 239, 243 (Ky. 2016).

224.   Ky. Rev. Stat. § 446.070 allows "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although

a penalty or forfeiture is imposed for such violation."

225.       Ky. Rev. Stat. §446.070 establishes negligence per se against Municipal Defendants by violation of Ky. Rev. Stat. § 431.025(3).

226.       Plaintiffs' right to privacy under the Kentucky Constitution as established and recognized by the Kentucky Supreme Court in *Commonwealth v. Wasson*, 842 S.W.2d 487 (Ky. 1993) was violated by Municipal Defendants' failure to train and supervise the individual Defendants regarding the use of excessive force and the foreseeable consequences thereof in making an arrest by the shooting of guns into Plaintiffs' apartment in violation of Ky. Rev. Stat. § 431.025(3) pursuant to the negligence per se under Ky. Rev. Stat. § 446.070.

227.       Plaintiffs' rights under §§ 1, 2, 10, and 14 of the Bill of Rights of the Kentucky Constitution were violated by use of excessive force in making an arrest by the shooting of guns into Plaintiffs' apartment in violation of Ky. Rev. Stat. § 431.025(3) pursuant to the negligence per se under Ky. Rev. Stat. § 446.07.

228.       Wherefore, as a direct and proximate result of Municipal Defendants official policies, customs, actions or inactions, Plaintiffs have suffered damages in an amount meeting or exceeding the statutory threshold necessary for this Court to exercise jurisdiction over this case.

**COUNT XI**
**§ 5 of the Bill of Rights of the Kentucky Constitution**
**Right of Religious Freedom**
**Municipal Defendants LouMetro and LMPD**

229.   All previous paragraphs are incorporated herein by reference as though fully set forth.

230.   Plaintiffs bring this claim under § 5 of the Bill of Rights of the Kentucky Constitution.

231.   § 5 of the Bill of Rights of the Kentucky Constitution reads in part (…"the civil

33

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000033 of 000140

AMC : 000033 of 000037

rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching."

232.    LouMetro and LMPD training materials based on the Christian Bible and pursuant to which Officers are trained that they are avengers of God bringing His wrath is a fundamental violation of § 5 of the Bill of Rights of the Kentucky Constitution..

233.    Plaintiffs' rights under § 5 of the Bill of Rights of the Kentucky Constitution were violated by use of excessive force resulting from lack of training and supervision of Officers and training of Officers by Municipal Defendants that the Officers were avengers of God and bringing His wrath in making an arrest by the shooting of guns into Plaintiffs' apartment in violation of Ky. Rev. Stat. § 431.025(3) pursuant to the negligence per se under Ky. Rev. Stat. § 446.07.

234.    Plaintiffs were subjected to an unreasonable risk of death and injured physically and emotionally by Municipal Defendants' failure to train and supervise individual Defendants in making an arrest and using excessive force and training the Officers they were avengers of God and bringing His wrath in violation of § 5 of the Bill of Rights of the Kentucky Constitution.

235.    Wherefore, as a direct and proximate result of Municipal Defendants official policies, customs, actions or inactions, Plaintiffs have suffered damages in an amount meeting or exceeding the statutory threshold necessary for this Court to exercise jurisdiction over this case.

## DECLARATORY RELIEF

236.    This suit involves an actual controversy within the Court's jurisdiction and the Court may declare the rights of Plaintiff under the Constitution and laws of the United States and the laws of the Commonwealth of Kentucky and grant such relief as necessary and proper.

34

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000034 of 000140

AMC : 000034 of 000037

Plaintiff seeks declaratory relief on his behalf.

237.    Plaintiff seeks declaratory judgment that Defendants' policies, pattern of practices, customs, lack of supervision, failure to train, acts, and omissions described herein violate the Fourth Amendment to the U.S. Constitution and constitute excessive force in violation of Kentucky state law and federal law.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiffs and against the Defendants, and grant the following:

A.    Enter a declaratory judgment on behalf of Plaintiffs that Defendants' policies, pattern of practices, customs, lack of supervision, failure to train, acts, and omissions, described herein, constituted excessive force in violation of the Fourth Amendment and in violation of Kentucky state law and federal law;

B.    Plaintiff seeks declaratory judgment that Defendants' training materials based on the Christian Bible herein violate the First and Fourteenth Amendments to the U.S. Constitution.

C.    Enter an Order that the Louisville/Jefferson Country Metro Government shall submit to this Court's oversight (the structure of which shall be determined by the Court) the Louisville Metro Police Department for a period of no less than twenty-four months and no more than thirty-six months for purposes of approving and monitoring training and adherence to Standard Operating Procedures, Community Engagement, Excessive Force complaints and ensuring that no internal or external training or outside influence from the River City Fraternal Order of Police Lodge No. 614, Inc., contains, references or impliesany establishment of religion in violation of the Establishment Clause of the First Amendment or any teachings that LMPD officers are warriors of God or avengers of God's wrath according to the Bible, Quran or Torah or any other religiously-associated text.

35

D.      Enter judgment on behalf of Plaintiffs against Defendants for reasonable actual

damages in the amount of $12,000,001.00 to compensate them for the violation of their First

Amendment, Fourth Amendment, Eighth Amendment, and Fourteenth Amendment rights, rights

under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 and rights under Kentucky state law;

E.      Permanently enjoin and prohibit Defendants from interfering with Plaintiffs'

constitutional rights. Specifically, to enjoin Defendants from:

        a.      Retaliating against Plaintiffs or their family or attorneys for bringing this
            lawsuit; and

        b.      Subjecting Plaintiffs to excessive force in the future.

F.

        Order Defendants to pay punitive and other exemplary damages in the amount of

$12,000,001.00 based on claims under First Amendment, Fourth Amendment, Eighth Amendment,

and Fourteenth Amendment rights, rights under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 and rights

under Kentucky state law;

G.      Order Defendants to pay Plaintiff's attorneys' fees and costs as authorized by 42

U.S.C. §1988; pre-judgement interest and any other relief deemed necessary and proper;

H.      For punitive damages under state law in the amount of $12,000,001.00; and

I.      Grant all other and additional relief to which Plaintiffs may be entitled.

J.      In accordance with *Fratzke v. Murphy*, 12 S.W.3d 269 (Ky. 2000) Plaintiffs will

        not seek nor accept a total award of damages in excess of or greater than

        $36,000,003.00

Dated: November 4, 2020                By:___ s/Jeffrey A. Sexton_____
                                Jeffrey A. Sexton, Attorney
                                Pirata PSC d/b/a Jeffrey A. Sexton, Attorney
                                John W. Byrnes, Attorney
                                325 W. Main St., Ste. 150
                                Louisville, KY 40202

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

jsexton@jeffsexton.com

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000037 of 000140

AMC : 000037 of 000037

37

Filed          20-CI-003067  05/04/2020          David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

CIVIL ACTION NO.                                    JEFFERSON CIRCUIT COURT
                                                    CIRCUIT DIVISION
                                                    JUDGE

CHELSEY NAPPER
-and-
CODY ETHERTON
-and-
CHELSEY NAPPER, legal guardian, mother
and next friend of minor Zayden Flournoy                        PLAINTIFFS

vs.                          **COMPLAINT**

BRETT HANKISON
2203 Wendell Avenue
Louisville, KY 40205

-and-

MYLES COSGROVE
2844 Brookdale Avenue
Louisville, KY 40220

-and-

JONATHAN MATTINGLY
8913 Meadow Street Way
Louisville, KY 40228                                            DEFENDANTS

** ** ** ** **

I.      **PRELIMINARY STATEMENT**

1.  At 12:30 a.m. on March 13, 2020 Chelsey Napper, Zayden Flournoy and Cody
    Etherton were asleep in their apartment. Chelsey and Cody were set to go to work
    later that morning. While Chelsey, Cody and Zayden were sleeping peacefully, the
    three Defendants arrived in their neighborhood in plain clothes in unmarked
    vehicles. These Defendants were working within the criminal interdiction unit of the
    Louisville Metro Police Department (LMPD). The Defendants had a knock and
    announce warrant for the apartment immediately next door to Chelsey Napper's
    apartment. The Defendant officers were searching for an individual who lived in a

Presiding Judge: HON. JUDITH MCDONALD BURKMAN (630153)          06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000038 of 000140

GEOM : 000001 of 000011

Filed          20-CI-003067   05/20/2020          David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

different part of Louisville. The Defendant officers had an ambulance staged around the corner from the apartment immediately next door to Chelsey Napper's apartment. The Defendant officers did not defer to the LMPD SWAT unit for execution of the warrant. Furthermore, the individual that the officers were seeking had already been apprehended by LMPD earlier that morning at his own home. As the Defendant officers approached the apartment immediately next door to Chelsey Napper's apartment, they did so in a manner that kept them from being detected by neighbors. The officers then entered the apartment immediately next door to Chelsey Napper's apartment without knocking and without announcing themselves as police officers. The Defendants then proceeded to spray gunfire into Chelsey Napper's apartment with a total disregard for the value of human life. Shots were blindly fired by the officers all throughout Chelsey Napper's home. A bullet that was shot from the Defendant police officer's gun flew inches past Cody Etherton's head while he was in the hallway of Chelsey Napper's apartment. Neither Chelsey Napper, Cody Etherton nor Zayden Flournoy posed a threat to the officers and did nothing to deserve their apartment being shot full of bullets and having to experience the anxiety, angst, emotional distress, stress and trauma that they went through that early morning. The Plaintiffs bring this personal injury action in order to obtain damages resultant from the Defendants' unlawful conduct, which directly and proximately caused this young family to endure post-traumatic stress. Chelsey was pregnant at the time of this unlawful intrusion into her home by the Defendants.

## II.   JURISDICTION AND VENUE

2. Jurisdiction and venue are proper due to the location of the incident, the claimed damages and the matters in controversy.

## III.   THE PARTIES

3. Plaintiffs are Chelsey Napper, Cody Etherton and Zayden Flournoy, all residents at 3003 Springfield Drive, Apartment #3, Louisville, Kentucky.

4. Defendants Brett Hankison, Myles Cosgrove, and Jonathan Mattingly were, at all times relevant to this action, employees of Louisville Metropolitan Government who

Presiding Judge: HON. JUDITH MCDONALD BURKMAN (630153)          06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000039 of 000140

GEDM : 000002 of 000011

Filed          20-CI-003067   05/04/2020          David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

worked as police officers in the Louisville Metropolitan Police Department. They are

each sued in their individual capacities.

## IV.    <u>FACTS</u>

5.   Chelsey Napper's apartment was not the subject of the warrant that was issued that

LMPD possessed.

6.   The Defendants were each working at the time.

7.   Defendant Mattingly was an LMPD sergeant at the time that the bullets entered

Chelsey Napper's apartment.

8.   Defendant Cosgrove was an LMPD officer at the time bullets entered Chelsey

Napper's apartment.

9.   Cosgrove has a prior history of shooting a Louisville resident seven times.

10.  Defendant Hankison was an LMPD officer at the time  that the bullets entered

Chelsey Napper's apartment.

11.  Defendant Hankison has a prior history of unnecessary force and corruption within

his employment.

12.  Hankison's documented use of force history within LMPD is pages long,

documenting dozens of situations where he has sent citizens to the hospital for

injuries from being tased, pepper sprayed and struck repeatedly in the nose and

eyes. Hankison has taken out his anger both while on the job and during off-duty

security detail at bars on Shelbyville Road. He has a history of fighting citizens,

breaking out car windshields with flashlights, and punching citizens with such force

that Hankison himself has needed stiches in his hand.

13.  The Defendant officers, in the early morning of March 13, 2020 had a warrant that

they were going to execute at the apartment immediately next door to Chelsey

Napper's apartment.

14.  LMPD requires that a Risk Assessment matrix (LMPD #05-0016) be completed prior

to the service of all search warrants.[1]

---

[1] Louisville Metro Police Department Standard Operating Procedures (SOP) 8.1.13.

Filed          20-CI-003067   11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed     20-CI-003067   05/20/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed        20-CI-003067   05/20/2020        David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

15. This is a ministerial duty of all LMPD officers.

16. There is a ministerial duty imposed upon LMPD commanding officers to complete an Arrest/Search Warrant Information Sheet (LMPD #05-0023) and notify the Special Weapons and Tactics (SWAT) Team Commander to coordinate a response if:

    a. The Risk Assessment Matrix score necessitates the use of the SWAT unit; or

    b. The situation requires a mandatory SWAT unit call-out, as listed on the RISK Assessment Matrix, regardless of the score.[2]

17. The Defendants, none of whom were assigned to the SWAT unit at the time of the subject incident, each had a ministerial duty to refrain from executing the warrant if either of the factors in paragraphs 26(a) or 26 (b) above were present.

18. The Defendants did not adhere to this duty.

19. Defendant Mattingly, as the commanding officer in charge of executing the warrant, had a ministerial duty to complete a Search Warrant Operations Plan form (LMPD #05-0025).[3]

20. Prior to warrant service, Defendant Mattingly, as the acting Incident Commander (IC) for service of the search warrant, was required to implement and follow the Incident Command System (ICS). Mattingly was required to conduct a briefing with all search team personnel included:

    a. A review of operating procedures that the search personnel will follow.

    b. An analysis of conditions at the premises utilizing maps, charts, and diagrams, when appropriate.

    c. Tactics and equipment that are to be used in the event of forced entry.

    d. A pre-planned hospital route.

21. The Defendants did not adhere to this duty, as evidenced by the fact that a hospital route had to be planned after the Defendants fired multiple shots on Chelsey Napper's home.

[2] *Id.*

[3] SOP 8.1.17

Filed           20-CI-003067   05/20/2020              David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

22. The Defendants were required, prior to executing the warrant, to notify Metrosafe that the search warrant was being executed.[4]

23. The Defendant officers each had a ministerial duty to identify themselves as law enforcement officers and state their intent to execute a search.[5]

24. The Defendants did not adhere to this duty.

25. The Defendants, even with a valid search warrant, had a ministerial duty to call off the warrant's execution if the probable cause listed on the affidavit no longer existed.[6]

26. The Defendants did not adhere to this duty.

27. There was not any illegal activity being conducted at Chelsey Napper's home by the residents of the apartment.

28. As confirmed by multiple neighbors, the Defendant officers did not knock or identify themselves March 13, 2020.

29. The officers were in plain clothes.

30. It was 12:40 in the morning.

31. The Defendant officers shot their weapons into Chelsey Napper's apartment repeatedly.

32. None of the occupants in Chelsey Napper's apartment were mentioned in the search warrant.

33. Chelsey Napper's apartment was not mentioned in the search warrant.

34. No Defendant officer should have entered into Chelsey Napper's apartment.

35. No projectile from the weapon of the Defendant officers should have entered into Chelsey Napper's apartment.

36. The Defendants' gunshots struck objects in Chelsey Napper's apartment living room, dining room, kitchen, hallway, and shattered her sliding glass door.

37. Cody Etherton was nearly shot in the head.

38. Cody Etherton, Chelsey Napper and Zayden Flournoy were unarmed.

---

[4] Id.
[5] SOP 8.1.19
[6] SOP 8.1.17

Filed           20-CI-003067   11/04/2020              David L. Nicholson, Jefferson Circuit Clerk

Filed     20-CI-003067   05/20/2020          David L. Nicholson, Jefferson Circuit Clerk

Presiding Judge: HON. JUDITH MCDONALD BURKMAN (630153)

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000042 of 000140

GEDM : 000005 of 000011

Filed          20-CI-003067   05/04/2020          David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

39. Cody Etherton, Chelsey Napper and Zayden Flournoy posed no threat to the officers that were shooting into their apartment.

40. The Defendants acted intentionally, knowingly, unreasonably, maliciously, negligently, recklessly, and in bad faith with deliberate indifference to the safety and rights of Cody Etherton, Chelsey Napper and Zayden Flournoy when they attempted to execute a warrant without the SWAT unit, proceeded with executing the warrant without probable cause, engaged in erratic gunfire at Cody Etherton, Chelsey Napper and Zayden Flournoy, who were unarmed and posed no threat, in an intentional, erratic and deadly manner. These actions were objectionably unreasonable.

41. The officers failed to use any sound reasonable judgment whatsoever when firing more than 25 blind shots into multiple homes and causing the injuries to Cody Etherton, Chelsey Napper and Zayden Flournoy.

42. The Defendants had absolute, certain and imperative duties to knock and announce their presence.

43. Cody Etherton, Chelsey Napper and Zayden Flournoy had committed no crime and posed no immediate threat to the safety of the Defendants.

44. The actions of the Defendant officers were made in bad faith, were performed with corrupt motive, were outside the scope of the Defendants' authority, were executed willfully and with the intent to harm, and were in violation of the constitutional and statutory rights of Cody Etherton, Chelsey Napper and Zayden Flournoy.

45. The Defendants knew or reasonably should have known that the actions taken would violate the rights of Cody Etherton, Chelsey Napper and Zayden Flournoy.

46. The Defendants' actions were made with the malicious intention to cause a deprivation of the constitutional rights of Cody Etherton, Chelsey Napper and Zayden Flournoy.

47. The Defendants unlawfully and forcibly entered the home of Cody Etherton, Chelsey Napper and Zayden Flournoy, causing Cody Etherton, Chelsey Napper and Zayden Flournoy to have a reasonable fear of imminent peril of death or great bodily harm.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000043 of 000140

Presiding Judge: HON. JUDITH MCDONALD BURKMAN (630153)

000006 of 000011

Filed          20-CI-003067   11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed          20-CI-003067   05/20/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed          20-CI-003067   05/20/2020          David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

48. Cody Etherton, Chelsey Napper and Zayden Flournoy knew, or had a reason to believe, that an unlawful and forcible entry was occurring or had occurred. The Defendants, under the facts which were present at the time, had no lawful right to shoot or enter into the home of Cody Etherton, Chelsey Napper and Zayden Flournoy.

49. The Defendants did not identify themselves prior to entry into the home or prior to shooting into the home, and neither Cody Etherton, Chelsey Napper nor Zayden Flournoy knew or reasonably should have known that the individuals were peace officers.

50. The use of force on Cody Etherton, Chelsey Napper and Zayden Flournoy by the Defendants was unreasonable, excessive, and in violation of clearly established law prohibiting assault, battery and gross negligence.

51. As a direct and proximate result of the conduct of the Defendants, Cody Etherton, Chelsey Napper and Zayden Flournoy all suffered emotional trauma when they were shot at multiple times in their own home.

52. The Defendants unlawfully attempted to take Cody Etherton into custody.

53. Cody Etherton, Chelsey Napper and Zayden Flournoy are all actively in counseling as a result of the Defendant officer's actions.

54. The Defendants' conduct was grossly negligent, reckless, malicious, willful, wanton, and conducted with a flagrant indifference for the value of human life with a subjective awareness that those within the residence would be seriously injured or killed. As such, punitive damages are necessary against these officers.

**COUNT I**

**Assault**

55. Plaintiffs incorporate the preceding paragraphs by reference.

56. On March 13, 2020 the Defendants, in intentionally shooting into Chelsea Napper's apartment repeatedly without privilege or authority to do so, committed assault on the occupants of the apartment several times.

Filed        20-CI-003067   05/20/2020        David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

57. As a result of this conduct, Chelsey Napper, Cody Etherton and Zayden Flournoy suffered harm.

58. Plaintiffs damages secondary to the Defendants' conduct include emotional pain and suffering, as well as any other damages secondary to the actions of the Defendants.

59. The Plaintiffs are entitled to punitive damages due to the Defendants' conduct.

## COUNT II

### Excessive Force in Violation of KRS 431.025

60. Plaintiffs incorporate the preceding paragraphs by reference.

61. The Defendants had a statutory duty, pursuant to KRS 431.025(3), to refrain from using unnecessary force upon Chelsey Napper, Zayden Flournoy and Cody Etherton.

62. The Defendants used unnecessary force and violence upon Chelsey Napper, Zayden Flournoy and Cody Etherton in violation of KRS 431.025.

63. The statute was enacted to prevent this type of conduct associated with the Defendants.

64. The Defendants were negligent per se.

65. The Defendants' violations of this statute were the direct and proximate causes of the injuries Chelsey Napper, Cody Etherton and Zayden Flournoy sustained and the claimed damages herein.

66. Plaintiffs damages secondary to the Defendant's conduct include emotional pain and suffering, as well as any other damages secondary to the actions of the Defendants.

67. The Plaintiffs are entitled to punitive damages due to the Defendants' conduct.

## COUNT III

### Negligence and Gross Negligence

68. Plaintiffs incorporate the preceding paragraphs by reference.

69. Each of the Defendants breached their respective ministerial duties of reasonable care owed to Chelsey Napper, Cody Etherton and Zayden Flournoy, with said breaches serving as direct and proximate causes of their injuries and damages.

70. These ministerial duties included, but were not limited to:

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000045 of 000140

Presiding Judge: HON. JUDITH MCDONALD BURKMAN (630153)

CEOM : 000008 of 000011

Filed        20-CI-003067   11/04/2020        David L. Nicholson, Jefferson Circuit Clerk

Filed        20-CI-003067   05/20/2020        David L. Nicholson, Jefferson Circuit Clerk

Filed          20-CI-003067   05/20/2020        David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

    a.  Mandatory activation of the SWAT team for the planning and execution of the search warrant.

    b.  Calling off the warrant once the primary target was apprehended elsewhere.

    c.  Calling off the warrant once probable cause no longer existed.

    d.  Knocking and announcing prior to shooting into Chelsey Napper's apartment.

    e.  Accurately, completely, and specifically completing the affidavit in support of the search warrant so that an informed decision could be made as to the probable cause for the warrant and its terms of execution.

    f.  Refraining from blind gunfire into an apartment which the Defendants knew or should have known was not the subject of the search warrant and was occupied by unarmed individuals, among them, a five-year-old sleeping child.

71. The Defendants' failures to adhere to their ministerial duties owed to Chelsey Napper, Zayden Flournoy and Cody Etherton were a substantial factor in causing their injuries and the claimed damages herein.

72. Plaintiffs damages secondary to the Defendant's conduct include emotional pain and suffering, as well as any other damages secondary to the actions of the Defendants.

73. The Plaintiffs are entitled to punitive damages due to the Defendants' conduct.

## COUNT IV

### Intentional Infliction of Emotional Distress

74. Plaintiffs incorporate the preceding paragraphs by reference.

75. Defendant officers intentional and reckless act of failing to follow proper statutorily mandated protocol while executing the search warrant and the extreme and outrageous act of firing a deadly weapon into an occupied dwelling in the wee hours of the morning with no prior given notice while the unarmed occupants were sleeping caused Chelsey Napper, Zayden Flournoy and Cody Etherton to suffer from extreme emotional distress and actively seek treatment for post-traumatic stress syndrome.

76. Plaintiffs damages secondary to the Defendant's conduct include emotional pain and suffering, as well as any other damages secondary to the actions of the Defendants.

Presiding Judge: HON. JUDITH MCDONALD BURKMAN (630153)    06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000046 of 000140

EDDM : 000009 of 000011

Filed                    20-CI-003067    05/20/2020          David L. Nicholson, Jefferson Circuit Clerk

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

77. The Plaintiffs are entitled to punitive damages due to the Defendants' conduct.

## COUNT V

### False Imprisonment

78. Plaintiffs incorporate the preceding paragraphs by reference.

79. The home of Chelsey Napper, Cody Etherton and Zayden Flournoy was physically surrounded by the Defendant officers; Chelsey Napper, Cody Etherton and Zayden Flournoy were not allowed to leave their home by the Defendant officers. The Defendant officers pointed their deadly weapons in a threatening manner at Chelsey Napper, Cody Etherton and Zayden Flournoy and forced them to stay inside their apartment March 13, 2020. Chelsey Napper, Cody Etherton and Zayden Flournoy were aware that the Defendant officers were not allowing them to leave the apartment.

80. Plaintiffs damages secondary to the Defendant's conduct include emotional pain and suffering, as well as any other damages secondary to the actions of the Defendants.

81. The Plaintiffs are entitled to punitive damages due to the Defendants' conduct.

### V. JURY DEMAND

82. Plaintiffs hereby demand a trial by jury of all issues so triable.

### VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand that this Court award the following:

a. Compensatory damages in an amount to be shown at trial;

b. Punitive damages in an amount to be shown at trial;

c. Costs incurred in this action and reasonable attorney fees;

d. Pre-judgment and post-judgment interest; and

e. Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Brandon J. Lawrence
Brandon Lawrence

Presiding Judge: HON. JUDITH MCDONALD BURKMAN (630153)

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000047 of 000140

CEDM : 000010 of 000011

NOT ORIGINAL DOCUMENT
11/04/2020 03:43:05 PM
84458

101 North Seventh Street
Louisville, Kentucky 40202
Telephone: (502) 996-7799
Fax: (502) 996-7796
Brandon@lawyerforthecity.com
Counsel for Plaintiffs

Filed          20-CI-003067          11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

| | |
|---|---|
| Ky. Const. Section 10; RCr 2.02<br>RCr 13.10 | Case No.:<br><br>Court:    District<br><br>County:   Jefferson<br><br>Division: |

**AFFIDAVIT FOR SEARCH WARRANT**

**Affiant,** ___Detective Joshua C. Jaynes (7627)___ , a peace officer of ___Louisville Metro Police Department___ , being first duly sworn, states he/she has, and there is reasonable and probable grounds to believe, and **Affiant** does believe, there is now on the premises known and numbered as:

**St. Anthony Gardens**
**3003 Springfield Drive #4**
**Louisville, KY 40214**
**Jefferson County Kentucky**
**and All Surrounding Curtilage**

**and more particularly described as follows:**

A multi-family, two-story apartment complex that consists of beige vinyl siding, multi colored brick, and brown shingles. The numbers "3003" are in black lettering arranged vertically on a single column of the apartment building. The specific apartment has a sliding glass door that opens to a small patio on the first floor of the complex. The specific apartment has a green door with a gold-plated number "4" in the top center of the front door. The apartment complex is located within St. Anthony Gardens.



**and/or in a vehicle or vehicles described as:**

2017 Dodge Charger SRT-8, red in color, Mississippi Registration – MTA7305, VIN: 2C3CDXHG2HH612076



Filed          20-CI-003067          11/04/2020          David L. Nicholson, Jefferson Circuit Clerk          EXHIBIT ONE (1)

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000049 of 000140

EXH - 000001 of 000004

2016 Chevrolet Impala, white in color, Kentucky Registration – 140ZAT, VIN:1G11Z5SA6GU159016

**and/or on the person or persons of**:
B/M Jamarcus Cordell Glover, DOB█       SSN█
B/M Adrian Orlandes Walker, DOB█       SSN█
B/F Breonna Taylor, DOB█      SSN█      █

**the following described personal property, to wit:**
Marijuana, cocaine, heroin, meth and all illegal narcotics or paraphernalia as described in violation of KRS 218A.
Any monies that are proceeds from drug trafficking. Any safes that are used to store illegal narcotics or money.
Any weapons that may be used to protect illegal narcotics or money. Any paperwork that may be a record of narcotics
sales or that may indicate the transport, concealment or sales of narcotics. Any paper that may be evidence of individuals living
in the residence. Any documents, to include mail matter, which may indicate financial activities stemming from illegal activity. Any
electronic recording media, computers, software, cameras or other such devices that may be used to hold or document illegal
narcotics activities in violation of KRS 218A. Any items that may be evidence of other violations of the Kentucky Revised Statutes.

**Affiant believes and states there is probable and reasonable cause to believe said property constitutes:**
(check appropriate box or boxes):

☐     stolen or embezzled property;

☒     property or things used as means of committing a crime;

☒     property or things in possession of a person who intends to use it as a means of committing a crime;

☒     property or things in possession of a person to whom it was delivered for the purpose of concealing it or preventing
       its discovery and which is intended to be used as a means of committing a crime;

☒     property or things consisting of evidence which tends to show a crime has been committed or a particular person
       has committed a crime;

☐     Other     _____
                _____
                _____

**Affiant** has been an officer in the aforementioned agency for a period of    15    years and _____ months.
The information and observations contained herein were received and made in his/her capacity as an officer thereof. On
March 12th _____ , 2  020   , at approximately    1000    ☒ a.m. p.m., **Affiant** received information
from/observed:

*Affiant received information from multiple LMPD crime tips (most recent being 01/18/2020 LMPD Tip # 277851) that there has
been drug activity going on at 2424 Elliott Avenue.

* A narcotics search warrant was executed by LMPD 1st Division on 12/30/2019 where narcotics and firearms were recovered.

* Less than a week after the search warrant, Affiant received information that the drug activity had resumed on 2424 Elliot Avenue.
Affiant conducted physical surveillance and witnessed vehicular traffic going to and from the listed location for short periods of time
which is indicative of trafficking in narcotics.

**Acting on the information received, Affiant conducted the following independent investigation:**

1.) On 01/02/2020, Affiant had LMPD tech unit place a "pole camera" at the intersection of S. 24th Street and Elliott Avenue. Within an hour of surveillance, Affiant witnessed approximately 15-20 vehicles go to and from 2424 Elliott Avenue within a short period of time which is indicative of trafficking in narcotics.

2.) On 01/2/2020, Detectives observed Adrian O. Walker, DOB ████ in operation of the above listed red 2017 Dodge Charger go to and from 2424 Elliott Avenue for a short period of time. Mr. Walker drove W/B on Elliott Avenue at a high rate of speed to which a traffic stop was conducted shortly after. Detectives could smell a strong odor of marijuana coming from the listed vehicle. A small amount of marijuana was located inside the vehicle along with a large undetermined amount of US currency located in the center console of the listed vehicle.

3.) *Adrian Walker* has a pending court case for COMP Convicted Felon in Possession of a Firearm, Drug Paraphernalia – Buy/Possess, ENH Trafficking in Marijuana (less than 8oz) 1st Offense, COMP Trafficking in a Controlled Substance 1st Degree, 1st Offense (>=4GMS Cocaine) (19-F-013851).

4.) On 01/08/2020, at approximately 1336 hours, Detectives observed Jamarcus Glover operating the above listed red 2017 Dodge Charger with Adrian Walker as a passenger. Detectives observed on the pole camera Jamarcus Glover exit the vehicle, walk over to the property line of 2425 and 2427 Elliott Avenue (near there is a chain- link fence that ends with an amount of large rocks appearing to be disturbed). Jamarcus Glover is seen on a zoomed camera dropping a large, blue cylinder-shaped object near the rocks and then appears to be covering it up to avoid detection.

5.) *Jamarcus Glover* has the following pending court cases: Convicted Felon in Possession of a Firearm, Convicted Felon in Possession of a Handgun, Receiving Stolen Property (Firearm), Drug Paraphernalia – Buy/Possess, Trafficking in a Controlled Substance 1st Degree, 1st Offense (<4GMS Cocaine) (20-F-000098), COMP Possession of a Controlled Substance 1st Degree, 1st Offense (Heroin), COMP Possession of a Controlled Substance 1st Degree, 1st Offense (Cocaine), Tampering With Physical Evidence, COMP Trafficking in a Controlled Substance (less than 8oz) 1st Offense (19-CR-001583-003), COMP Trafficking in a Controlled Substance, 1st Degree, 1st Offense (<4GMS Cocaine), COMP Tampering With Physical Evidence (19-CR-002323).

6.) Affiant has conducted surveillance multiple times on site near the physical location of 2424 Elliott Avenue and through the pole camera. Affiant has witnessed on occasion subjects running from 2424 Elliott Avenue to the rock pile near the property line of 2425 and 2427 Elliott Avenue where Jamarcus Glover dropped the suspected narcotics and then the subjects then run back into 2424 Elliott Avenue. Affiant believes through my 10 years of narcotics related detective work and experience that Jamarcus Glover and Adrian Walker are the sources of narcotics for the "trap house" (where drugs are sold) at 2424 Elliott Avenue. When the narcotics being dealt from 2424 Elliott Avenue are low (pedestrian and vehicular traffic is minimal), Mr. Walker and/or Mr. J. Glover show up operating the red 2017 Dodge Charger and appear to "re-up" the drug house at 2424 Elliott Avenue. Mr. Walker and/or Mr. J. Glover are seen either entering/exiting 2424 Elliott Ave. or going to drop suspected narcotics at the rock pile near the property line of 2425 and 2427 Elliott Avenue. Once they leave the area, normal pedestrian and vehicular traffic resumes.

7.) Affiant has observed the listed red 2017 Dodge Charger make frequent trips from 2424 Elliott Avenue to 3003 Springfield Drive. Both Mr. Glover and Mr. Walker have been known to operate the listed vehicle.

8.) On 01/16/2020, during the afternoon hours, Affiant witnessed Jamarcus Glover operating the listed red 2017 Dodge Charger. Mr. J. Glover pulled up and parked in front of 3003 Springfield Drive. Affiant then observed Mr. J. Glover walk directly into apartment #4. After a short period of time, Mr. J. Glover was seen exiting the apartment with a suspected USPS package in his right hand. Mr. Glover then got into the red 2017 Dodge Charger and drove straight to 2605 W. Muhammed Ali Blvd. which is a known drug house.

9.) Affiant verified through a US Postal Inspector that Jamarcus Glover has been receiving packages at 3003 Springfield Drive #4. Affiant knows through training and experience that it is not uncommon for drug traffickers to receive mail packages at different locations to avoid detection from law enforcement. Affiant believes through training and experience, that Mr. J. Glover may be keeping narcotics and/or proceeds from the sale of narcotics at 3003 Springfield Drive #4 for safe keeping.

10.) Affiant has observed the above listed white 2016 Chevrolet Impala park in front of 2424 Elliott Avenue on different occasions. This vehicle is registered to Breonna Taylor.

11.) Affiant has verified through multiple computer databases that Breonna Taylor lives at 3003 Springfield Drive #4.

12.) Affiant verified through multiple computer databases that as of 02/20/2020, Jamarcus Glover uses 3003 Springfield Drive #4 as his current home address.

14.) Mr. J. Glover and Mr. Walker are acquaintances and have been seen going to and from 2424 Elliott Avenue. Additionally, the red 2017 Dodge Charger has been driven by these individuals mentioned within this affidavit. Affiant has witnessed during physical surveillance the suspected drug traffickers sharing the red 2017 Dodge Charger numerous times to transport and store their suspected narcotics.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000051 of 000140
EXH : 000003 of 000004

15.) Affiant is requesting a No-Knock entry to the premises due to the nature of how these drug traffickers operate. These drug traffickers have a history of attempting to destroy evidence, have cameras on the location that compromise Detectives once an approach to the dwelling is made, and a have history of fleeing from law enforcement.

**Affiant** has reasonable and probable cause to believe, and believes, grounds exist for issuance of a Search Warrant based on the aforementioned facts, information and circumstances and **prays a Search Warrant be issued**, that the property (or any part thereof) be seized and brought before any Court and/or retained subject to order of said Court.

_____
                                    Officer

| |
|---|
| Subscribed and sworn to before me ☐ in my presence ☐ via oral communication on this the ___12th___ day of _March_, 2 _020_ , at _12:37_ ☐ a.m. ☑ p.m. <br><br> _____ <br> Judge |

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000052 of 000140

EXH : 000004 of 000004

Filed          20-CI-003067          11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

| | | Case No.: |
| --- | --- | --- |
| | | Court: District |
| | | County: Jefferson |
| Ky. Const. Sect. 10; RCr 13.10 | **SEARCH WARRANT** | Division: |

## TO ALL PEACE OFFICERS IN THE COMMONWEALTH OF KENTUCKY:

Proof by affidavit having this day been made before me by:   Detective Joshua C. Jaynes (7627)

a peace officer of   Louisville Metro Police Department                          ,  that there is probable and reasonable cause for the issuance of this Search Warrant as set out in the affidavit attached hereto and made a part hereof as if fully set forth herein; **you are commanded to search** the premises known and numbered as:

**St. Anthony Gardens**
**3003 Springfield Drive #4**
**Louisville, KY 40214**
**Jefferson County Kentucky**
**and All Surrounding Curtilage**

## and more particularly described as follows:

A multi-family, two-story apartment complex that consists of beige vinyl siding, multi colored brick, and brown shingles. The numbers "3003" are in black lettering arranged vertically on a single column of the apartment building. The specific apartment has a sliding glass door that opens to a small patio on the first floor of the complex. The specific apartment has a green door with a gold-plated number "4" in the top center of the front door. The apartment complex is located within St. Anthony Gardens.



Filed          20-CI-003067          11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

EXHIBIT TWO (2)

Filed          20-CI-003067      11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

**and/or in a vehicle or vehicles described as:**

2017 Dodge Charger SRT-8, red in color, Mississippi Registration – MTA7305, VIN: 2C3CDXHG2HH612076



2016 Chevrolet Impala, white in color, Kentucky Registration – 140ZAT, VIN:1G11Z5SA6GU159016

**and/or on the person or persons of:**
B/M Jamarcus Cordell Glover, DOB:        SSN:
B/M Adrian Orlandes Walker, DOB:       SSN:
B/F Breonna Taylor, DOB:      SSN:

**and seize the following described personal property:**
Marijuana, cocaine, heroin, meth and all illegal narcotics or paraphernalia as described in violation of KRS 218A.
Any monies that are proceeds from drug trafficking. Any safes that are used to store illegal narcotics or money.
Any weapons that may be used to protect illegal narcotics or money. Any paperwork that may be a record of narcotics
sales or that may indicate the transport, concealment or sales of narcotics. Any paper that may be evidence of individuals living
in the residence. Any documents, to include mail matter, which may indicate financial activities stemming from illegal activity. Any
electronic recording media, computers, software, cameras or other such devices that may be used to hold or document illegal
narcotics activities in violation of KRS 218A. Any items that may be evidence of other violations of the Kentucky Revised Statutes.

If you find the above-described property, or any part thereof, **you will seize the property and deliver it forthwith** to me or
any other court in which the offense in respect to which the property or things taken is triable, **or retain it in your custody
subject to order of said court.**

Date: _____3/12_. 2020_____.

_____Mary/m L_____
Judge

_____Jefferson ut_____ Court

Filed          20-CI-003067      11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed          20-CI-003067      11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Executed this _____ day of _March_ , 2 _0 20_ , by Officer _J. Taylor_

of the _____ LMPD _____ , Badge No. _7677_ , by

searching said premises/vehicle/person(s) described herein and by seizing the following:

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000055 of 000140

EXH-I : 000003 of 000003



# LOUISVILLE METRO POLICE DEPARTMENT
## SPECIAL INVESTIGATIONS DIVISION
### Public Integrity Unit
## INVESTIGATIVE REPORT



| Type of Investigation | | File No. | Date of Report: |
|---|---|---|---|
| Officer Involved Shooting | | 20-019 | 5-20-20 |
| Activity: | | Submitted By | |
| SWAT Follow-Up Interviews | | Sergeant Jason Vance | |
| | | Lead Investigator: | |
| | | Sergeant Jason Vance | |

## SWAT Follow-Up Interviews

On May 19, 2020 LMPD SWAT Commanding Officers Lieutenant Dale Massey, Sergeants Brandon Hogan, Michael Burns and Joel Casse agreed to be interviewed in relation to the on-going investigation. The interviews were conducted at the PIU office. The interviews would serve as a follow-up to the pre-operation briefing information and correspondence between CID and SWAT leading up to the search warrant served on March 13, 2020 at 3003 Springfield Drive Apartment #4. PIU Sergeant Jeremy Ruoff and I conducted the interviews.

### Lieutenant Dale Massey Interview:

Massey was informed after reviewing documentation provided to PIU by CID it was determined we did not receive an operations plan for the warrant at 3003 Springfield Drive Apartment #4. When questioned about the information CID provided SWAT prior to the briefing Massey stated approximately a month before the operation they were briefed about the large-scale operation and asked to assist serving multiple high-risk warrants. Massey stated Sergeants Casse and Burns received copies of the warrants including a HIDTA (Deconfliction) number and risk matrix for each property and subsequently conducted their own assessment of the target locations and advised CID not to serve simultaneous warrants due to the risks involved. Massey stated they proposed doing the warrants over the course of several days to lessen the risks. Massey referenced an email that was sent to Sergeant Casse by CID that listed the 3003 Springfield Drive address.

Massey stated the night of the warrants CID Detective Josh Jaynes came to the SWAT office to do a final briefing. Massey stated they had served warrants four other times on the 2424 Elliot Ave. address. Massey referenced SWAT tactics had changed and they now conducted their own separate investigation into the properties. Massey stated during the briefing with Detective Jaynes it was determined one of the addresses originally listed would not be served and noted the Springfield address was never mentioned in Detective Jaynes's briefing. Massey stated SWAT was under the impression they would be the only law enforcement unit executing warrants on March 13, 2020. Massey began describing what actions SWAT took to secure the properties on Elliott Ave. He stated as they were calling persons out of one of the properties, they heard shots fired on the SWAT police radio channel. He stated SWAT members began reporting back no shots had been fired at their location when CID Sergeant Luke Phan there had been an officer involved shooting on their channel. He stated after being advised of the officer involved shooting several members of SWAT responded to the location to assist units on Springfield. He stated enroute to the location additional information was given over the radio concerning an individual was in custody and there was a possible female injured inside the apartment. He stated when they arrived at the location it was chaotic, and he observed approximately twenty uniformed officers with long guns pointed at the apartment building in question. He stated his initial assessment of

Page 1 of 6

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000056 of 000140

EXH : 000001 of 000008

packages in months delivered to the address and the location was flagged if any were detected and the Postal Inspector would be notified. Detective Jaynes also inquired about Mr. Glover receiving any mail matter to the location address and Sgt. Sayler advised he would check on it for him. He did not have any other correspondence with Detective Jaynes after those text messages. (screen shot pictures of the text messages are in the case file). The postal carrier would be the only person to be able to determine who received any mail matter at the address. Detective Jaynes contacted Sgt. Sayler from ▮▮▮▮▮▮▮

After the shooting incident, Sgt. Sayler read the warrant affidavit and Detective Kuzma called Sgt. Mattingly by phone. Sgt. Mattingly advised he was doing ok and had to move to ▮▮▮▮▮ ▮▮▮▮ due to receiving threats. Detective Kuzma asked Sgt. Mattingly about the information listed on the affidavit pertaining to the packages being received at the address listed on the warrant. Sgt. Mattingly stated he told Detective Jaynes there was no package history at the address.
Detective Kuzma then called Detective Mike Nobles and inquired about the same information. Detective Nobles stated he remembered there being no packages delivered to the address and was confused about the conflicting information on the affidavit as well. Both phone calls were on speaker phone with Detective Kuzma and Sgt. Sayler.

Sgt. Sayler stated there were no packages of any kind being delivered to the address, suspicious or otherwise. No other names were given for him to check on for packages being delivered to the address. The postal carrier was the only person who could verify who received mail matter other than packages to an address.

Sgt. Sayler explained LMPD used Shively Police Department personnel for postal office information from an incident involving LMPD officers and postal workers several years ago. The postal service does not want to work with LMPD any longer. Sgt. Sayler was friends with Detective Nobles and Sgt. Mattingly and this was why he would inquire about this information on their behalf.

Sgt. Sayler had a good working relationship with the postal service affording him the opportunity to call and ask for any package or parcel information delivered to a certain address. An address can be flagged and if a package came through the post office, it would be stopped and a K-9 would be used. Then it would be determined if the package would be opened and contents saved as evidence, or a controlled delivery would happen, or the package would be delivered as normal. The information would be documented and used in the writing of search warrants. Sgt. Vance read a portion of the investigative letter for address 3003 Springfield Drive #4 stating the target Jamarcus Glover received a USPS package on January 16, 2020 from the address with photographs as evidence. Sgt. Sayler stated Detective Kuzma would need to be asked about how the address was looked at by the Postal Inspector. He explained the address could have been ran for packages at the address with the name and not for the whole address. He stated packages could have been delivered and received under another name to the address. The investigative letter and the affidavit had conflicting statements regarding the USPS packages at the address. Sgt. Sayler was confused as to why Detective Jaynes contacted him almost a month after the shooting incident inquiring about packages being delivered to the address. The interview concluded at 1329 hours with nothing further to report.   END OF REPORT

| Investigator's Signature: | Amanda L. Seeley #7846 |
| Supervisor's Signature: | L. ▮▮▮▮ 7508 |

This report is the property of the Louisville Metro Police Department. Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

PIU 005 11/14.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000057 of 000140

EXH : 000002 of 000008

the apartment was that shots had come from inside the apartment at the police. He stated SWAT members entered the apartment subsequently securing the location.

When questioned what significant information learned during their investigation into the properties, he stated not a lot due to the amount of times SWAT had served warrants at the locations. When questioned how long SWAT remained at 3003 Springfield Drive after securing it, he stated ten to fifteen minutes. He stated prior to leaving the location he advised CID Lieutenant Shawn Hoover and 3rd Division Major Micah Scheu find out who the involved members were and assign them escort officers. When questioned whether he was advised additional information from anyone at the scene, he stated CID Detective Myles Cosgrove provided detailed information concerning the incident, he later was informed that Cosgrove had fired his weapon. He stated at the time he was talking to Cosgrove he observed him with a long gun. *It should be noted Massey pointed out the information concerning Cosgrove because Cosgrove had already been involved in the police shooting and was not removed from the scene after numerous patrol units arrived for support.* He stated CID Detective Bret Hankison advised SWAT members on scene that he fired into the apartment. He stated after they assessed the scene location it was apparent what had occurred prior to their arrival.

Sergeant Ruoff asked Massey since CID linked the Springfield location to the other target locations and had identified the properties as high risk, then would it not have been more appropriate for SWAT to serve the warrant at Springfield. Massey agreed and stated SWAT should have been briefed on the Springfield address. Massey stated since LMPD created a full time SWAT team their tactics had evolved to include stopping simultaneous warrants. He stated SWAT emphasizes priority on people and not narcotics. He stated had SWAT known about the Springfield address they would have advised CID to watch the location until SWAT was available to help serve the warrant. Sergeant Ruoff asked if the targets of the investigation were located at the Elliott Ave. locations, Massey stated he believed two of the targets were taken down in vehicles and the others were at the properties. Sergeant Ruoff asked when the email to Sergeant Casse was sent from CID about the Springfield address. Massey referenced a conference call involving Lt. Colonel Lavita Chavous, Major Aubrey Gregory and Major Kim Burbrink debriefing the Springfield incident. He stated he had heard CID and SWAT weren't communicating effectively, he stated during that call was the first time he was aware of the email sent to Casse. He stated Major Burbrink brought it to his attention. He noted the email was sent two to three weeks prior to the warrants being served.

When questioned further about his comments related to the scene the night of the March 13, 2020, he stated SWAT talked about the incident internally. He stated SWAT members knew going forward they would be involved in the PIU investigation due to WVS recordings and securing the location. Massey referenced the "No-knock" warrant. He stated if SWAT is provided a no-knock warrant they knock and announce. He stated the only time SWAT would request a unit to obtain a no-knock is when an explosive breach is required and due to not being able to knock prior to entry they are required to have legal authority. When questioned if SWAT requested the no-knock on Elliott Ave, he stated no. When questioned if he had known about the warrant on Springfield what would he had informed CID, he stated he would have informed CID not to serve the warrant and wait for SWAT to complete the warrants on Elliott Ave. then serve the warrant on Springfield. Massey noted he was never given the risk matrix for Springfield address, but it was his impression the location was suspected to be the money location. He stated CID with assistance from SWAT could have surrounded the location and called the individuals out of the apartment. He noted SWAT operations and CID operations were completely opposite of each other. Sergeant Ruoff asked if CID provided SWAT an operations plan or matrix for the Springfield location. Massey responded by saying CID has never provided SWAT with a matrix that SWAT didn't serve. Massey noted LMPD policy requires CID to provide SWAT with all search warrant matrices whether it is utilized or not. He also noted they never received an

Page 2 of 6

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000058 of 000140

EXH : 000003 of 000008

operations plan related to the Springfield Drive address. He explained due to the intelligence SWAT obtained in their preparation for the operation they would have completed their own operations plan for Elliott Ave.

Sergeant Ruoff asks Massey to explain his previous statement about officers receiving fire from the apartment. He stated as they are responding to the location information is disseminated over the radio that automatic gunfire is coming from a rifle inside the apartment. He stated based from the initial information he was given his first assumption was that gunfire had come from inside the apartment through the glass patio door and window, but after securing the location he realized the glass defect had been caused by gunfire into the apartment.

When questioned about the glass patio door and whether he could see inside the apartment, he stated he could not see inside the apartment due to vertical blinds, nor could he see inside the bedroom window. He stated the apartment was dark inside. When questioned by Sergeant Ruoff about target identification and backdrop, he stated they are the two most important factors when discharging a weapon. He stated before discharging your weapon you must know what your target is, what is in front of the target and what is behind the target. When asked to give his opinion about whether muzzle flash would extend into a darkened area from an illuminated area, he stated due to the window coverings you would not be able to see the muzzle flash, but would be able to hear the rapid gunfire. He added the rapid gunfire could have been mistaken as gunfire from a long gun. When questioned whether it was tactically correct or proper in any capacity for three law enforcement officers to be positioned in what is commonly referred to as the "Fatal Funnel", he replied "absolutely not." When questioned further if he has ever seen a tactic where three individuals are punched out with their weapons in front of an entry door, he stated "No, you would never put yourself in that situation."

Sergeant Ruoff asked Massey who he told to secure Cosgrove outside the scene after learning he was an involved officer. He replied, he thought it was Lieutenant Shawn Hoover. He stated LMPD 3rd Division Major Micah Scheu and one of his lieutenants were present on scene when he arrived at the location. When questioned about the LMPD chain of command concerning who would have been in charge of the scene until PIU arrived to conduct the investigation, he stated Lieutenant Hoover or Major Scheu. When questioned whether he had anything else to add to his statement concerning the incident, he stated he and SWAT members felt after seeing what had occurred and their interactions with Bret Hankison "Something really bad happened." Massey described it as an "Egregious act" based on Hankison not having a target acquisition. Sergeant Ruoff asked who was in charge on the Elliott Ave. scene, he stated Lieutenant Colonel LaVita Chavous was with CID at the time of the warrants on Elliott Ave. He stated CID Detective Josh Jaynes was the only CID member to brief them at the SWAT office the night of the incident. Nothing further was provided and the interview was completed. The interview was audio and video recorded, a copy of the recording was placed in the file.

The documentation of the following interviews was prepared by PIU Investigator Sergeant Anthony Wilder based on his review of the recorded interviews conducted by Sergeants Vance and Ruoff. The following are intended to serve only of a synopsis of each interview. Please refer to each recording in their entirety for additional information.

Sergeant Joel Casse Interview:
The purpose of the follow-up interview was to focus particularly on the pre-operations briefing related to the execution of multiple search warrants with CID on 3-13-20. PBI detectives contacted SWAT concerning the execution of multiple search warrants at the same time. Detectives meet with Sgt. Casse, Sgt. Burns, and other SWAT members to discuss the warrants and begin planning the execution of the warrants. Detectives indicated they wanted to execute

Page 3 of 6

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000059 of 000140

EXH : 000004 of 000008

approximately 6 warrants simultaneously. Sgt. Casse advised that was not practical or possible and recommended serving two at a time over the course of several days. The Springfield location was never discussed in the preplanning meeting. However, at a later time Detective Janes sent him an email in which the Springfield location was mentioned, the email referenced approximately 8 locations and he only focused on the three locations SWAT was going to execute the warrants at. SWAT did request the use of a no-knock warrant at one of the locations so they could potentially use an explosive breach on the door. From previous warrant services at the location the door was known to usually be barricaded with 2X4's. The request for the no-knock warrant was out of a concerning for officer safety. Sgt. Casse explained SWAT would only use a no-knock warrant for officer safety reasons, the preservation of evidence would not be considered an acceptable reason for the use of a no-knock warrant. Sgt. Casse also explained SWAT reserved the right to make the final decision as to whether a warrant would be served as a no-knock or a knock and announce. Just because it was approved as a no-knock warrant did not prevent them from knocking and announcing if they chose to. Sgt. Casse explained CID wanted to execute the search warrants in the afternoon, but SWAT's site reconnaissance indicated there were to many people at the house in the afternoons. So, they went at midnight when it was believed only residents would be at the locations. Those decisions were based on SWAT's planning. They were not aware CID was going to serve additional warrants that "piggybacked" off the execution of their search warrants and that was why the Springfield warrant was executed at midnight. SWAT was able to get CID to change their plans and compromise and instead of conducting simultaneous warrants at six locations SWAT agreed to do three locations in close proximity in one night. SWAT also stated they would not stretch their resources so thin and do simultaneous warrants but instead hit one location and then immediately moved to the next one.

The operational briefing the night of the execution primarily focused on the three address on Elliott they were going to hit that night. There was no prior discussion with SWAT concerning the execution of the warrant on Springfield. Sgt. Casse explained had they been given prior knowledge SWAT would have advised it was not a good idea to execute the warrant at that time without advance planning and contingencies in place. Sgt. Casse explained while they were still on Elliott he heard the request for an ambulance and at that time learned CID had served another warrant on Springfield. Then a request for "armor" was made at the Springfield location and Sgt. Casse stated they were not prepared for that and did the best they could to respond. Sgt. Casse recalled the only person from PBI present at their operational briefing was Detective Janes. He did not recall Detective Janes ever mentioning the Springfield location during that briefing. SWAT was never provided any documentation regarding the Springfield location such as a matrix or operations plan. The interview then discussed if the targets associated with the locations on Elliott Ave. required the need for SWAT then would it not seem logical that since the same targets were associated with the Springfield location a SWAT presence would be needed at the Springfield location. It was also mentioned despite the Springfield location being referred to as a "soft target" SWAT would not have considered in that way since it was linked to the same "players" and other locations involved in a criminal syndicate and they would have treated it as they did the locations on Elliott Ave. Sgt. Casse explained he believed there was a disconnect between the goals and objectives of SWAT and CID. SWAT rarely does simultaneous warrants anymore and their practice is to clear one structure then move on to the next and have surveillance conducted on the other targets until they arrive. SWAT is focused with the preservation of life while CID appeared to have a fear concerning the loss of evidence because of the methods used.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000060 of 000140

EXH : 000005 of 000008

Sergeant Brandon Hogan Interview:

The purpose of the follow-up interview was to focus particularly on the pre-operations briefing related to the execution of multiple search warrants with CID on 3-13-20. According to Sgt. Hogan he had limited involvement in the pre-operation planning and SWAT Sergeants Burns and Casse were more involved with that aspect. He had knowledge that approximately a week prior to the execution of the search warrants Burns and Casse met with Detective Janes to discuss the operation, however he did not attend the meeting. During that week SWAT conducted surveillance related to the three target locations on Elliot Ave to determine access points and things of that nature. The night of the operation they conducted the operational briefing and at the end Detective Janes mentioned the location on Springfield scoring low on the threat matrix and advised it was a location where one of the main targets would stay on occasion. Sgt. Hogan had no previous knowledge a search warrant was going to be executed at the Springfield location at the same time the three warrants on Elliot were going down. Based on the briefing Sgt. Hogan understood the main target was not expected to be at the Springfield location that night and SWAT would not be involved with the execution of the warrant at that location. Based on the interview it appeared there was some brief discussion concerning SWAT being involved with the execution of the Springfield warrant but based on Detective Janes information it was considered a low-level threat and no further discussion occurred. Sgt. Hogan stated he never reviewed the threat matrix and relied on Detective Jane's word. The interview then discussed the use of SWAT to execute a warrant at a location which has been directly associated to the target of the warrant. Sgt. Hogan explained based on his experience when the target is known to sleep or stay at a location it raises the threat level and he would recommend SWAT executing the search warrant.

Sergeant Michael Burns Interview:

This is a follow-up interview particularly focusing on pre-operations briefing related to the execution of multiple search warrants with CID on 3-13-20. One or two weeks prior to the execution of the search warrants several members of SWAT met with CID to discuss the investigation , the target locations, and begin planning the operation. He did not recall any discussion of the Springfield location during the meeting. He believed there was an email sent at a later time to some members of SWAT which referenced the Springfield location, however he did not receive the email. According to Sgt. Burns, SWAT advised CID against conducting simultaneous with warrants the SWAT warrants. He went on to explain SWAT has gone away from conducting simultaneous warrants because of the depletion of resources and inherent danger. The night of the briefing Detective Janes was present, and they reviewed their plan to hit the occupied house first then two vacant houses believe to be used to store guns and narcotics. During the briefing Detective Janes mentioned another location but did not specific the address and described the location as place where the target "laid his head" and referred to the location as "low risk". Based on what Detective Janes had said Sgt. Burns felt the location was a future target and had no indication the location was going to be hit that night. While SWAT is securing the first house, they hit they hear updates concerning the Springfield location and the request for "armor" on site. Sgt. Burns described being "dumbfounded" and completely unaware of the Springfield location. Several SWAT members responded to the Springfield location in the Bearcat armored vehicle. While enroute they received updates concerning an officer having been shot and a male and female suspect were on scene. Sgt Burns was asked questions regarding his first interview and reiterated some of the information previously provided. Sgt. Burns recalled Sgt. Meany, Det. Campbell, and Det. Janes and one other person from CID being present during the first pre-operation planning meeting at the SWAT office.

Page **5** of 6

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000061 of 000140

EXH : 000006 of 000008

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk



| Investigator's Signature: | John Lowe #7591 |
| Supervisor's Signature: | Lt. R.S.D. 1508 |

This report is the property of the Louisville Metro Police Department. Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

PIU 005  11/14.

Page 6 of 6

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000063 of 000140

EXH-I : 000008 of 000008



# LOUISVILLE METRO POLICE DEPARTMENT
## *SPECIAL INVESTIGATIONS DIVISION*
### Public Integrity Unit
### INVESTIGATIVE REPORT

| Type of Investigation OFFICER INVOVLED SHOOTING | File No. 20-019 | Date of Report: 07/2/2020 |
|---|---|---|
| Activity: Summary of Events | Submitted By Sergeant Jason Vance | |
| | Lead Investigator: Sergeant Jason Vance | |

#### Summary of Events

On March 13, 2020 at approximately 0100 hours Metro Safe communications sent a command notification advising there had been an officer involved shooting at 3007 Springfield Drive. PIU investigators responded to the scene location (3003 Springfield Drive). At the time PIU investigators arrived on scene limited information was given to investigators by on scene CID command concerning the incident, including information about the involved officers. The scene was obviously not secured, and the initial actions taken by PIU investigators was to secure the scene by removing non-essential LMPD personnel. *It should be noted LMPD Peer Support had been notified of the incident and were on scene prior to PIU investigators learning of the incident.* PIU investigators were eventually able to obtain information through other resources. PIU Sergeant Anthony Wilder briefed PIU investigators on scene. The advised LMPD Narcotics (CID) were serving a search warrant at 3003 Springfield Drive #4 when they were fired upon during entry. Sergeant Wilder stated CID Sergeant, Jon Mattingly, sustained a gunshot injury during the exchange of gunfire. Sergeant Wilder stated Mattingly was extricated from the location and taken to University of Louisville Hospital for treatment.

Sergeant Wilder advised the following LMPD members were also involved in the incident:
1. Brett Hankison code# 6150
2. Myles Cosgrove code# 7519
3. Tony James code# 2522
4. Mike Nobles code#7668
5. Mike Campbell code# 2186
6. Lt. Shawn Hoover code#6340

PIU investigators responded to the hospital to secure any and all evidence related to the incident concerning Sgt. Mattingly. LMPD Police Surgeon, William Smock, responded to the hospital and assisted PIU investigators in obtaining a forensic examination of Mattingly's injuries. *It should be noted Sergeant Mattingly provided Dr. Smock with written consent to document his injuries through a forensic examination.*

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000064 of 000140

EXH : 000001 of 000014

EXHIBIT FIVE (5)

Filed          20-CI-003067       11/04/2020          David L. Nicholson, Jefferson Circuit Clerk



# LOUISVILLE METRO POLICE DEPARTMENT
## SPECIAL INVESTIGATIONS DIVISION
### Public Integrity Unit
## INVESTIGATIVE REPORT



| Type of Investigation | | File No. | Date of Report: |
|---|---|---|---|
| OIS | | 20-019 | 7.28.2020 |

| Activity: | Submitted By |
|---|---|
| • Training Records received from Major Humphrey<br>• Open Records Request from Det. Goodlett | Sgt. Amanda Seelye |
| | **Lead Investigator:**<br>Sgt. Amanda Seelye |

## Training Records

On Tuesday July 21, 2020, Major Paul Humphrey from LMPD's Training division, contacted PIU Sgt. Jason Vance via phone about having LMPD's Criminal Interdiction Department's (CID) Training Records on two thumb drives and the thumb drives were ready to be picked up. Sgt. Vance asked me to collect the thumb drives as he would be on vacation Wednesday July 22, 2020 through Friday July 24, 2020

On Wednesday July 22, 2020 at approximately 0853 hours, I contacted Major Humphrey to meet with him at his office located at 2911 Taylor Blvd to retrieve the thumb drives. At approximately 0919 hours, I arrived at the Training Division and received the two thumb drives.

On Thursday July 23, 2020 at approximately 1003 hours, I contacted Major Humphrey for clarification on the information on the thumb drives. He advised me the second thumb drive was a duplicate of the first thumb drive. He also stated the information had all of CID's individual's transcripts and all the curriculum for the classes, but it may be missing the records separated by who took which specific class. One thumb drive was placed into my case file #20-019 and the other thumb drive reserved for the Attorney General's office.

On Monday July 27, 2020, I provided the thumb drive reserved for the Attorney General's Office to PIU Sgt. Vance.

## Open Record Request Information

On Wednesday July 22, I received a paper copy version of LMPD CID Detective Kelly Goodlett's open record request of bond history for several individuals and who bonded the individuals out of jail starting from 2016 to present. A copy of the information was placed into my case file #20-019 and another copy was reserved for the Attorney General's office.

On Monday July 27, 2020, I provided the information to PIU Sgt. Vance reserved for the Attorney General's Office.

| Investigator's Signature: | *Amanda L. Seelye #7846* |
|---|---|
| Supervisor's Signature: | *[signature] 7508* |

This report is the property of the Louisville Metro Police Department. Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

PIU 005   11/14.

*Page 1 of 1*

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000065 of 000140

EXH : 000002 of 000014

*At this point in the investigation investigators were only aware that Mattingly had fired his weapon. PIU eventually learned CID Detective Brett Hankison had discharged his service weapon during the incident. Investigators observed Detective Hankison walking in and out of the primary scene. At 0200 hours Sergeant Wilder and I verbally requested Hankison to remove himself from the primary scene and make contact with members of LMPD Peer Support. *It should be noted investigators later learned Detective Hankison deviated from standard LMPD practices for an involved officer in a critical incident and left the scene location without his assigned LMPD Peer Support escort. Hankison deviated from the standard protocol when he traveled unattended to University of Louisville Hospital having contact with CID command and Police Chief Steve Conrad.*

Investigators learned during an interview with Chief Steve Conrad he had interaction with Hankison at the hospital. Chief Conrad having knowledge Hankison was an involved officer in the critical incident was surprised to see Hankison. He noted he viewed Hankison's presence at the hospital as unusual. Chief Conrad stated in his experience as police chief, officers involved in critical incidents are typically escorted by LMPD Peer Support members to the PIU office from the scene as part of the PIU investigation. Eventually Hankison responded to the PIU office. At approximately 0342 hours, a round count was completed on Hankison's ammunition. Hankison's round count was as follows: Hankison stated his total load out was (44) rounds. *It should be noted having investigated numerous officer involved shootings I have never seen an officer with a Glock 22 have a load out of (44). Officers either load out all three magazines for a total of (45) and/or top off after charging their handgun for a total of (46). See the round count form for further details.*

PIU investigators drafted legal authority to enter the apartment separate from the warrant CID prepared, due to limited LMPD CSU personnel at the time of the incident the scene process was delayed. CSU personnel responded to the PIU office before responding to the primary scene. Investigators began documenting the scene prior to CSU arrival. This included documenting vehicles parked at the location and their positions in the parking lot.
Investigators made contact with residents at 3003 Springfield Drive to assure there were no other injured parties based from the obvious gunfire investigators observed on the exterior of 3003 Springfield Drive. Investigators extended this to 3001 Springfield Drive due to unknown trajectories of bullet defect. *It should be noted investigators were not able to speak with all the residents of 3003 Springfield Drive during the scene process due to employment schedules and responsibilities, however information was obtained for future contact.* Investigators made contact with family members of Breonna Taylor and Kenneth Walker on scene, the contact was documented through audio recording. A copy of the recordings was placed in the file. Investigators made contact with the occupants of 3003 Springfield Drive apartment number ▮▮▮ the immediate north apartment in relation to apartment number four. Multiple bullet defects were observed including projectiles. The occupants provided investigators consent to document and collect the evidence related to the incident. One of the projectiles traveled north through the glass patio door of apartment #▮ causing the glass to shatter. At the time of the incident apartment ▮▮▮ was occupied by two adults and one child.

Investigators completed the scene process at 3003 Springfield Drive. Each item of evidence collected from the scene was assigned a marker number and exhibit number.

*It should be noted the scope of the search conducted in the interior scene would have included all areas of the property.* Investigators meticulously searched the property for evidence related to the incident to include projectiles recovered from the kitchen stove and structure.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000066 of 000140

EXH : 000003 of 000014

*It should be noted mail matter from Jamarcus Glover and Breonna Taylor were collected.* CSU completed the processes and examinations of each item. Subsequent examinations were and continue to be conducted at the Kentucky State Police Laboratory. At the conclusion of the scene process members of the PIU unit escorted Breonna Taylor's mother and family into the apartment and confirmed with apartment complex maintenance personnel that the property would be secured. At the time of contact with apartment maintenance LMPD Officer Donavis Duncan was present at the request of maintenance personnel due to his courtesy officer position at the property.

The following photo was sent to PIU investigators on March 18, 2020 by CID command after the March 13, 2020 shooting occurred documenting what information was briefed on March 12, 2020 during the CID briefing. *It should be noted the photo reflects the wrong address and PIU investigators never received an operations plan for the Springfield Drive location.*



Investigators conducted a neighborhood canvass of the apartment community on March 20, 2020. *It should be noted the Public Integrity Unit investigated (2) additional officer involved shootings following this incident. Including another officer involved shooting that occurred on March 13, 2020 at approximately 2128 hours. The shootings are referenced only to explain the delay of the neighborhood canvas.* Multiple residents were contacted, investigators placed business cards on apartment doors where no contact was made. Investigators eventually made contact with the witness, ▮▮▮▮▮▮ police had contact with just prior to the shooting. Investigators conducted a brief phone interview with ▮▮▮▮▮

During the course of the investigation numerous officers were identified on scene after reviewing wearable video recordings (Body cam). On March 20, 2020 approximately (53) officers were interviewed concerning the incident at the PIU office; see the associated investigative reports for details. Investigators learned through wearable video recordings from multiple officers, Hankison identified bullet defects on the exterior of 3003 Springfield Drive as "My" shots. Hankison is heard on wearable video and radio tape advising responding officers and CID personnel responding from the Elliott Ave. location, there is a long gun in play, meaning the suspect(s) are armed with a rifle. Hankison advises CID Sergeant Luke Phan on the CID radio tape, he observed the suspect armed with a long gun inside the apartment. Hankison is also heard on radio tape advising Metro Safe the

*Page 3 of 12*

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000067 of 000140

EXH : 000004 of 000014

suspect was barricaded inside the apartment with a long gun that looked like an AR. He further requests patrol units with long rifles to respond.

After numerous officers arrived at the scene, Hankison advised them to cover the north side of 3003 Springfield Drive to eliminate the possibility of the suspect fleeing from the apartment building. *It should be noted based from Hankison's communication during the incident it was obvious he was unaware of pertinent information pertaining to the target location. In investigators experience in law enforcement the warrant briefing should have provided a layout of the target location for tactical/safety reasons.*

Hankison began hailing the suspect(s) out of the apartment. The suspect, Kenneth Walker, exited the apartment unarmed with his hands in the air and was taken into custody. At the time of Walker's arrest, he made several utterances indicating his girlfriend was deceased inside the apartment and that she had fired a 9mm handgun at police. Walker was transported to the PIU office where he provided investigators a mirandized statement concerning the incident. Walker stated he and his girlfriend, Breonna Taylor, were in bed when they heard loud thud at the entry door.

Walker stated he thought it may have been a "guy" Taylor was on and off with. Walker stated they both put clothes on and walked to the hallway asking who was at the door. The following reflects the official transcript of the interview.

So there's a loud bang at the door. She pops up outta her sleep. It scared her to death. Me too, like, who is that. I was honestly thinkin' it was lis- 'cause we been on and off together whatever for, like, 7 years or whatever. So there was a guy that she was messin' with or - or whatever throughout that time, you know. And he popped over there once before while I was there like a couple months ago. So that's what I thought was goin' on. So there's a loud boom at the door. First thing she said was, "Who is it?" No response. So we like, what the heck. We both get up start puttin' on clothes. Another knock at the door. She's like, "Who is it?" Loud at the top of her lungs. No response. So I'm like, what the heck. So I then I grab my gun which is legal, like, I'm licensed to carry everything. I've never even fired my gun outside of a range. I'm scared to death. So she says - there's another knock at the door. She's yellin' at the top of her lungs and I am too at this point, "Who is it?" No answer, no response, no anything. So we like, what the heck. We both just - see what I have on. Grabbed the nearest thing. These aren't even mine these are hers, like - so we both are just puttin' on somethin' to go answer the door and see who's knockin' at the door this late at night. So when we come out, when we get outta the, um, bed or whatever, like, walkin' towards the door. The, like - the door, like, comes, like, off the hinges. So I just let off one shot like I can't still see who it is or anything. So now the door's like flying open. I let off one shot and then all of a sudden there's a whole lot of shots. And, like, we both just

*It should be noted Walker states he was immediately worried that the individual at the door was the guy Taylor had messed with on and off. Walker states the "Guy" showed up at the apartment while he was there a couple of months prior to the incident. The incident referenced by Walker corresponds to the same time frame (January 16, 2020) when Glover is seen at Ms. Taylor's apartment by CID Detectives Jaynes and Goodlett. Walker states he had never fired his Glock*

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000068 of 000140

EXH : 000005 of 000014

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

*handgun outside of a gun range. It should be noted at the time of this report a NIBIN lead associated to a spent casing located outside of 3003 Springfield Drive was linked to Walker's Glock handgun. \*KSP comparison report pending.*

PIU investigators attended the autopsy of Breonna Taylor on March 14, 2020. The autopsy was conducted at 10511 LaGrange Road Louisville, KY 40223 Jefferson County Medical Examiner's Office by Dr. Jeffrey R. Springer. On March 30, 2020 the postmortem examination report was completed. The report stated Ms. Taylor's injuries were front to back. *It should be noted WVS recordings from SWAT personnel show Ms. Taylor's position was not disturbed prior to PIU arriving to the scene beyond being moved slightly to her right side and her left wrist raised to assess vitals by SWAT personnel, Daniel Zummach and Grant Young.* The WVS recordings are important to note due to the Medical Examiner's findings. Ms. Taylor was positioned in the hallway with her feet closest to the entry door and head closest to the east wall in the hallway. Based on the Medical Examiner's report it was initially thought Ms. Taylor's injuries would have been caused by projectiles with a trajectory west to east in relation to the property. Investigators came to this conclusion based from trajectories established at the time of the scene process. (Sequential defect documentation).



*During the course of the investigation PIU investigators learned through witness statements on March 5, 2020, CID Detective Josh Jaynes sent LMPD SWAT Sergeant Joel Casse an email. The email provided Sergeant Casse with the affidavits of each property within the "Elliott Ave. Project".*

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk



Sergeant Joel Casse
Louisville Metro Police
Special Weapons and Tactics

From: Jaynes, Joshua C. <joshua.jaynes2@louisvilleky.gov>
Sent: Thursday, March 5, 2020 7:49 PM
To: Casse, Joel <Joel.Casse@louisvilleky.gov>
Subject: Elliott Ave Project

Please find the attached affidavite. They are close to being done. Just a few, small things to be freshened up! Thanks!

Josh

PIU investigators learned through SWAT commanders the email containing the Springfield Drive address is the only time the property is mentioned prior to the search warrants being served. It should be noted according to SWAT command during the briefing with Detective Jaynes SWAT was never informed CID would be serving the warrant on Springfield Drive. Detective Jaynes stated during his interview with PIU investigators he, CID Sergeant Kyle Meany, CID Detective Wes Barton and CID Detective Mike Campbell met with SWAT on March 5, 2020 to brief them. Detective Jaynes stated it was at that briefing SWAT was informed CID was planning to serve the warrants at ████████████████████ and Springfield Drive. During the interviews with SWAT command this information is refuted. SWAT commanders all stated if they had known about the Springfield Drive location, they would have advised CID not to serve the warrant simultaneously with the locations on Elliott Ave.

On March 19, 2020 Kenneth Walker was indicted through the Jefferson County Grand Jury for shooting Sergeant Jon Mattingly. The case was presented to the Grand Jury and an indictment was obtained. *It should be noted the case was presented on the aforementioned date due to the documented pandemic affecting the community at large. The Jefferson County Grand Jury was set to be suspended until government health officials allowed the proceedings to continue.*

The PIU investigation continued after obtaining the indictment on Kenneth Walker, investigative reports associated to actions completed during the investigation were completed. Investigators drafted search warrants for cell phones, reviewed countless hours of WVS footage, requested any/all information related to the CID investigation and created a paper/ digital version of the file.

On May 13, 2020 Lieutenant Theodore Eidem informed investigators, the Attorney General's Office would be investigating actions purported by law enforcement. The following letter reflects the request made by Commonwealth Attorney Thomas Wine.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000071 of 000140



On May 13, 2020 Jefferson County Commonwealth Attorney Tom Wine recused his office from the investigation due to conflicts he identified. The investigation into criminal actions purported by law enforcement would be reviewed by the Kentucky State Attorney General's Office.

On May 14, 2020 PIU investigators were scheduled to have a WebEx meeting with the following individuals concerning a general briefing about the incident. This briefing was a newly established practice implemented by current SID command. Chief Steve Conrad, Dennis Sims, Assistant Chief Robert Schroeder, Major Jamey Schwab, Lieutenant Colonel LaVita Chavous, Lieutenant Colonel Shara Parks, Lieutenant Colonel Joshua Judah and Jessie Halladay. Prior to the meeting PIU investigators were informed CID Major Kim Burbrink would be a part of the meeting.

PIU investigators voiced concern about Major Burbrink being a part of the meeting because investigators considered Major Burbrink as an informational witness and due to the type of communication feared other parties could be present during the meeting without PIU investigators knowledge. PIU investigators made several requests to PIU Lieutenant Theodore Eidem for Major Burbrink not to be a part of the briefing. Lieutenant Eidem took investigators concerns to PIU Deputy Chief Robert Schroeder and Major Jamey Schwab and was informed Major Burbrink would be a part of the meeting because she was the CID commander.

Prior to the briefing investigators prepared a power point presentation containing general information. This presentation was provided to the parties on the WebEx meeting. During the briefing PIU investigators shared general information with Chief Conrad about the incident. Major Burbrink began asking pointed questions about the investigation. Major Burbrink questioned the PIU scene processing casting doubt whether evidence was not collected associated with the CID investigation. Investigators advised the Chief there were inconsistencies in CID Detective Brett Hankison's statement to investigators.

*Page 7 of 12*

EXH : 000008 of 000014

Major Burbrink took opposition with investigators and requested investigators to list the inconsistencies. Investigators felt pressured to provide the information but deemed this content sensitive to the investigation. At the conclusion of the meeting Deputy Chief Schroeder apologized for Major Burbrink's comments and acknowledged his decision to involve her in the meeting was a mistake. *It should be noted at no time did any other commander intervene to stop what has been characterized by multiple individuals present during the WebEx meeting as a "Cross examination" of the investigation.*

*It should be noted after the WebEx meeting on May 14, 2020 Chief Conrad requested Lieutenant Eidem to assign me as a co-lead on the investigation.*

On May 15, 2020 Investigators requested the following information from FBI task force Agent Lee Morrison.
*Muzzle flash signatures for a Glock 22 generation 4 handgun.
*Reconstruction of the primary scene as it pertained to the conditions at the time of the incident. More specifically digital reconstruction of gunfire that occurs in an illuminated space extending into a dark space. Investigators completed a word document outlining details associated with the scene process necessary for the request.

On May 16, 2020 PIU investigators learned Detective Jaynes wished to speak to investigators about the information he placed on the Springfield Drive affidavit. On May 18, 2020 I was contacted by Major Kim Burbrink in relation to investigators requesting the digital versions of the paper documents already provided to PIU. Prior to the phone conversation I contacted PIU Lieutenant Theodore Eidem advising him Major Burbrink wished to speak with me, he stated he saw no problem with me returning Major Burbrink's communication. During the conversation Major Burbrink advised she had provided the involved officers an update after she had a follow-up meeting on May 15, 2020 with the Chief's staff.

On May 19, 2020 PIU investigators conducted an interview with Detective Jaynes at the PIU office. Attorney John Dolan was present for the interview. The interview was precipitated by a media story alleging information Jaynes placed in the affidavit for Springfield Drive was untruthful. Jaynes stated during his interview he requested CID Sergeant Jon Mattingly to utilize contacts at Shively Police Department to ascertain whether Jamarcus Glover was receiving suspicious parcels at 3003 Springfield Drive #4. *It should be noted LMPD and the USPS Inspector's Office do not have a working relationship due to previous incidents.* Due to the situation, Jaynes was forced to utilize Shively Police Department to obtain the information he was requesting.

Sergeant Mattingly reported back to Jaynes that Glover was NOT receiving suspicious packages at the address. When questioned why Jaynes put on the affidavit Glover had been receiving parcels at the address, he stated he meant any parcels. Investigators learned throughout the investigation the inspector's office was only asked to check for parcels that were flagged as suspicious and not for any other type of parcel. PIU investigators interviewed members of the Shively Police Department involved in confirming the postal inspector's information. Shively Police Sergeant Timothy Salyers and Detective Mike Kuzma confirmed they informed Sergeant Mattingly there had NOT been suspicious parcels delivered to the Springfield address. Investigators believe the wording on the affidavit is misleading, but given Jaynes statement related to the information, should be reviewed for criminal actions. The following was snipped from a scanned image of the affidavit Jaynes presented to Jefferson Circuit Court Judge Mary Shaw.

9.) Affiant verified through a US Postal Inspector that Jamarcus Glover has been receiving packages at 3003 Springfield Drive #4. Affiant knows through training and experience that it is not uncommon for drug traffickers to receive mail packages at different locations to avoid detection from law enforcement. Affiant believes through training and experience, that Mr. J. Glover may be keeping narcotics and/or proceeds from the sale of narcotics at 3003 Springfield Drive #4 for safe keeping.

During the course of the investigation PIU investigators were provided a paper case file associated to the CID/PBI investigation into the narcotic trafficking syndicate led by Jamarcus Glover. Investigators subsequently requested the digital copies of each paper document CID provided. The request was made through email to CID Lieutenant Gerald Huckleberry.

On May 20, 2020 PIU investigators presented the case in its entirety to Deputy Attorney General Amy Burke and Tim Cocanougher. Prior to the meeting investigators obtained several external hard drives to transfer data from the file through a digital format. During the course of the meeting investigators were requested to remove the file content from the main network to a secure drive. Investigators subsequently fulfilled this request on the same date. On the aforementioned date investigators met with Police Surgeon, William Smock, in his office at LMPD headquarters. After meeting with Dr. Smock investigators were stopped outside of police headquarters by then Deputy Chief of Police Robert Schroeder. Chief Schroeder apologized for Major Burbrink' s actions during the WebEx meeting on May 14, 2020.

On May 22, 2020 the indictment against Kenneth Walker was dismissed by Jefferson County Commonwealth Attorney Tom Wine. Assistant Commonwealth Attorney Ebert Haegele dismissed the charge of attempted murder. In his motion to dismiss he references the dismissal is due to the on-going investigation into the death of Breonna Taylor.

> Due to Ms. Taylor's death, the circumstances of the execution of the search
> warrant and resultant gun fire are subject to ongoing investigations by the Louisville
> Metro Police Public Integrity Unit (PIU) and the Federal Bureau of Investigation
> (FBI). The Commonwealth moves to dismiss the indictment against Defendant
> pending the conclusion of these investigations.

*It should be noted investigators weren't informed prior to the charges being dismissed against Kenneth Walker. Investigators learned this information from an outside law enforcement entity.* Jefferson County Commonwealth Attorney Tom Wine subsequently scheduled a press conference publicly revealing information in the case.

At the time of the dismissal investigators were reviewing a forensic examination report of Kenneth Walker's cell phone. The examination showed Walker was clearly trafficking in marijuana and prescription medication. The report documents numerous communications between Walker and other parties confirming Walker's drug trade. On February 19, 2020 chat #193 between Walker and ▢▢▢▢▢ phone # ▢▢▢▢ ▢▢▢▢ tells Walker she saw a car on the internet that looked like his and explained that someone tried to rob ▢▢▢▢ and it's on camera and it looked like Walker's car, but she didn't say anything to ▢▢▢▢

*Page 9 of 12*

Indicating Walker may have committed a robbery prior to March 13, 2020. Investigators believe this information should be noted because it may have contributed to Walker's actions on March 13, 2020.

The following photos were taken from the report. PIU Sergeant Jeremy Ruoff documented the communications from the report in an investigative report. See the report for details.



On June 1, 2020 Louisville Metro Police Chief Steve Conrad was relieved from his position after an officer involved shooting occurred where a member of the community began shooting at LMPD officers and National Guard members. Louisville Mayor, Greg Fischer, released a statement saying Chief Conrad was relieved of his duties due to LMPD officers not wearing assigned WVS cameras at the time of the shooting. Deputy Chief Robert Schroeder was subsequently named interim chief. It should be noted misinformation disseminated on the Breonna Taylor case lead to civil unrest.

On June 8, 2020 investigators met with Deputy A.G. Amy Burke and Tim Cocanougher, A.G. Commissioner Rich Ferretti, Assistant Special Agent in charge Jake Williams, FBI Agents Lee Morrison, Matt Russell and LMPD PIU Sergeant Kristen Downs. The meeting was for the purpose of assigning specific portions of the investigation.

On June 9, 2020 investigators were contacted by Interim Chief Robert Schroeder related to file content quantities. The following email reflects the information provided.

*Page **10** of **12***

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000074 of 000140

EXH : 000011 of 000014

From: Vance, Jason <Jason.Vance@louisvilleky.gov>
Sent: Tuesday, June 9, 2020 9:43 PM
To: Schroeder, Robert J <Robert.Schroeder@louisvilleky.gov>
Cc: Eidem, Theodore <Theodore.Eidem@louisvilleky.gov>; Schwab, Jamey <Jamey.Schwab@louisvilleky.gov>
Subject: Case Information

Chief,

This is a break down of the case to date. Let me know if you need further.

1. Total file size: 430 GB
2. Total number of interviews: 70
3. Total number of physical evidence collected during the course of the investigation: 182 actual items/ 117 exhibit numbers
4. Total number of scene scans completed (25) exterior/interior.
5. Total number of photos 1272
6. WVS (approximately 26 hours)

Sergeant Jason Vance
Louisville Metro Police Department
Special Investigations Division
Public Integrity Unit (PIU)
3672 Taylor Blvd.
Louisville, KY 40215
502-574-7258 Office
_____ Cell

On June 10, 2020 investigators traveled to the Attorney General's Office in Frankfort, Kentucky to request Digital Forensic Examiner, Mike Littrell to conduct additional examinations on the cell phones belonging to Breonna Taylor. Investigators previously obtained legal authority to forensically exam the phones. Due to a security passcode on the phone only an abbreviated examination was obtained. Mr. Littrell took custody of the cell phones pending further analysis.

On June 10, 2020 LMPD Legal Advisor, Dennis Sims, made several requests for the file content to satisfy requests made through open records and the Civil Division of the Jefferson County Attorney's Office. After consulting with Deputy A.G. Amy Burke, the request was denied due to the potential prosecution of law enforcement. Investigators learned later the same day the iLeads report associated with the incident had been released by PIU Lieutenant Theodore Eidem prior to its completion. The report reflected incorrect information generated from CAD information.

*It should be noted the information was publicly released without knowledge or approval of the lead investigators and prior to review for completion and accuracy. The report was disseminated through multiple media sources creating a disparaging narrative towards LMPD.*

On June 11, 2020 investigators traveled to the Attorney General's Office to meet with additional prosecutors assigned to the investigation. Case information was presented, and follow-up material was identified going forward.

On June 11, 2020 Investigators were ordered to stop all proactive investigative actions by close of business on June 12, 2020. Investigators along with LMPD CSU personnel traveled outside of Jefferson County to an undisclosed location to obtain a DNA standard for Sergeant Jon Mattingly. Sergeant Mattingly provided written consent to obtain the standard in the form of a buccal swab. Investigators returned to the PIU office working through the night to complete the outstanding investigative tasks deemed important to the investigation.

*On June 12, 2020 investigators had an unscheduled meeting with Interim Police Chief Robert Schroeder and Louisville Metro Chief of Public Services Amy Hess. Chief Hess was provided a briefing on the case and was informed of the outstanding investigative actions needed to be fulfilled by investigators.

Investigators requested to seek legal authority to obtain Kenneth Walker's DNA standard and were denied the request by Louisville Metro Chief of Public Services Amy Hess. Investigators were informed prior approval would be needed before taking any further police action in the investigation.

On June 15, 2020 at the request of the prosecutors from the Attorney General's Office investigators took the prosecutors to 3003 Springfield Drive apartment #4. Prior to arriving at the location investigators contacted property management maintenance supervisor, █████████ █████ by phone and received approval from the ownership. *It should noted while scheduling the visit investigators confirmed with property management the apartment was not being leased by an individual or other entity. It should be noted there were numerous repairs clearly made to the apartment due to the incident.* However, the majority of the bullet defect inside the apartment was not repaired and remained untouched. While reviewing the scene location investigators observed the window treatments (Curtains) from the glass patio door lying on the living room floor. Investigators confirmed the bullet defect in the material and collected them at the request of the prosecutors.

On June 29, 2020 the FARO company met with LMPD CSU personnel at the request of investigators and examined the scans completed during the original scene process. FARO representatives David Dustin and Noreen Charlton examined the original scan and established a trajectory for one of the projectiles fired by Hankison through the third bedroom window. The trajectory terminated in Breonna Taylor's body. Scene photographs document there was no corresponding defect in the structure associated with the trajectory. *It should be noted investigators weren't able to establish a trajectory for this projectile due to not observing a corresponding defect. Therefore, a sequential defect documentation was not possible.* It should be noted during this process I learned CSU Technician Jim Sparks had requested to complete training within the FARO platform related to trajectory analysis and was denied the request. Noreen Charlton and I reviewed numerous scene photographs corresponding with projectile defects at the scene. It was determined one of the trajectory rods was placed in the wrong position. The trajectory was noted and will be highlighted within the final trajectory report completed by Noreen Charlton. This information revealed Hankison fired an additional shot through the glass patio door.

On June 30, 2020 investigators requested to conduct a follow-up interview with Sergeant Jon Mattingly through attorney Steve Schroering. Investigators were denied the request due to the threats made against Sergeant Mattingly and the misinformation reported by media. The interview was to serve as follow-up to information investigators learned throughout the investigation.

On July 1, 2020 I requested Dr. Jeffrey Springer (Medical Examiner) and all the prosecutors from the Attorney General's Office for a meeting at the PIU office in relation to the new trajectory information. Prior to the meeting I obtained still image photographs taken from the scene scan from Noreen Charlton for presentation to the parties. After presenting the information associated with the new trajectory, I requested Dr. Springer to identify the five injuries documented on Breonna Taylor's body and which injury could have been caused by the aforementioned trajectory. Dr. Springer stated three injuries were possibly related allowing for movement. Dr. Springer stated the gunshot injury in the right heel, the abdomen injury and the fatal injury to Ms. Taylor's chest were all possibly caused by the trajectory of projectile. It should be noted an absolute determination is not possible due to the projectiles removed from Ms. Taylor's body at time of the autopsy were not suitable for comparison to associate a specific projectile with an officer.

Investigator's Signature: _James Vance_ # 7599
Supervisor's Signature: _L. TREL_ #7508

This report is the property of the Louisville Metro Police Department. Neither it nor its contents may be disseminated to unauthorized personnel or agencies.

PIU 005   11/14.

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-656CFAC3EDA4 : 000077 of 000140

EXH : 000014 of 000014

Filed          20-CI-003067      11/04/2020        David L. Nicholson, Jefferson Circuit Clerk



06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000078 of 000140

EXH- : 000001 of 000001

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Louisville Metro Police Department
## 2017 Spring Qualification



Training Division ▪ Firearms Training Section

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000079 of 000140

EXH-: 000001 of 000038

EXHIBIT SEVEN (7)

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Orientation

- The 2017 Spring qualification will be conducted in low light conditions.

- We must qualify in low light conditions at least once a year due to:
  - LMPD S.O.P. 4.13.1
  - KRS 15.383 and KAR 1:180
  - Case law: Popow vs. City of Margate

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000080 of 000140

EXH : 000002 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000081 of 000140

# Orientation

- To complete this qualification you will need the following:

– Class A duty weapon w/ three (3) magazines

– Class A/B duty belt

– Handheld flashlight

– Weapon-mounted light (Optional)



EXH : 000003 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed        20-CI-003067    11/04/2020        David L. Nicholson, Jefferson Circuit Clerk

# Orientation

## Acceptable hand-held flashlights:



06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000082 of 000140

EXH : 000004 of 000038

# Orientation

- <u>NOT</u> acceptable flashlights:





06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000083 of 000140

EXH : 000005 of 000038

# Review: Flashlight Techniques



Modified Harries Technique



Loaded Shoulder / Neck Index Technique



06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000084 of 000140

EXH-: 000006 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Flashlight Techniques



Ayoob Technique



NYPD Technique

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000085 of 000140

EXH : 000007 of 000038

Filed          20-CI-003067      11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Flashlight Techniques



## Other Techniques:
Loaded Hip Technique
Syringe Technique
Chapman Technique
Rogers Technique



06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000086 of 000140

EXH : 000008 of 000038

Filed          20-CI-003067      11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk



## Qualification Form

Fill in areas marked in yellow for your Class A handgun

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000087 of 000140

EXH : 000009 of 000038



SPRING 2017
LOUISVILLE METRO POLICE DEPARTMENT
FIREARMS QUALIFICATION

**ON-DUTY HANDGUN — CLASS A**

If transitioning from a .40 caliber to a 9mm fill out the middle section also.

Filed 20-CI-003067 11/04/2020 David L. Nicholson, Jefferson Circuit Clerk

# Orientation

Please turn in all completed paperwork to the instructor.



06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000089 of 000140

EXH-I: 000011 of 000038

Filed       20-CI-003067       11/04/2020       David L. Nicholson, Jefferson Circuit Clerk

# Range Safety Rules



firing range accidental shooting

All   News   Videos   Images   Maps   More       Settings   Tools

About 331,000 results (0.96 seconds)

**Man dies after accidental shooting at California gun range - Guns.com**
www.guns.com/2017/01/.../man-dies-after-**accidental-shooting**-at-california-**gun-rang**... ▾
Jan 17, 2017 · A 36-year-old man died Saturday due to injuries he received from an **accidental shooting**
at a **range** near Corona, California. The man was ...

**Woman on life support after South Carolina shooting range accident**
www.guns.com/.../woman-fights-for-her-life-after-south-carolina-**shooting-range-acci**... ▾
Dec 27, 2016 · Woman on life support after South Carolina shooting range accident. ... After an instructor
was killed by a young girl with a machine **gun**.

**Woman shot in the face at South Carolina shooting range | Fox News**
www.foxnews.com/us/2016/.../woman-**shot**-in-face-at-south-carolina-**shooting-range**.ht... ▾
Dec 22, 2016 · The **shooting range** in Anderson County, S.C. (Fox Carolina) ... range told FOX Carolina's
crew at the scene that the **shooting** was an accident but ... Fox News US · Video · Groundbreaking gun
camera takes aim at police body ...

**How many people die annually at shooting ranges in the US? - Quora**
https://www.quora.com/How-many-people-die-annually-at-**shooting-ranges**-in-the-US ▾
Other have given you stats, let me give you an example of why it's typically so safe. 1 ...How many
people accidentally **shoot** themselves, a friend or loved one in the US every year? Can you rent a **gun** at a
shooting range? We have seen ...

**9-year-old accidentally kills range instructor with Uzi - CNN.com**
www.cnn.com/2014/08/26/us/arizona-girl-fatal-**shooting-accident**/ ▾
Aug 28, 2013 · A 9-year-old girl firing a submachine **gun** **accidentally** killed her instructor at a **shooting**
**range** when the weapon recoiled, authorities said.

Florida gun range shooting: 'The gun didn't kill my boy, I did,' father ...

EXH : 000012 of 000038

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000090 of 000140

Filed          20-CI-003067    11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Universal Range Safety Rules



- ALWAYS treat any weapon as though it is loaded until you can safely physically and visually check it.

- ALWAYS keep your finger off the trigger until ready to fire the weapon.

- Be aware of your target and beyond.

- Remember the laser beam rule!

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000091 of 000140

EXH : 000013 of 000038

Filed          20-CI-003067    11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Range Safety Rules

- NEVER insert a magazine into your weapon until you are instructed to do so by an instructor.

- Weapons are loaded ONLY when the instructor gives the command.

- Weapons are loaded ONLY when you are on the firing line facing downrange.

- NEVER place a magazine into the weapon or load a weapon behind the firing line.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000092 of 000140

EXH-I : 000014 of 000038

Filed          20-CI-003067   11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Range Safety Rules

- <u>NEVER</u> anticipate a command from an instructor.

- <u>NEVER</u> draw a handgun from your holster or return to holster with your finger on the trigger.

- Do <u>NOT</u> talk to other officers while on the firing line.  If you have a question, raise your hand and wait for assistance from an instructor.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000093 of 000140

EXH : 000015 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Range Safety Rules

- <u>NEVER</u> leave your firing lane and walk in front of the firing line.  If you drop something <u>LEAVE IT</u> and raise your hand for assistance, i.e. Glock toss.

- In case of a negligent discharge, keep your weapon pointed down range and raise your hand for assistance.

- <u>NEVER</u> put live rounds into your pocket unless ordered to do so by an instructor.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000094 of 000140

EXH : 000016 of 000038

Filed        20-CI-003067    11/04/2020        David L. Nicholson, Jefferson Circuit Clerk

# Range Safety Rules

- *A CEASE FIRE CAN BE CALLED BY ANYONE ON THE FIRING LINE IN THE EVENT OF AN EMERGENCY.*

- NEVER dry fire your weapon unless directed to do so by an instructor.

- If a piece of hot brass gets into your shirt, HOLSTER YOUR WEAPON FIRST; then you can retrieve the brass.

Filed        20-CI-003067    11/04/2020        David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000095 of 000140

EXH-: 000017 of 000038

Filed          20-CI-003067      11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# OSHA

- Eye protection and ear protection (Eyes & Ears) must be worn while you are on the range.

- For hearing protection you can wear either the foam ear inserts or the hard-shell earmuffs, or both.




06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000096 of 000140

EXH-: 000018 of 000038

Filed    20-CI-003067    11/04/2020    David L. Nicholson, Jefferson Circuit Clerk

# OSHA

- Rubber / latex gloves must be worn while you are cleaning any weapon.

- Be sure to wash your hands after firing on the range.



06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000097 of 000140

EXH : 000019 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Housekeeping

- No smoking or tobacco products on the property unless in designated areas (50 ft. away from building).

- Empty trash, sweep up brass, and put up new targets at the end of the training session.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000098 of 000140

EXH·: 000020 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# SOP 4.13

We have made extensive modifications to our firearms policy.

Some of these modifications were necessary due to unsafe conditions on the range.

Other modifications were made to clarify our position on equipment (i.e. holsters) or to add new equipment (i.e. 9mm handguns).

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000099 of 000140

EXH-1 : 000021 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed 20-CI-003067 11/04/2020 David L. Nicholson, Jefferson Circuit Clerk

# SOP 4.13

## Approved Class A holsters:

- 

*Safariland 6360 ALS*

*High gloss*



06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000100 of 000140

EXH : 000022 of 000038

Filed                    20-CI-003067    11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# SOP 4.13 Class A



Safariland 070 (Old JCPD)



Safariland 295 (Old LPD)



06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000101 of 000140

EXH-: 000023 of 000038

Filed          20-CI-003067    11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# SOP 4.13

## Approved Class B,C,D,E holsters:

Safariland 6360 ALS

STX / Plain Black finish



06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000102 of 000140

EXH : 000024 of 000038

Filed          20-CI-003067    11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed          20-CI-003067    11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# SOP 4.13 Class B,C,D,E



*Safariland 7300 (7TS)*

*Safariland 6360*
*STX / Plain Black finish*

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000103 of 000140

EXH : 000025 of 000038

Filed          20-CI-003067   11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# SOP 4.13

"Any holsters with the SERPA (or similar) style retention and release are prohibited for departmental use, including training. This includes any holster with an external release button primarily designed to be disengaged by use of the trigger finger."

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000104 of 000140

EXH-I : 000026 of 000038

Filed 20-CI-003067 11/04/2020 David L. Nicholson, Jefferson Circuit Clerk





06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000105 of 000140

EXH-I : 000027 of 000038

Filed          20-CI-003067   11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# SOP 4.13

- Why are we changing the policy now?
  - SERPA holsters have never been approved by the Training Division or the Firearms Training Section.
  - The policy up until this point always referred to "approved holsters" and SERPA was never on the list.
  - These holsters are cheap plastic holsters that should NEVER be depended upon for law enforcement duty use!!

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000106 of 000140

EXH : 000028 of 000038

Filed          20-CI-003067    11/04/2020          David L. Nicholson, Jefferson Circuit Clerk





06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000107 of 000140

EXH : 000029 of 000038

Filed          20-CI-003067    11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed          20-CI-003067    11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000108 of 000140

EXH-I : 000030 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# SOP 4.13

Effective immediately the following handguns will be allowed for <u>Class A use</u>:



– Glock 17

– Glock 19

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000109 of 000140

EXH : 000031 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

Filed   20-CI-003067   11/04/2020   David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000110 of 000140

EXH : 000032 of 000038

# Specifications

## Glock 17

- 9 mm
- Magazine capacity: **17**
- Grip width: 1.18 inches
- Barrel length: 4.49 inches
- Weight: 25.06 oz.
- Weight loaded: **32.12** oz.
- Overall length: 7.95 inches

## Glock 22

- .40 caliber
- Magazine capacity: **15**
- Grip width: 1.18 inches
- Barrel length: 4.49 inches
- Weight: 25.59 oz.
- Weight loaded: **34.42** oz.
- Overall length: 7.95 inches

Filed   20-CI-003067   11/04/2020   David L. Nicholson, Jefferson Circuit Clerk

Filed        20-CI-003067    11/04/2020        David L. Nicholson, Jefferson Circuit Clerk

# Specifications

## Glock 19

- 9 mm
- Magazine capacity: **15**
- Grip width: 1.18 inches
- Barrel length: 4.01 inches
- Weight: 23.65 oz.
- Weight loaded: **30.18** oz.
- Overall length: 7.28 inches

## Glock 23

- .40 caliber
- Magazine capacity: **13**
- Grip width: 1.18 inches
- Barrel length: 4.01 inches
- Weight: 23.65 oz.
- Weight loaded: **31.06** oz.
- Overall length: 7.28 inches

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000111 of 000140

EXH : 000033 of 000038

Filed          20-CI-003067      11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Specifications

## Glock 26

- 9 mm
- Magazine capacity: **10**
- Grip width: 1.18 inches
- Barrel length: 3.46 inches
- Weight: 21.71 oz.
- Weight loaded: **26.12** oz.
- Overall length: 6.41 inches

## Glock 27

- .40 caliber
- Magazine capacity: **9**
- Grip width: 1.18 inches
- Barrel length: 3.46 inches
- Weight: 21.89 oz.
- Weight loaded: **27.00** oz.
- Overall length: 6.41 inches

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000112 of 000140

EXH : 000034 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# 9mm vs. 40

LMPD research indicates that _most_ officers are able to shoot more quickly, absorb the recoil better, and re-align the sights quicker while using a Glock 17 (9mm) versus the 22 (.40 caliber).

These results were the same whether testing with new recruits or experienced shooters.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000113 of 000140

EXH : 000035 of 000038

Filed          20-CI-003067   11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# 9mm vs. 40

Other officers tested with both the 17 (9mm) and the 22 (.40 caliber) reported they were more comfortable shooting the 17 because they felt less recoil and the were able to handle the weapon better.

Ultimately the choice between 9mm or .40 is up to the individual officer based upon his/her personal preference, confidence, accuracy, and competence.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000114 of 000140

EXH : 000036 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# SOP 4.13

## Patrol Rifle

- *AR15 style Police carbine (__BLACK IN COLOR OR WITH A STAINLESS STEEL FINISH__) chambered in 5.56 caliber. Stocks, foregrips, handguards, pistol grips, accessory rail covers and all other accessories must be __BLACK IN COLOR__. Exceptions must be approved by the Training Division Commander.*

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000115 of 000140

EXH : 000037 of 000038

Filed          20-CI-003067     11/04/2020          David L. Nicholson, Jefferson Circuit Clerk



06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000116 of 000140

EXH-: 000038 of 000038

Case 3:20-cv-00764-DJH  Document 1-3  Filed 11/13/20  Page 117 of 140 PageID #: 133
20-CI-003067    11/04/2020        David L. Nicholson, Jefferson Circuit Clerk

06.08.2020
**NEWS**

# The Short, Fraught History of the 'Thin Blue Line' American Flag

The controversial version of the U.S. flag has been hailed as a sign of police solidarity and criticized as a symbol of white supremacy.

By **MAURICE CHAMMAH** and **CARY ASPINWALL**

As protests over policing continue to convulse cities throughout the U.S., one symbol keeps showing up: a black-and-white American flag with one blue stripe.

Recently, the flag was flown from the back of a car alongside protests in South Dakota, and burned outside the Utah State Capitol. When deputies hoisted the flag outside government buildings in Cincinnati, Ohio, and Orange, California, the sheriffs in both communities were sharply criticized. Officers have worn versions of the flag on face masks while clashing with protesters in Baltimore and in Washington, D.C.

Those who fly the flag have said it stands for solidarity and professional pride within a dangerous, difficult profession and a solemn tribute to fallen police officers. But it has also been flown by white supremacists, appearing next to Confederate flags at the 2017 'Unite the Right' rally in Charlottesville, Virginia. County officials in Oregon recently paid $100,000 to a black employee of a law enforcement agency there, after she said she was harassed by coworkers for complaining about her colleagues displaying the flag at work.

Case 3:20-cv-00764-DJH   Document 1-3   Filed 11/13/20   Page 118 of 140 PageID #: 134
11/1/2020                              20-CI-003067   11/04/2020        David L. Nicholson, Jefferson Circuit Clerk
                        The Short, Fraught History of the 'Thin Blue Line' American Flag | The Marshall Project

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000118 of 000140

Now, as police again become the focal point of a fight for racial equality in the U.S., the flag has returned to both mirror and amplify divisions.

But how did this flag come to be so pervasive? And what does it really stand for?

In 2014, a white college student named Andrew Jacob was watching protests of police killings of Eric Garner, Michael Brown and Tamir Rice. He had seen the image of the flag on patches and stickers, he told The Marshall Project, but not an actual flag. While in high school in West Bloomfield, Michigan, he had attended a memorial service for a police officer who had been killed on the job.

Now, Jacob is the president of Thin Blue Line USA, one of the largest online retailers devoted exclusively to sales of pro-police flags, T-shirts, neckwear and jewelry. "The flag has no association with racism, hatred, bigotry," he said. "It's a flag to show support for law enforcement—no politics involved." The company officially disavowed its use in Charlottesville.

Jacob said the flag was not a direct reaction to the first Black Lives Matter protests—an idea suggested by a previous origin story in Harper's—but he allows he may have first seen the thin blue line image after those protests spurred the circulation of pro-police imagery online. "That's maybe why it came to my eyes," he said.

As Jacob built the company, a "Blue Lives Matter" movement was growing in the wake of news stories of multiple officers shot to death in Baton Rouge, Louisiana; Brooklyn, New York; and Dallas. Meanwhile, Donald Trump, as a presidential candidate, called police "the force between civilization and total chaos." Some states began passing laws to categorize physical attacks on law enforcement officers as hate crimes.

Police were not actually in greater danger than they had been before the Black Lives Matter movement. Ambush killings of police have actually declined more than 90 percent since 1970, even with the recent spikes, according to a study by Michael White, a professor of criminology at Arizona State University. White understands how the thin blue line flag has become a part of police culture, and that officers may view it as a sign of solidarity, but also worries about the message it sends to the public.

"It fosters this 'us versus them' mentality," he said. "The police and community should work together, in order to produce safety. Each should respect the role of the other. If you're looking at the community as a potential enemy, or a threat, that's certainly going to hinder any positive relationship."

Before the flag came the phrase. The idea of a "thin blue line" can be traced all the way back to a 1854 British battle formation, a "thin red line" used during the Crimean War and then popularized in art, poetry and song. According to lawyers James Clapp and Elizabeth Thornburg, who have dug up the history behind popular phrases, the idea migrated to other professions, with other colors, from a "thin white line of bishops" to a "thin blue line of public schoolboys in blazers."

It was occasionally used for police, they write. But that usage caught on in 1922, after New York police commissioner Richard Enright, facing criticism of his leadership, mentioned it in a public relations effort. The phrase started showing up in speeches by politicians and related press coverage from Chicago to Los Angeles.

In the 1950s, "The Thin Blue Line" was the title of a briefly running television show about the Los Angeles Police Department, masterminded by the chief, William H. Parker, who took advantage of Hollywood's proximity to make public relations a key part of his tenure. He also opened up the department's files to the writers of "Dragnet."

Parker was known for unambiguous racism. He said some immigrants were "not far removed from the wild tribes of Mexico" and compared black residents participating in the Watts Riots—which stemmed in part from anger over his own department's mistreatment—to "monkeys in a zoo."

Parker used the phrase 'thin blue line' constantly in his speeches. The phrase was further popularized by the novels of Joseph Wambaugh, and it typified Parker's philosophy: having served in the military, he wanted to end corruption and professionalize the police force.

In his view, the police "protected Western civilization from communists, progressive politicians, minorities, anybody who agitated for something that didn't fit his very narrow scheme," said Alisa Kramer, who wrote a 2007 dissertation on Parker's tenure. "There are a lot of parallels between Parker and Trump; Parker had no understanding of the complexities of poverty and racism."

After Parker's sudden death in 1966, the city named the police headquarters after him. The Parker Center went on to be a primary site of protests in 1992 after police were filmed beating Rodney King.

Parker's tenure augured a bigger shift towards militarism in police departments, which came to buy military gear directly from the Department of Defense. Criminologists Don L. Kurtz and Alayna Colburn have analyzed the language police officers use in formal interviews, and argue that the "thin blue line" idea is an example of popular culture informing internal police culture,

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000119 of 000140

EXH : 000003 of 000006

highlighting "the assumed differences between officers and citizens and further progresses an 'us versus them' mentality among officers."

The phrase gained another boost with Errol Morris's 1988 film "The Thin Blue Line," in which a Dallas judge quotes a prosecutor describing what separates "the public from anarchy." The title was ironic, if not sly, since the film depicted how law enforcement sent an innocent man to death row.

Over the years, officers around the country occasionally placed stickers of a blue line surrounded by black on their cars. After the ambush of Dallas officers in 2016, the flag became a common sight in yards and on bumper stickers around the city, along with "Back the Blue" and "Thank a Cop" signs. Mourners wore blue neckties and hair ribbons at the funeral service, but the fallen officers' caskets were draped with American flags.

Dallas Police Sgt. Stephen Bishopp has a doctorate and has studied police stress, use of force and officer misconduct. The "thin blue line" symbol existed before several of his colleagues were gunned down by a sniper in July 2016, he said. To him, it symbolizes respect and understanding for the families of officers killed in the line of duty—including suicides.

"When I see that flag as a sticker on a car or flying in someone's yard, I know that there is someone there that knows what I'm going through. They know because they are a part of the family," Bishopp said. "I don't really care if it bothers people or hurts their feelings to see that flag. I absolutely could care less. I am proud of what I do, the people I work with, and the ones who have died defending the rights of strangers. I will continue to fly that flag until my very last day."

Social media allows for endless remixing, and the offerings now appear infinite. You can buy a sticker that mixes the imagery with the Disney World logo. You can buy a dog tag necklace, with a Matthew 5:9 engraved on the back: "Blessed are the peacemakers, for they will be called children of God." Law enforcement officers can buy a special edition Sig Sauer pistol covered with the flag and blue line.

But as the images have multiplied, so have the meanings. The American flag and blue line have often been blended with the image of a skull associated with The Punisher, an ex-Marine turned vigilante who first appeared in Marvel comics in 1974, combatting crime through extrajudicial murder and torture. "Police should not be embracing a criminal as their symbol," the character's creator Gerry Conway told Syfy Wire last year. "In a way, it's as offensive as putting a Confederate flag on a government building."

Case 3:20-cv-00764-DJH   Document 1-3   Filed 11/13/20   Page 121 of 140 PageID #: 137
20-CI-003067       11/04/2020        David L. Nicholson, Jefferson Circuit Clerk

Although the flag's manufacturers have tried to keep politics away from the flag, the current protests over the death of George Floyd have thrust the image into larger debates. In Cold Spring, New York, local leaders debated last week whether placing a decal of the flag on a police car would make some people afraid to ask officers for help. In Montclair, New Jersey, a police leader begged residents on a Zoom call not to view the flag as a "symbol of racism."

"We've seen trucks riding around with big old versions," said Melina Abdullah, a co-founder of the Los Angeles chapter of Black Lives Matter, about the protests in recent days. "It feels akin to a Confederate flag." She has also noticed the flag's image on police and other government-owned vehicles, and she sees this as evidence that even self-described liberal officials are not doing enough to combat white supremacy. "The supposed 'liberal' answer to Donald Trump has not been as critical of police violence as it should be," she said.

Police officers themselves are also not speaking uniformly about the flag. Last month, San Francisco's chief of police Bill Scott banned his officers from wearing face masks emblazoned with the thin blue line flag, worrying they would be seen as "divisive and disrespectful." The masks had been distributed by the local police union, which accused the department of failing to provide masks. "We did it as a morale booster for each other," union president Tony Montoya said, "not as a political statement."



Some San Francisco police officers wore "thin blue line" flag face coverings at a housing protest in May. CHRIS VICTORIO/SPECIAL TO SAN FRANCISCO EXAMINER

Local skirmishes and letters to the editor in various states have questioned whether the thin blue line flag is a violation of the U.S. Flag Code, which specifically states: "The flag should never have placed upon it, nor any part of it, nor attached to it any mark, insignia, letter, word, figure, design, picture, or drawing of any nature."

Despite that language, the American flag is depicted in many other ways for a number of purposes, many commercial. Still, the American Legion, which played a key role in drafting the Flag Code

Filed                    20-CI-003067    11/04/2020            David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000121 of 000140

EXH : 000005 of 000006

and is the go-to authority on proper U.S. flag etiquette, has not taken an official position yet on the black-and-white version with a blue line, a spokesman told The Marshall Project.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000122 of 000140

EXH·: 000006 of 000006

Filed          20-CI-003067   11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Louisville Metro Police Department

| | |
|---|---|
| **Standard Operating Procedures** | SOP Number:   8.1 |
| | Effective Date:  07/20/03 |
| | Prv. Rev. Date: 02/24/19 |
| | Revised Date:   05/31/20 |
| **Chapter: Field Operations** | Accreditation Standards: |
| **Subject:  Search Warrants** | KACP: 1.3, 1.4, 19.6 |

### 8.1.12     DISTRIBUTION OF COPIES (CONTINUED)

- One (1) copy of the search warrant, affidavit, inventory sheet, and order to seal, if applicable, will be forwarded to the Legal Advisor's Office. Officers should not send additional documents with the search warrant documents (e.g. risk assessment matrices, operations plans, currency seizure forms), as anything returned to the Jefferson Circuit Court Clerk's Office is subject to open records inspection.
- If the search warrant is a "no-knock" warrant, the requesting officer will write "No-Knock" on the top of the warrant copy returned to the Legal Advisor's Office.

If a search warrant is not executed, one (1) copy of the search warrant, affidavit, and order to seal, if applicable, must still be sent to the Legal Advisor's Office with the words "Not Executed" written on the first page of the search warrant. At least one (1) copy of each warrant document should be retained by the officer for his/her case file.

If the officer wants the search warrant documents to be exempt from open records inspection, he/she must follow the instructions in SOP 8.1.10 for sealing search warrants.

### 8.1.13     RISK ASSESSMENT MATRIX/SWAT TEAM RESPONSE (KACP 19.6d)

A Risk Assessment Matrix (LMPD #05-0016) will be completed prior to the service of all search warrants.  A commanding officer will complete an Arrest/Search Warrant Information Sheet (LMPD #05-0023) and notify the Special Weapons and Tactics (SWAT) Team Commander to coordinate a response if:

- The Risk Assessment Matrix score necessitates the use of the SWAT Team; or
- The situation requires a mandatory SWAT Team call-out, as listed on the Risk Assessment Matrix, regardless of the score.

Prior to SWAT Team entry, the SWAT Team Commander will be provided a copy of the search warrant, affidavit, and completed matrix. The SWAT Team will only assist with the entry and security search.

All completed matrices will be forwarded, through the appropriate chain of command, to the Support Bureau Commander or Patrol Bureau Commander. A copy of the completed matrix will be forwarded to the SWAT Team Commander.

Nothing in this section prohibits a commanding officer from consulting the SWAT Team Commander, even if the matrix requirements for a call-out are not met.

### 8.1.14     CLANDESTINE LABORATORY GUIDELINES

Clandestine laboratories pose a serious danger to responders and surrounding neighborhoods. Police officers are prohibited from entering a known clandestine drug laboratory without proper equipment and certifications and prior to conducting air monitoring and an explosive sweep.

Clandestine laboratory-certified officers must be present prior to entry at locations with suspected clandestine laboratories. Clandestine laboratories will be treated as hazardous material sites and officers will follow the

Filed          20-CI-003067   11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000123 of 000140

EXHIBIT THREE (3)

# Louisville Metro Police Department

| | | |
|---|---|---|
| **Standard Operating Procedures** | SOP Number: 8.1 | |
| | Effective Date: 07/20/03 | |
| | Prv. Rev. Date: 02/24/19 | |
| | Revised Date: 05/31/20 | |
| Chapter: Field Operations | Accreditation Standards: KACP: 1.3, 1.4, 19.6 | |
| Subject: Search Warrants | | |

## 8.1.17    PREPARATION FOR SEARCH WARRANT EXECUTION

A commanding officer will be responsible for verifying that the search warrant is valid and that the premise to be searched is the location listed on the warrant. For the purposes of this policy, acting sergeants will be considered commanding officers. The lead officer will complete a Search Warrant Operations Plan form (LMPD #05-0025).

Prior to warrant service, the on-scene commander will act as the Incident Commander (IC) for service of the search warrant and the Incident Command System (ICS) will be implemented and followed. The IC will conduct a briefing with all search team personnel. This briefing will include:

- A review of operations and procedures that the search personnel will follow.
- An analysis of conditions at the premises utilizing maps, charts, and diagrams, when appropriate.
- Tactics and equipment that are to be used in the event of forced entry.
- A pre-planned hospital route.

The IC should also determine if any circumstances have changed that would make executing the search warrant, at that time, undesirable.

MetroSafe will be notified that a search warrant is being executed. For safety reasons, this notification may be made by phone. If the search warrant is executed within another police jurisdiction, that agency will be notified.

When a search warrant is executed in another division, the on-duty supervisor in the affected division will be notified. If requested, a uniformed officer will be provided to assist.

## 8.1.18    ENTRY PROCEDURES

All members of the search team will wear body armor.

All non-uniformed officers will be clearly identified as law enforcement officers by a distinctive vest, jacket, or other visible indicator of position and authority. The identification will include the word "POLICE" clearly marked on the vest, jacket, or other visible indicator of position. Members of other agencies assisting the LMPD will be identified by using the procedures of their own agency's policy.

All search warrants in which forced entry is anticipated will have a uniformed officer and a marked police vehicle respond to provide a visible presence outside of the premises prior to any attempts of forced entry. An exception to this rule would be when a tactical situation determines it to be unsafe. In these limited cases, the warrant will be served by the LMPD SWAT Team.

## 8.1.19    NOTIFICATION

Before entry to the premises is made, the officer executing the search warrant will give appropriate notice by identifying themselves as a law enforcement officer and the intent to execute a search. To justify a "no-knock" entry, an officer must have a reasonable suspicion that knocking and announcing his/her presence under the particular circumstances would present a threat of physical violence against the officer or others.

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000124 of 000140

EXH : 000002 of 000004

Filed          20-CI-003067      11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

## Louisville Metro Police Department

| Standard Operating Procedures | SOP Number:  8.1 |
| --- | --- |
| | Effective Date:  07/20/03 |
| | Prv. Rev. Date: 02/24/19 |
| | Revised Date:   05/31/20 |
| Chapter: Field Operations | Accreditation Standards: |
| Subject:  Search Warrants | KACP: 1.3, 1.4, 19.6 |

**8.1.19      NOTIFICATION (CONTINUED)**

If the officer has reasonable suspicion, <u>prior</u> to obtaining a search warrant, that circumstances exist which may justify a "no-knock" entry, he/she should seek a "no-knock" search warrant. Officers may not seek a "no-knock" search warrant merely to prevent the destruction of evidence. To obtain a "no-knock" search warrant, the officer must:

- Obtain prior approval from a lieutenant;
- Obtain prior approval from the Division Commander;
- Describe the circumstances that he/she believes justify the necessity for a "no-knock" search warrant, in the warrant affidavit;
- Notate "No-Knock" on the search warrant draft;
- Obtain final LMPD approval from the Chief of Police, or his/her designee; and
- Verbally advise the reviewing judge that he/she is requesting a "no-knock" search warrant.

The judge will approve (sign) or deny the "no-knock" search warrant. If the signing judge does not approve a "no-knock" entry, the executing officer will give appropriate notice of his/her identity and purpose. All "no-knock" warrants will be served by the SWAT Team. The commanding officer supervising the application for a "no-knock" warrant will notify the SWAT Team Commander when a "no-knock" warrant is applied for to allow the SWAT Team adequate time to begin preparations for warrant service. Unless exigent circumstances exist requiring the service of a "no-knock" warrant in the overnight hours, all "no-knock" warrants will be served between 0800 and 2200 hours. All "no-knock" warrants approved by a judge will be documented on an AIR, regardless of whether the warrant was served. It will be noted in the AIR whether the signing judge approved a "no-knock" entry. A commanding officer from the division or unit applying for the "no-knock" warrant will complete the AIR, via the BlueTeam link, located on the LMPD Intranet (refer to SOP 3.1).

Each situation must be considered individually, based on the facts known prior to, and during, the execution of the search warrant. The officer may use whatever force is reasonable to execute the warrant, including forced entry into the building to be searched.

**8.1.20      ON PREMISES ACTIVITIES**

The lead officer should verify that members of the search team conduct a security sweep of the premises and secure all persons found.

Before undertaking any search or seizure pursuant to the warrant, the lead officer should give a copy of the warrant to the person to be searched, or the person in apparent control of the premises or vehicle to be searched.

Once the premises have been secured, each room or vehicle should be carefully searched. This search should be conducted by pairs of officers or, at a minimum, officers in visual contact with one another.  If manpower permits, each area should be searched twice by different officers.

The lead officer should verify that the entire search warrant execution process is documented.  A written record should be supported by photographs and, if practical, video recording the entire search site from start to finish.

Filed          20-CI-003067      11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000125 of 000140

EXH : 000003 of 000004

Filed          20-CI-003067    11/04/2020          David L. Nicholson, Jefferson Circuit Clerk

# Louisville Metro Police Department

| | |
|---|---|
| **Standard Operating Procedures** | SOP Number:   8.1 |
| | Effective Date:   07/20/03 |
| | Prv. Rev. Date: 02/24/19 |
| | Revised Date:   05/31/20 |
| **Chapter: Field Operations** | Accreditation Standards: |
| **Subject:  Search Warrants** | KACP: 1.3, 1.4, 19.6 |

**8.1.20      ON PREMISES ACTIVITIES (CONTINUED)**

Members are required to process property, or evidence, in accordance with established policies and procedures of the Louisville Metro Police Department (LMPD).

Members are prohibited from converting for their own use, manufacturing, concealing, falsifying, destroying, removing, tampering with, or withholding any property, or evidence, in connection with an investigation or other police action, except in accordance with established departmental procedures and statutory law.

**8.1.21      SEIZED ITEMS**

Items to be seized are as follows:

- Items listed specifically in the warrant.
- Instruments of the crime.
- Fruits of the crime.
- Contraband, or items illegal to possess, such as illegal drugs or stolen property, that are either in plain view or found within the scope of the search (KACP 1.4b).

Suspected stolen articles may not be manipulated, or moved, for the sole purpose of checking for serial numbers or other identifying markings. If, for example, an officer lifts a television set to search for drugs, and notices a serial number that has been listed as belonging to a stolen television, the television can be seized, but the officer must be able to articulate the reason that the television was moved.

A logging officer should document the collection of, and be responsible for, the preservation of evidence until the items are transferred to an evidence custodian. All seized items should be photographed, or their location documented, prior to being taken to the logging officer.

The logging officer should complete an inventory sheet that includes the following:

- Items seized.
- Location seized.
- Time seized. Preferably one (1) timepiece should be used to avoid discrepancies.
- Name and code number of the seizing officer.

If an inventory sheet is not utilized, the logging information should be written on the search warrant.

The lead officer will verify that a copy of the search warrant (but not the affidavit) and a list of seized items are left at the site of the search.

The officer in charge must verify that all reports and evidence control forms are completed before the end of his/her tour of duty. The seizing officer will verify that all evidence is properly packaged and turned in prior to the end of his/her tour of duty, unless otherwise directed by competent authority.

| AOC-E-105      Sum Code: CI |  | Case #: **20-CI-003067** |
|---|---|---|
| Rev. 9-14 | | Court: **CIRCUIT** |
| Commonwealth of Kentucky | | County: **JEFFERSON Circuit** |
| Court of Justice     *Courts.ky.gov* | | |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | |

*Plaintiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO:  **HANKISON, BRETT**

   **C/O CAROL PETITT, ATTORNEY AT LAW**

   **7600 WEST HIGHWAY 146, SUITE 100**

   **PEWEE VALLEY, KY 40056**

The Commonwealth of Kentucky to Defendant:
**HANKISON, BRETT**

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nichoben*

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

   Date: _____, 20 _____          _____
                                                                    Served By

                                                                _____
                                                                    Title

Summons ID: @00000959955
CIRCUIT: 20-CI-003067 Certified Mail
NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL



Page 1 of 1

eFiled

| AOC-E-105 | Sum Code: CI | | Case #: | **20-CI-003067** |
|---|---|---|---|---|



AOC-E-105
Rev. 9-14

Sum Code: CI

Commonwealth of Kentucky
Court of Justice       Courts.ky.gov

CR 4.02; Cr Official Form 1

Case #: **20-CI-003067**
Court: **CIRCUIT**
County: **JEFFERSON Circuit**

## CIVIL SUMMONS

*Plaintiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO: **COSGROVE, MYLES**

   **C/O KENT WICKER, ATTY AT LAW**

   **325 WEST MAIN STREET, #2100**

   **LOUISVILLE, KY 40202**

The Commonwealth of Kentucky to Defendant:
**COSGROVE, MYLES**

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nicholar*

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

   Date: _____ , 20 _____          _____

                                                              Served By

                                                  _____

                                                              Title

Summons ID: @00000959956
CIRCUIT: 20-CI-003067 Certified Mail
NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL



Page 1 of 1

eFiled

| AOC-E-105      Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice      Courts.ky.gov<br><br>CR 4.02; Cr Official Form 1 |  | Case #: **20-CI-003067**<br>Court:   **CIRCUIT**<br>County: **JEFFERSON Circuit** |
|---|---|---|

# CIVIL SUMMONS

*Plantiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO:   **MATTINGLY, JONATHAN**

   **C/O KENT WICKER, ATTORNEY AT LAW**

   **325 WEST MAIN STREET, #2100**

   **LOUISVILLE, KY 40202**

The Commonwealth of Kentucky to Defendant:
**MATTINGLY, JONATHAN**

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*David L. Nicholson*

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

   Date: _____, 20 _____        _____
                                                            Served By

                                                     _____
                                                            Title

Summons ID: @00000959957
CIRCUIT: 20-CI-003067 Certified Mail
NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL



Page 1 of 1

*eFiled*

| AOC-E-105    Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice    *Courts.ky.gov*<br><br>CR 4.02; Cr Official Form 1 |  | Case #: **20-CI-003067**<br>Court: **CIRCUIT**<br>County: **JEFFERSON Circuit** |
|---|---|---|
| | **CIVIL SUMMONS** | |

*Plaintiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*


TO: **LOU/JEFF CO. METRO GOVERNMENT**
 **MAYOR GREG FISHER**
 **527 WEST JEFFERSON STREET, 4TH FLOOR**
 **LOUISVILLE, KY 40202**


The Commonwealth of Kentucky to Defendant:


You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.


*Davis L. Nicholson*

Jefferson Circuit Clerk
Date: **11/4/2020**


---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

   Date: _____, 20_____       _____
                                                    Served By

                                             _____
                                                    Title

---



Page 1 of 1

**eFiled**

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000130 of 000140

CI : 000001 of 000001

| AOC-E-105 Sum Code: CI |  | Case #: **20-CI-003067** |
|---|---|---|
| Rev. 9-14 | | Court: **CIRCUIT** |
| Commonwealth of Kentucky | | County: **JEFFERSON Circuit** |
| Court of Justice    *Courts.ky.gov* | | |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | |

*Plaintiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO: **LMPD**

**INTERIM CHIEF, YVETTE GENTRY**

**633 WEST JEFFERSON STREET**

**LOUISVILLE, KY 40202**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

David L. Nicholson

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____         _____
                                                                              Served By

                                                                              _____
                                                                              Title


eFiled



| AOC-E-105 | Sum Code: CI | | Case #: | **20-CI-003067** |
| Rev. 9-14 | | | Court: | **CIRCUIT** |
| Commonwealth of Kentucky | | | County: | **JEFFERSON Circuit** |
| Court of Justice | *Courts.ky.gov* | | | |

CR 4.02; Cr Official Form 1

# CIVIL SUMMONS

*Plantiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO: **LMPD**

   **MICHAEL O' CONNELL, COUNTY ATTORNEY**

   **600 WEST JEFFERSON STREET**

   **LOUISVILLE, KY 40202**

The Commonwealth of Kentucky to Defendant:

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nicholson*

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

   Date: _____, 20 _____      _____

                                              Served By

                                        _____

                                              Title

---

Summons ID: @00000959960
CIRCUIT: 20-CI-003067 Certified Mail
NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL



Page 1 of 1

eFiled

| AOC-E-105        Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice      Courts.ky.gov<br><br>CR 4.02; Cr Official Form 1 | <br><br>**CIVIL SUMMONS** | Case #: **20-CI-003067**<br>Court:  **CIRCUIT**<br>County: **JEFFERSON Circuit** |

*Plaintiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO:  **ANTHONY  JAMES**
**LMPD DETECTIVE**
**633 WEST JEFFERSON STREET**
**LOUISVILLE, KY 40202**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons.  **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nicholson*

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title



eFiled

AOC-E-105          Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice     Courts.ky.gov

CR 4.02; Cr Official Form 1



**CIVIL SUMMONS**

Case #: **20-CI-003067**
Court: **CIRCUIT**
County: **JEFFERSON Circuit**

*Plaintiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO: **MIKE  NOBLES**
   **LMPD DETECTIVE**
   **633 WEST JEFFERSON STREET**
   **LOUISVILLE, KY 40202**

The Commonwealth of Kentucky to Defendant:

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nicholas*

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

   Date: _____, 20 _____      _____

                                           Served By

                                           _____

                                           Title

Summons ID: @00000959962
CIRCUIT: 20-CI-003067 Certified Mail
NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL



Page 1 of 1

**eFiled**



| AOC-E-105<br>Rev. 9-14 | Sum Code: CI | | Case #: **20-CI-003067** |
|---|---|---|---|
| Commonwealth of Kentucky<br>Court of Justice    *Courts.ky.gov* | | | Court:   **CIRCUIT** |
| CR 4.02; Cr Official Form 1 | | | County: **JEFFERSON Circuit** |

## CIVIL SUMMONS

*Plantiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO:  **MIKE  CAMPBELL**

**LMPD DETECTIVE**

**633 WEST JEFFERSON STREET**

**LOUISVILLE, KY 40202**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nicholson*

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____          _____

Served By

_____

Title



Page 1 of 1

eFiled

| AOC-E-105        Sum Code: CI |  | Case #: **20-CI-003067** |
|---|---|---|
| Rev. 9-14 | | Court: **CIRCUIT** |
| Commonwealth of Kentucky | | County: **JEFFERSON Circuit** |
| Court of Justice    *Courts.ky.gov* | | |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | |

*Plaintiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO:  **SHAWN  HOOVER**

**LT. LMPD**

**633 WEST JEFFERSON STREET**

**LOUISVILLE, KY 40202**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons.  **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nicholar*

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

    Date: _____, 20_____          _____

                                                          Served By

                                              _____

                                                          Title



Page 1 of 1

eFiled

 **Commonwealth of Kentucky**
**David L. Nicholson, Jefferson Circuit Clerk**

| | |
|---|---|
| **Case #:** 20-CI-003067 | **Envelope #:** 2908443 |
| **Received From:** SEXTON, JEFFREY ALLAN | **Account Of:** SEXTON, JEFFREY ALLAN |
| **Case Title:** NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL | **Confirmation Number:** 116475301 |
| **Filed On** 11/4/2020   4:06:45PM | |

| **#** | **Item Description** | **Amount** |
|---|---|---|
| 1 | Charges For Services(Jury Demand / 12) | $70.00 |
| 2 | Money Collected For Others(Postage) | $209.30 |
| 3 | Charges For Services(Copy - Photocopy) | $166.40 |
| | **TOTAL:** | $445.70 |

Generated: 11/5/2020

Page 1 of 1

06173379-81C7-4619-BBA3-655CFAC3EDA4 : 000137 of 000140

| AOC-E-105 | Sum Code: CI |
|---|---|

Rev. 9-14

Commonwealth of Kentucky
Court of Justice    Courts.ky.gov

CR 4.02; Cr Official Form 1



Case #: **20-CI-003067**
Court: **CIRCUIT**
County: **JEFFERSON Circuit**

# CIVIL SUMMONS

*Plantiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO: **STEVE CONRAD**
**RETIRED CHIEF LMPD**
**9208 WHITEGATE COURT**
**LOUISVILLE, KY 40222**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nicholson*

Jefferson Circuit Clerk
Date: **11/4/2020**

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

Summons ID: @00000959965
CIRCUIT: 20-CI-003067 Certified Mail
NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL



Page 1 of 1

eFiled

| AOC-E-105    Sum Code: CI | | Case #: **20-CI-003067** |
| Rev. 9-14 | | Court: **CIRCUIT** |
| Commonwealth of Kentucky |  | County: **JEFFERSON Circuit** |
| Court of Justice    *Courts.ky.gov* | | |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | |

*Plaintiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO:  **JERRY  HUCKLEBERRY**

   **LT. LMPD**

   **633 WEST JEFFERSON STREET**

   **LOUISVILLE, KY 40202**

The Commonwealth of Kentucky to Defendant:

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons.  **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nicholson*

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

   Date: _____, 20_____      _____
                                         Served By

                                         _____
                                         Title

Summons ID: @00000959966
CIRCUIT: 20-CI-003067 Certified Mail
NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL



eFiled

| | | |
|---|---|---|
| AOC-E-105    Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice      *Courts.ky.gov*<br><br>CR 4.02; Cr Official Form 1 |  | Case #: **20-CI-003067**<br>Court:   **CIRCUIT**<br>County: **JEFFERSON Circuit** |

# CIVIL SUMMONS

*Plaintiff,* **NAPPER, CHELSEY , ET AL VS. HANKISON, BRETT , ET AL**, *Defendant*

TO:   **JOSHUA  JAYNES**
      **DETECTIVE LMPD**
      **633 WEST JEFFERSON STREET**
      **LOUISVILLE, KY 40202**

The Commonwealth of Kentucky to Defendant:

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*David L. Nicholson*

Jefferson Circuit Clerk
Date: **11/4/2020**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

Date: _____ , 20 _____        _____

                                                                      Served By

                                                        _____

                                                                           Title



Page 1 of 1

eFiled