**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

CHELSEY NAPPER, ET AL.                                                   PLAINTIFFS

v.                                                        No. 3:20-cv-764-BJB

BRETT HANKISON, ET AL.                                                   DEFENDANTS

<u>OPINION & ORDER</u>

The many claims raised in this case lie adjacent to the familiar and tragic events that followed the Louisville Metro Police Department's execution of a *no-*knock search warrant by *knocking* on the door of Breonna Taylor's apartment. Her boyfriend, Kenneth Walker, fired a weapon in response, hitting one officer. Three officers returned fire, killing Taylor and wounding Walker.

This lawsuit does not seek compensation for Taylor's death or Walker's injury, however. It concerns what happened next door. Shots fired by one of the three LMPD officers entered the neighboring apartment. Inside were Cody Etherton, Chelsey Napper, Napper's unborn baby, and a five-year-old child—all Plaintiffs in this case.

None of those four were hit by bullets or required immediate medical attention for any physical injuries. But one says drywall hit his eyeball, and all allegedly suffered an invasion of privacy, unreasonable risk of death, excessive force, and emotional distress. And they say this is the fault not only of the three officers who fired shots, but also their supervisors, several backup officers at the scene, two detectives who obtained the search warrant, and the Metro Government. All are Defendants here whose actions, at least according to the Plaintiffs, violated a great many constitutional and common-law rights:

- The Metro Government and Louisville Metro Police Department supervisors failed to adequately train officers on proper use of force and warrant execution.

- Officers improperly obtained a no-knock warrant for Taylor's apartment and failed to follow standard operating procedures for its execution.

- Other officers on the scene caused, or at least failed to prevent, the use of force by not intervening and insisting that the execution of the warrant follow standard operating procedures.

- Officers used unconstitutionally excessive force by shooting (or causing the shooting) through the walls of the Plaintiffs' apartment.

1

- The officers' use of force and their supervisors' failures amounted to assault, battery, false arrest, negligence, and intentional infliction of emotional distress.

- The Metro Government "indoctrinated the officers as white Christian nationalists," in violation of the First Amendment's prohibition against the establishment of religion, by including a Bible verse in a 2017 PowerPoint presentation used at a firearms training session.

How do Plaintiffs connect so many legal claims and defendants to the bullets from a single officer's gun?  Through an extensive and aggressive theory of causation reminiscent of Robert Penn Warren: "the world is like an enormous spider web and if you touch it, however lightly, at any point, the vibration ripples to the remotest perimeter…. It does not matter whether or not you meant to brush the web of things." ALL THE KING'S MEN (1946).  Plaintiffs' own theory of interconnectedness, as the Court understands their pleadings and oral argument, goes like this:

The City's and Police Department's inadequate training and "religious indoctrination" caused officers to ignore the law and act as vigilantes dispensing "God's wrath."  Which led to Detective Joshua Jaynes' improper and unsupervised risk calculation, affidavit, and warrant application.  Which led the state-court judge to issue a no-knock warrant and excluded SWAT from the scene.  Which contributed to the narcotics officers who *were* there deciding—erroneously in Plaintiffs' view—to knock on the door.  Which created a foreseeable risk of a firefight and gave Walker time to grab and fire his gun.  Which caused Officers Jonathan Mattingly and Myles Cosgrove to return fire.  Which in turn caused Officer Brett Hankison to "wildly and randomly" fire his weapon at the apartment complex.  Which sent bullets into the Plaintiffs' apartment.  Which ultimately trapped and terrified Plaintiffs and hit Etherton with drywall.

Warren may have been right about history, but he did not write about law. And under the law, this chain of alleged causation is far too attenuated.  It fails to connect the three-year-old PowerPoint slide and any inadequacies in the officers' other training to Hankison's shots.  Its emphasis on the errors in the no-knock warrant process ignore that the officers eventually knocked.  It doesn't say what any of the supervisors or onlooking officers did or failed to do that *caused* Hankison's shots to enter the neighboring apartment.  It ignores the law that treats Walker's gunfire as an intervening cause separating any earlier mistakes from the return fire that followed.  And it never explains how the decision of Officers Mattingly and Cosgrove to return fire caused Hankison to return fire in a manner that struck the Plaintiffs' apartment.

In many other respects discussed below, Plaintiffs' allegations—*even accepting them as true*—fall short of fundamental pleading standards set forth in the Federal Rules of Civil Procedure and interpreted by the U.S. Supreme Court.  However

terrifying these events must've been for the Plaintiffs, the only relief this Court may offer is vindication of any plausibly-alleged deprivation of their rights under the United States Constitution and Kentucky law. But their allegations, though lengthy, haven't stated a claim to relief under the law—at least not with respect to the Defendants besides Hankison, whose case has been stayed in light of his criminal prosecution. As to the other Defendants, the Court must dismiss the claims alleged in the Second Amended Complaint for failing to assert any legal violation that would entitle Plaintiffs to relief.

## I. THIS LAWSUIT

A lot has already happened in this case. The Plaintiffs have amended their complaint twice—once in state court and once in this court. *See* DN 1-2 (initial complaint); DN 1-3 (First Amended Complaint); DN 8 (Second Amended Complaint). The Court granted a motion to dismiss LMPD, which the Plaintiffs conceded was not a proper party. DNs 40, 57.[1] The Court also dismissed claims against Jaynes, whom the Plaintiffs named as a Defendant but failed to link to any of their actual claims. DN 67. And the Plaintiffs have abandoned several claims initially lodged against the Defendants: conspiracy, state constitutional claims, negligent infliction of emotional distress, strict liability, all official-capacity claims, and the Establishment Clause claim against the individual Defendants. Oral Arg. Tr. (DN 91) at 4–6. The false-imprisonment claim and the intentional-tort claims have been narrowed to run against only Hankison. *Id.* at 5, 23.

Neither those claims nor any of the others against Hankison are at issue in this Order. After a state-court grand jury indicted Hankison for his role in these events, the Court stayed the civil claims against him. DN 50. Since then, the Commonwealth tried Hankison for wanton endangerment and a jury acquitted him. DN 108. So at this juncture the Court does not face the question whether the Plaintiffs stated a plausible claim against Hankison—the only Defendant whose bullets allegedly entered the Plaintiffs' apartment.

Instead, this Order addresses the motions to dismiss filed by Louisville Metro Government and the individual defendants aside from Hankison. DNs 28, 31. That means each Defendant addressed here is one degree or more removed from the shots that entered the Plaintiffs' apartment. Their motions argue the allegations—even assuming their truth—would not establish liability for several reasons. Across the board, these Defendants argue their actions did not cause any injuries suffered by the Plaintiffs. And with respect to the specific federal and state causes of action asserted against them, the Defendants contend the allegations consistently fall short of the standards necessary to establish liability: for an intentional seizure under the

---

[1] This Orders references to LMPD describe or quote the Plaintiffs' allegations, but should not imply that LMPD remains a party subject to this lawsuit.

Fourth Amendment; for a malicious, sadistic, or conscience-shocking action or failure to act under the Fourteenth Amendment; or for supervisors' deliberate indifference or knowing callousness to officer training or the risk of such violations. And in any event, the officers contend that qualified immunity shields them from liability for any alleged constitutional harm. As to the state claims, the officers argue the claims of negligence fail as a matter of law, and that qualified immunity would shield them from liability regardless.

## II. THE PLAINTIFFS' ALLEGATIONS

In measuring Plaintiffs' allegations against these legal standards, the Court accepts the allegations of the Second Amended Complaint as true and views them in the light most favorable to the Plaintiffs. This is their description of the events that allegedly violated their rights and led to this lawsuit.

* * *

Suspecting illicit drug activity, LMPD officers Joshua Jaynes, Wes Barton, and Kyle Meany[2] obtained a warrant to search Breonna Taylor's apartment and cars owned by her and her boyfriend, Kenneth Walker. Affidavit (DN 8-1) at 1–4. Jaynes signed and submitted an affidavit seeking a "no-knock" entry into the apartment. Such warrants required an identified exigency in order to serve them at night. Standard Operating Procedures ("SOP") 8.1.19 (DN 33-3). To obtain them, LMPD Standard Operating Procedures at the time required officers to "reference … any 'exigent circumstances,'" Second Amended Complaint (DN 8) ¶¶ 51–52, and write "no-knock" across the top of the warrant," ¶¶ 60–61. But Jaynes did not. Instead, preventing the destruction of evidence was listed as the reason for the request. ¶¶ 89–90. Officers also failed to calculate the "risk assessment" contained on the warrant form. *See* ¶¶ 62–63; Oral Arg. Tr. at 13–14. Barton and Meany allegedly played some role in approving the deficient warrant application, but Plaintiffs' counsel admitted that he was "a little foggy as to exactly what Barton and Meany … did with respect to" supervising Jaynes, or who supervised whom more generally. Oral Arg. Tr. at 14:4–13. In any event, Jefferson Circuit Judge Mary Shaw ultimately signed the affidavit on March 3, 2020, and authorized a no-knock search warrant. SAC ¶¶ 54–55.

Before serving the warrant at Taylor's apartment, however, the officers changed course and decided to knock. ¶¶ 56, 58; Oral Arg. Tr. at 15:7–16. They were

---

[2] Although Barton and Meany were not named in the first three complaints filed in this suit, Plaintiffs' counsel identified their roles at a hearing on the motion to dismiss, DN 32; in a motion for leave to file a third amended complaint, DN 68; and in a parallel lawsuit also pending before this Court, *see* No. 3:21-cv-320. After this Court granted in part Barton and Meany's motion to dismiss those claims in the second case, DN 32, Plaintiffs filed a motion to voluntarily dismiss that lawsuit, DN 34, which remains pending.

motivated by racism and religious animus, according to the Plaintiffs, and violated the standard operating procedures in the process. SAC ¶¶ 56–58, 134. None of the other officers, Plaintiffs complain, intervened to prevent the allegedly unlawful execution of the warrant or to prevent the officers from returning fire on Walker. ¶¶ 150–153; Oral Arg. Tr. at 21:4–10. After they knocked, Walker fired a gun at them, hitting Officer Mattingly. SAC ¶ 86; *see id.* at ¶ 81 (citing "Summary of Events" from LMPD Investigative Report (DN 8-5) at 4–5). Officers Hankison, Mattingly, and Cosgrove returned fire, killing Taylor and injuring Walker. *Id.* According to the pleadings, Hankison "wildly and randomly" returned fire into the apartment next to Taylor's, which was occupied by the Plaintiffs. ¶¶ 158, 160. By "engaging in a gunfight outside their apartment," the officers allegedly "caus[ed] emotional pain and suffering and great fear of imminent physical injury." ¶ 159.

Plaintiffs refer to themselves as "innocent bystanders," ¶ 143, and concede that the LMPD warrant targeted Taylor and Walker, not themselves, ¶¶ 49–50, 108. In their telling, the "loud commotion outside" woke them up. ¶ 30. And when one of them arose from bed to investigate, "pieces of drywall flew into his eye as simultaneously he heard gunshots." ¶ 31. Understandably alarmed, they sought to exit the apartment, but officers ordered them back into their home "for approximately two hours as the individual Defendants attempted to clean up the chaotic mess they created while failing to check on the safety and well-being of the Plaintiffs." ¶ 161.

In addition to these events from the day and night of the shooting, the Plaintiffs also complain about steps the officers and the officers' supervisors and employers took (or should've taken) long before March 2020. These allegations come in both general and specific varieties.

Their general allegation is that the City, LMPD, and individual supervisors failed to adequately train and supervise the officers whose later steps led to the shooting. ¶¶ 170–77. The complaint, however, contains little detail about what Plaintiffs believe these supervisory Defendants should've done differently—only that they didn't do enough.

Their specific allegation, meanwhile, is that three years before the shooting, LMPD hosted a firearms safety training for the officers sued here. ¶¶ 115, 126; LMPD Training Manual (DN 8-7). A 38-slide PowerPoint presentation used at that training contained a slide that displayed a thin-blue line flag overlaid with a Bible verse inside a shield: "For he is God's servant for your good. But if you do wrong, be afraid, for he does not bear the sword in vain. For he is the servant of God, an avenger who carries out God's wrath on the wrongdoer[.] Romans 13:4." LMPD Training Manual at 38. This harmed Plaintiffs, according to the complaint, by offending them and by "indoctrinati[ng]" officers, SAC ¶ 123, without a "secular purpose," ¶¶ 116–17, to act "in the service of the … White Christian Nationalist movement," ¶ 174.

5

### III. CAUSATION

How did the insertion of a Bible verse into a police-training curriculum cause bullets to fly into the Plaintiffs' apartment years later?  What about the decision to knock despite authorization not to?  These are difficult questions that Plaintiffs have struggled to answer.  *See* Oral Arg. Tr. at 54:3–55:18.  By reaching so far back and trying to hold so many people liable for their fear and distress, Plaintiffs strain to string together a legally plausible chain that links five detectives, three supervisors, the City itself, and the two officers besides Hankison who actually fired shots.  None of these Defendants, of course, actually shot into the neighbors' apartment—though the Plaintiffs contend that they all played roles that *caused* Hankison to fire those shots.

### A. Causation at the Pleading Stage

For the constitutional and common-law claims alike, plaintiffs must establish that the defendants' actions "w[ere] both the cause in fact and the proximate cause of the" injury.  *Powers v. Hamilton County Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007).  "Causation in the constitutional sense," the Sixth Circuit has recognized, "is no different from causation in the common law sense."  *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005).  The Supreme Court has "repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability," *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (quotation omitted), meaning the statute "should be read against the backdrop of tort … that makes a man responsible for the natural consequences of his action," *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) (quotation omitted).  On that understanding, "a public official is liable under § 1983 only if he *causes* the plaintiff to be subjected to a deprivation of his constitutional rights."  *Baker v. McCollan*, 443 U.S. 137, 142 (1979) (quotation omitted).  In order to withstand a motion to dismiss, plaintiffs must plausibly allege both actual and proximate causation.  *Cameron v. City of Pontiac*, 813 F.2d 782, 784 (6th Cir. 1987); *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994) ("proximate causation is an essential element of a § 1983 claim for damages").

In ascribing legal responsibility to Defendants who did not shoot the bullets that entered the neighbors' apartment, the Second Amended Complaint relies on conjecture and ignores intervening events.  This is insufficient under basic pleading standards.  A district court may (indeed must) grant a motion to dismiss pleadings that fail to "plausibly establish" that defendants are "legally responsible for" the alleged harms.  *Paige v. Coyner*, 614 F.3d 273, 281 (6th Cir. 2010).  While questions of causation often involve factual disputes that must be resolved on summary judgment, *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004), the legal standard applies at the pleading stage as well, *see Paige*, 614 F.3d at 281 ("to survive a motion to dismiss, [plaintiff's] allegations must plausibly establish…. both cause in fact and proximate cause."); *cf. Han v. Univ. of Dayton*, 541 F. App'x 622, 626 (6th

Cir. 2013) (the "'plausibility' standard ... for assessing whether a complaint's factual allegations support its legal conclusions ... applies to causation in discrimination claims").

Consideration of causation at the pleading stage is especially appropriate in this case because most of these allegations rest on investigations, press reports, and other factual materials Plaintiffs have themselves attached to their pleadings and briefs. *See, e.g.*, Attachments to SAC (DN 8 Ex. 1–8); Exhibits of Response to Mattingly/Cosgrove MTD (DN 38 Ex. 1–6); Exhibits of Response to Louisville MTD (DN 41, Ex. 1–25). The "Plaintiffs request[ed] that the Court take judicial notice of the media coverage related to the Breonna Taylor shooting attached." *See* Response to Louisville MTD (DN 41) at 4–5. And the Sixth Circuit has explained that "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Center, Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing FED. R. CIV. P. 10(c)); *see also Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993). "In determining whether to grant a Rule 12(b)(6) motion," WRIGHT & MILLER explains, "the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (2d ed. 1990).

## B. Plaintiffs' Causation Allegations

Setting aside Hankison, did the rest of the Defendants cause the seizure, trespass, fear, and offense Plaintiffs say they suffered because of the shooting? Here is Plaintiffs' explanation of why they think the Defendants are legally responsible:

Rather than training officers in best practices for obtaining and serving warrants and the use of force, *see* SAC ¶ 55; Response to Mattingly/Cosgrove MTD (DN 38) at 15–16, the City through its Police Department indoctrinated officers to consider themselves "White Christian Nationalist" vigilantes "carry[ing] out God's wrath according to the book of Romans" and "in the service of the 'Thin Blue Line' or 'Blue Lives Matter'" movements, SAC ¶ 174. In Plaintiffs' view, this inadequate training protocol manifested itself in a variety of ways. ¶¶ 98–100. Detective Joshua Jaynes failed to follow standard operating procedures in his warrant application by failing to note specific "exigent circumstances" requiring a no-knock warrant, ¶ 52, and failed to write "No-Knock" atop the warrant," ¶¶ 60–61. Then, rather than having a SWAT team serve the no-knock warrant in accordance with the standard operating procedures, ¶ 92, the less-well-trained narcotics team served it, ¶ 97. But before serving that warrant, the officers "decided to actually knock on the door"

7

instead. ¶ 56; Response to Mattingly/Cosgrove MTD at 7.[3]  And "[b]y changing it from a no-knock to a knock, they gave the occupants … time to collect themselves [and] collect a weapon," Oral Arg. Tr. at 15:14–16, and fire upon the officers. SAC ¶ 86 ("Defendant Mattingly … was shot in the leg by Kenneth Walker ….").[4]  After Walker fired, three officers—Mattingly, Cosgrove, and Hankison—returned fire.  Louisville MTD (DN 31) at 3; Response to Mattingly/Cosgrove MTD (DN 28) at 10.  And in Plaintiffs' view, "Mattingly [and] Cosgrove [and the others] … should have known that by being there in violation of standard operating procedures, if a gunfight was triggered, it created a foreseeable risk that all the other officers would start shooting." Oral Arg. Tr. at 12:8–14.  "So by [Mattingly and Cosgrove] starting to fire their guns, they also cause[d] Hankison to start firing his gun," *id.* at 12:14–15, "wildly and randomly … into Plaintiffs' apartment," SAC ¶ 160.

These events fall into three basic categories.  First, the religious and inadequate-training allegations that occurred well before the shootout.  Second, the procurement of the warrant and planning of its execution that happened before any engagement with Walker, Taylor, or the Plaintiffs.  And third, the shooting that happened once the officers executed the warrant.

For the Plaintiffs to hold these Defendants liable on the basis that their actions caused Hankison to fire into their apartment, the actions must've actually and foreseeably caused those shots.  The legal terms for these requirements are "but-for causation" (or causation in fact) and "proximate causation" (a foreseeable and direct connection between the Defendants' actions and the Plaintiffs' injuries).  The Defendants contend the pleadings satisfy neither.  Oral Arg. Tr. at 38:3–6.  According to Mattingly and Cosgrove, the Plaintiffs' theory "fundamentally misunderstands the law [of] causation" under § 1983, "read against the background of tort liability," because independent intervening actions "brea[k] the causal chain" between any earlier violations and later harm.  Mattingly/Cosgrove Reply (DN 46) at 11 (quoting

---

[3] The Second Amended Complaint alleges a failure to intervene, although Plaintiffs' counsel sought to recharacterize that allegation during oral argument (Tr. at 33:12–20):

> If I may, I would rephrase.  Instead of a duty to intervene, it was a duty to follow standard operating procedure.  And by failing to not – by failing to follow standard operating procedure or failing to – "Hey, buddy, we're not following standard operating procedure," whether you call that an intervention or whether you call that following my – adhering to my duty to follow standard operating procedure, no one said, "Hey, where's SWAT?  You know, we're not supposed to change a warrant."

[4] *See also* Response to Mattingly/Cosgrove MTD at 12; SAC ¶ 81 (citing and attaching the LMPD Investigative Report); LMPD Investigative Report (DN 8-5) at 4 (Kenneth Walker admitting he fired the first shots at police officers); *id.* at 1 ("The … LMPD Narcotics [Unit]… w[as] serving a search warrant at 3003 Springfield Drive #4 when they were fired upon during entry.").

*Malley*, 475 U.S. at 345 n.7).  And the City and other Defendants similarly explain that the causal-chain theory doesn't work in excessive-force cases like this that would "creat[e] liability for all officers on a scene simply for showing up for work and failing to stop an investigation."  Louisville Reply (DN 47) at 14.  Instead, they say the appropriate time period to consider in analyzing a use of force is "the few moments directly preceding it."  *Id.* (quoting *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007)).

These Defendants are right.  None of the actions of the non-Hankison Defendants, even as alleged by Plaintiffs, satisfies the but-for and proximate-causation requirements.

### C.  But-For Causation

A plaintiff bears the burden of pleading that a harm "would not have occurred in the absence of the alleged wrongful action."  *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  Analyzing but-for causation requires a court to "imagine whether the harm would have occurred if the defendant had behaved other than it did…. Similarly, if the result would have occurred without the conduct complained of, such conduct cannot be a cause in fact of that particular result."  *Powers*, 501 F.3d at 608 (quotation omitted); *see also Paige*, 614 F.3d at 281 (same).  In other words, courts compare "what did occur with what would have occurred if hypothetically contrary-to-fact conditions had existed."  W. PAGE KEETON, PROSSER & KEETON ON THE LAW OF TORTS, § 41, at 264–65 (5th ed. 1984).  The Sixth Circuit has affirmed dismissals based on plaintiffs' failure to plausibly plead but-for causation.  *See, e.g., Gohl v. Livonia Pub. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016); *Gamble v. Greater Cleveland Reg'l Transit Auth.*, No. 15-4208, 2017 WL 5135537, at *2 (6th Cir. June 2, 2017).[5]

**1.  Training and Supervision.**  If the firearms training had never occurred, or had occurred without mention of the Book of Romans, would the Plaintiffs' apartment never have been shot?  Plaintiffs' pleadings give no reason to think so, offering nothing but conjecture to the extent they address causation at all.  SAC

---

[5] *See also Han*, 541 F. App'x at 626 (6th Cir. 2013) (the "plausibility" standard  for "assessing whether a complaint's factual allegations support its legal conclusions … applies to causation…."); *Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613, 622, 624 (6th Cir. 2019) (ordering dismissal of Title IX suit for failure to plead causation); *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 728 (6th Cir. 2009) (affirming dismissal of discrimination claim for failure to allege facts plausibly linking her termination to religious beliefs); *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 288 (6th Cir. 2017) (affirming dismissal of claim for failure to plausibly allege causation); *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 82 n.2 (1st Cir. 2013) ("[T]he plausibility standard applies with undiminished force to allegations of causation.") (citing *In re NM Holdings Co.*, 622 F.3d 613, 618–25 (6th Cir. 2010)).

¶¶ 167–179.  The theory seems to be that if the officers hadn't attended the training, or had blinked during the slide mentioning Romans, then the officers wouldn't have returned fire after Walker shot.  Or perhaps that if they hadn't been "indoctrinated" they wouldn't have messed up the warrant application or execution?  This piling of distant and implausible inferences is an extreme conception of "causation."  Nothing in the pleadings or attachments suggests these events were linked in any way whatsoever.

When pressed at argument on this point, Plaintiff's counsel struggled to identify a coherent connection of any sort, much less one evident in the pleadings:

> THE COURT: How did – walk me through the chain of causation between that slide and the shots that went into the neighbor's house.
>
> MR. SEXTON: Hankison – let's just focus on Hankison – was blindly firing shots through an apartment wall/window, and he had been trained by the City of Louisville that he was an avenger of God bringing God's wrath upon wrongdoers.
>
> THE COURT: And connect those two.
>
> MR. SEXTON: He was following God's law.
>
> THE COURT: He didn't intend to – well, set that to the side. Your clients weren't the targets of the search warrant.
>
> MR. SEXTON: But –
>
> THE COURT: How could they possibly be connected to God's law regarding being an avenging warrior?
>
> MR. SEXTON: I read the U.S. Supreme Court case law to state that my clients were seized by Hankison's firing of bullets. Hankison was trained by Louisville Metro Government that he was an avenger of God and that he was following God's law and not the law of the Commonwealth and the U.S.
>
> THE COURT: What … factual allegation indicates that it is plausible to think that when Hankison fired those shots he was thinking about the slide with the Bible verse from his training?
>
> MR. SEXTON: Well, that's why I would like some fact discovery, and that's why the Sixth Circuit has said –
>
> THE COURT: You don't automatically get fact discovery. You have to state a claim.

Oral Arg. Tr. at 53:8–54:10.  This is plainly insufficient.

What about the more general allegations regarding the supervisors who, in Plaintiffs' view, didn't properly train and supervise the officers at the apartment building? The Plaintiffs assert claims against "Defendants Chief Steve Conrad (Ret.), Lt. Jerry Huckleberry[,] and Defendant Mattingly," whom Plaintiffs claim "were superior officers to … the … individual Defendants with respect to the procurement and implementation of the search warrant" governed by "SOP 8.1." SAC ¶ 175. Some of Plaintiffs' arguments also mention Barton and Meany (two other alleged supervisors who are not defendants in this case, *see* above n.2) in the supervisory context. Oral Arg. Tr. at 14:2–13. But counsel admitted that he was "a little foggy as to exactly what Barton and Meany and Huckleberry and Jaynes did with respect to each other. Who was in charge of whom[.]" *Id.* at 14:8–12. And though his complaint raised a failure-to-supervise claim, he admitted that he was "not able to pinpoint exactly who was supposed to be supervising whom [or] who was supposed to be reviewing" the warrant application documents. *Id.* at 14:14–22.

This fogginess at argument further obscures similar gaps in the Second Amended Complaint. It is notably silent on the chain of command and does not contain plausible allegations about who failed to supervise whom or the source of any such obligation. Other than a single sentence asserting that "Defendants Chief Steve Conrad (Ret.), Lt. Jerry Huckleberry[,] and Defendant Mattingly were superior officers" who "owed Plaintiffs a duty of care," no facts connect any supervisor to the actual harm. SAC ¶ 175.

This is likewise insufficient. By definition, a causal chain requires plausible *factual* allegations of links between earlier actions and later harms, and the Court may not supply missing links with assumptions of its own or of counsel. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Given the failure to plead a connection between an unknown supervisory officer's dereliction of duty and Hankison's shooting , the barebones allegation of causation is a "mere conclus[ion]" not entitled to the presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009).

**2. The Warrant and Its Execution.**  Plaintiffs also allege a causal link between violations of LMPD standard operating procedures regarding no-knock warrants and the bullets that entered Plaintiffs' apartment walls. SAC ¶¶ 128–149, 172 (violation of standard operating procedures directly caused the "use of excessive force").

Standard Operating Procedure 8.1 sets forth the LMPD internal policy for obtaining and serving a warrant. *See* SOPs (DN 33-3). That procedure requires all applications for no-knock warrants to "[n]otate 'No-Knock' on the search warrant draft," and to "[d]escribe the circumstances that [the officer] believes justify the necessity for a 'no-knock' search warrant." SOP 8.1.19. It also prevents officers from "seek[ing] a 'no-knock' search warrant merely to prevent the destruction of evidence," requires the officer seeking such a warrant to notify the SWAT team where a no-

knock warrant will be served, and requires no-knock warrants to be served by SWAT. SOP 8.1.13; *id.* at 8.1.19 ("All 'no-knock' warrants will be served by the SWAT Team.").[6]

In Plaintiffs' telling, the officers violated the standard operating procedures in several ways. Jaynes sought a no-knock warrant, SAC ¶ 51, without specifying any "exigent circumstances" or marking it as a no-knock warrant, ¶ 52, and instead specifying that the warrant was sought to prevent the destruction of evidence, ¶¶ 89–90. That warrant application was approved by Lt. Jerry Huckleberry, ¶ 55, and eventually by Jefferson County Circuit Judge Mary Shaw, ¶¶ 53–54. Further, although the warrant was designated as "no-knock," the officers did not present a risk-assessment matrix to the SWAT team, ¶¶ 68–69, nor did they request that the SWAT team serve the no-knock warrant, as required by the internal procedure, ¶¶ 71, 93. Instead, members of the LMPD Narcotics Criminal Interdiction Unit ("CID") chose to serve the warrant themselves. ¶¶ 71, 94.

Plaintiffs' causal theory is internally inconsistent. Because in addition to the errors listed above that led to the improper issuance of a no-knock warrant, ¶¶ 89–91, Plaintiffs also complain that the officers decided to knock anyway, ¶¶ 56, 58. They say the officers caused the shooting not only by utilizing a no-knock warrant, but also by knocking when they executed that warrant. Huh?

Plaintiffs' counsel described it this way: "So by changing it on the fly, their negligent, complete ignorance of the standard operating procedures did in fact trigger more chaos. But, again, they shouldn't have been there that night in the first place, but then they're there and they still violate standard operating procedures by knocking when they're not supposed to knock, thereby defeating the entire purpose of a no-knock warrant." Oral Arg. Tr. at 15:17–23.

Did any of these warrant-related SOP allegations "cause" the shooting—in the sense that if officers had done otherwise the Plaintiffs' apartment wouldn't have been shot? Let's take this step by step.

*First*, should the Defendant officers never have been at the apartment to serve the search warrant in the first place—regardless of how the officers ultimately

---

[6] As defense counsel explained at argument, the standard operating procedures—which the Plaintiffs attached to their pleadings—permit officers to decline to knock if they have "a reasonable suspicion that knocking and announcing his/her presence under the particular circumstances would present a threat of physical violence against the officer or others." SOP 8.1.19. *See also id.* ("Each situation must be considered individually, based on the facts known prior to, and during, the execution of the search warrant. The officer may use whatever force is reasonable to execute the warrant, including forced entry into the building to be searched."); Oral. Arg. Tr. at 16:8–14 ("[I]f you look at the SOPs in the very beginning, it discusses the fact that the officers have to use their discretion…").

executed it?  To the extent that is the Plaintiffs' current position on causation, then it doesn't follow from any of the violations and facts Plaintiffs have alleged. Importantly, the Plaintiffs do *not* allege that no warrant should've been issued at all, or that the warrant was constitutionally deficient.  If they had, then their chain of causation would be far stronger.  The pleadings don't complain about *whether*, but instead about *how* and *by whom*: the designation of the nighttime warrant as no-knock and the execution of the warrant by the narcotics-interdiction unit rather than SWAT.  SAC ¶¶ 51–52, 58, 91–95.

*Second*, despite the many allegations that Jaynes and his supervisors violated standard operating procedures in procuring a no-knock warrant, these violations didn't ultimately affect the execution of the warrant.  ¶¶ 59, 89, 91, 95.  Because we know what would've happened if the officers had executed a knock-and-announce warrant rather than a no-knock warrant.  As Plaintiffs explain, the officers met on site to coordinate their plan beforehand, Oral Arg. Tr. at 18:20–19:1, and decided to "actually knock on the door of Unit 4 when serving the Search Warrant despite requesting and being approved for 'No-Knock' entry into the premises," SAC ¶ 56. So improperly securing a no-knock warrant couldn't have caused the injuries—at least on Plaintiffs' theory of the case—because the officers actually knocked despite the warrant's designation otherwise.  ¶ 56.

*Third*, Plaintiffs offered the counterintuitive and speculative contention that *not* knocking actually could've prevented the shooting.[7]  Officer Mattingly, they allege, served as the "on-scene commander" during the execution of the warrant, responsible for "implanting [sic] and following the Incident Command System," "briefing with all of the Defendants" on the scene, and preparing for emergent contingencies.  SAC ¶¶ 82–87.  The complaint seems to imply (but never expressly alleges) that Mattingly was responsible for the decision to knock even though the warrant was designated as a "no-knock warrant." ¶ 95; ¶ 88.  But even assuming the knock caused (in a but-for sense) Hankison's fire, an intervening cause severed the decision to knock from the ultimate harm.  *See* below at § III.D.

*Fourth*, what if SWAT rather than the narcotics unit had executed the warrant?  Would they not have elicited the gunshot from Walker or not have returned fire?  Plaintiffs say Jaynes failed to properly complete a risk assessment matrix ("RAM"), and that if he had, he would have noticed that SWAT instead of the narcotics

---

[7] *See* Oral Arg. Tr. 15:12–16 (Counsel: "The whole point, however misguided it may be, of a no-knock warrant is surprise so that the occupants may not grab a gun in the middle of the night.  By changing it from a no-knock to a knock, they gave the occupants – Mr. Walker and Ms. Taylor – time to collect themselves, collect a weapon.").  This theory conflicts somewhat with the Plaintiffs' description of no-knock warrants as being "especially" "inherently dangerous" as compared to knock-and-announce warrants.  Response to Mattingly/Cosgrove MTD at 35.  And if the no-knock warrants are "especially" more dangerous than a typical warrant, knocking would seem to *decrease* rather than *increase* the risk of harm.

13

unit should have served the warrant. Response to Louisville MTD at 25.[8] But according to Plaintiffs' pleadings, the standard operating procedures designated *all* no-knock warrants as the purview of SWAT anyway. SAC ¶ 92. So it's not clear what additional effect the RAM has on the Plaintiffs' SWAT theory. Indeed, aside from Hankison, the pleadings offer no reason why events would've played out any differently had SWAT in fact served the warrant. They state that SWAT was necessary to serve a *no-knock* warrant, yet the officers knocked. *See* ¶¶ 97–98. The pleadings simply insinuate that SWAT would've performed better and assume that "attempting to serve a 'No-Knock' warrant without SWAT … subject[ed] the Plaintiffs to an unreasonable risk of death." ¶ 97; ¶ 73 ("SWAT would have *advised* it was not a good idea to execute the warrant at that time without advance planning and contingencies in place.") (emphasis added). This conclusory allegation offers no factual support for the proposition that if SWAT had been charged with executing the warrant, those officers would've acted differently and the shooting wouldn't have occurred. All we have is an allegation that the Defendants violated the standard operating procedures by not involving SWAT. And an SOP violation standing alone is not automatically either a "caus[e]" or a "deprivation" of a constitutional right under § 1983. *See generally United States v. Caceres*, 440 U.S. 741 (1979) ("the violations of agency regulations … do not raise any constitutional question").

*Fifth*, the pleadings attempt to pin liability on a number of officers who were present on the scene but not directly involved in serving the warrant or firing shots. SAC ¶¶ 180–84. Plaintiffs point to no authority indicating liability may attach to officers on the scene of a shooting for failing to prevent or stop it, at least not when the shooting occurred suddenly and ended quickly. Louisville Reply at 14–15. Here Plaintiffs haven't alleged any particular errors from the non-shooting officers—only that they were present yet failed to prevent the shooting. This sort of collective liability, visited upon officers who were nearby but didn't interact with a plaintiff, is foreign to the law surrounding police use of force. A plaintiff must "plead that each Government-official defendant, through the *official's own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added). This question is not simply whether "it was reasonable for the police to create the circumstances" that led to the use of force. *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (quoting *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992)). Here, of course, Plaintiffs haven't even said how these non-shooting officers actually "create[d] the circumstances." *Id.*

Lacking a plausible factual allegation that a different "result would have occurred without the conduct complained of," Plaintiffs are left with the sort of

---

[8] Jaynes, of course, is no longer a party to this suit. The Court granted his motion to dismiss (DN 12), holding that by omitting him almost entirely from their pleadings, the Plaintiffs failed to assert a plausible claim against him in the Second Amended Complaint. Order (DN 67).

conclusory allegation that cannot overcome a motion to dismiss. *Iqbal,* 556 U.S. at 678–79. So with respect to the warrant-related allegations, no but-for causation connects the ultimate harm (Hankison's shots) with the actions of Jaynes, his supervisors who approved the warrant, or the other unnamed officer or officers on-scene who decided to knock. *See Powers*, 501 F.3d at 608; *Marvaso v. Sanchez*, 971 F.3d 599, 606–07 (6th Cir. 2020).

**3. Mattingly and Cosgrove.** Plaintiffs' theory of liability regarding the two officers besides Hankison who fired shots is unclear. The Second Amended Complaint asserts that "Hankison's use of force against Plaintiffs was excessive." SAC ¶ 152. At places it seems to imply that other officers did *not* use excessive force. *See* ¶ 158 ("Hankison committed assault and battery upon Plaintiffs when he intentionally pointed and fired his loaded gun at Plaintiffs....") (not mentioning other officers). The complaint does, however, say that "individual Defendants committed assault against Plaintiffs by engaging in a gunfight outside their apartment," ¶159, vaguely asserts that Mattingly's and Cosgrove's "use of force against Plaintiffs was not reasonable under the circumstances and was excessive," ¶ 133, and seeks to hold these officers liable for failing to intervene and supervise, ¶¶ 153, 175. More pointedly, at argument, Plaintiffs' counsel described the theory of liability for Mattingly and Cosgrove this way: "They triggered a gunfight which had natural and foreseeable consequences" including "Hankison's shots." Oral Arg. Tr. at 13:9–15. In other words, "Mattingly [and] Cosgrove ... should have known that by being there in violation of standard operating procedures, if a gunfight was triggered, it created a foreseeable risk that all the other officers would start shooting ... [including] Hankison." *Id.* at 12:8–15.

To the extent this refers to the warrant-related actions described above, the theory fails for the same reasons already discussed. To the extent it refers to Mattingly's and Cosgrove's part in the "gunfight outside th[e] apartment," this theory of causation makes little sense. The Plaintiffs seem to allege that their returning fire *caused* Hankison to "wildly and randomly" return fire as well. Should Mattingly and Cosgrove not have fired at all, or should they have fired in a different manner that— in the heat of the moment—might've caused Hankison to shoot less wildly or from a different angle? The pleadings don't say. They just assume that had Mattingly and Cosgrove done otherwise, the shots might not have entered the neighboring apartment. But nothing about their allegations concerning Hankison indicate that the nature of his shots turned on the nature of Mattingly's and Cosgrove's (as opposed to Walker's). So as a matter of but-for causation, no law or logic supports the theory that Hankison wouldn't have shot through the apartment next door had Mattingly and Cosgrove not fired first. *See Iqbal*, 556 U.S. at 681. This also completely ignores the intervening cause (Walker's shot) discussed below and the lack of any alleged violation by Mattingly and Cosgrove that tipped the first domino.

### D. **Proximate Causation**

Even assuming that Plaintiffs sufficiently alleged but-for causation, no proximate causation connects the alleged violations and injuries because a superseding event cut the causal chain. As with but-for causation, plaintiffs bear the burden of pleading proximate causation. And the failure to do so leads to dismissal. *See, e.g.*, *City of Cleveland v. Ameriquest Mort. Secs., Inc.*, 615 F.3d 496, 504–06 (6th Cir. 2010) (affirming dismissal of complaint because "the connection between the alleged harm and the alleged misconduct [wa]s too indirect to warrant recovery"); *Crosby v. Twitter, Inc.*, 921 F.3d 617, 624–26 (6th Cir. 2019) (affirming dismissal of complaint for failure to plausibly plead proximate causation); *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 889–91 (6th Cir. 2000) (dismissing complaint for failure to plead proximate causation).

The Supreme Court has made clear that a use-of-force claim is remediable only if the harm is "proximately caused" by the unconstitutional actions of the state actors. *County of Los Angeles v. Mendez*, --- U.S. ----, 137 S. Ct. 1539, 1549 (2017) (citing *Heck*, 512 at 483); *see also Horn by Parks v. Madison County Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994) ("[A] violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused the injury."). Proximate causation asks whether a reasonable person would've foreseen that an act would cause a given injury. *See Paige*, 614 F.3d at 281 (focusing on appropriate scope of responsibility). "Courts have framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct." *Powers*, 501 F.3d at 609. The inquiry also asks whether "defendants' conduct [was] 'a substantial factor in the sequence of responsible causation,'" which "requires sufficient directness." *Crosby*, 921 F.3d at 624 (describing proximate causation in the Anti-Terrorism Act context) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 n.8 (D.C. Cir. 2017)). This standard applies to the state-law claims too: pleading a negligence claim under Kentucky law requires both "but-for" and "proximate causation." *Patton v. Bickford*, 529 S.W.3d 717, 730 (Ky. 2016).

As Plaintiffs note, these authorities mean that causation—under § 1983 as well as the common law of torts that supplies its background—"makes a man responsible for the natural consequences of his actions." *Malley*, 475 U.S. at 344 n.7 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). But § 1983 and the common law likewise recognize that defendants are *not* liable if their actions are separated from their consequences by "a "superseding cause that cuts off the otherwise foreseeable chain of causation." *Marvaso*, 971 F.3d at 607 ("a superseding cause that cuts off the otherwise foreseeable chain of causation, may "entitl[e] a defendant to judgment as a matter of law"). "[E]ven if it is foreseeable that a defendant's conduct will lead to the complained of harm, a defendant may be able to avoid § 1983 liability by pointing to the intervening action of a [third party] as the proximate cause of the plaintiff's

16

injury." *Powers*, 501 F.3d at 610; *see also* RESTATEMENT (SECOND) OF TORTS §§ 440–453 (1965) (no liability if intervening cause cuts off proximate causation). This is true under Kentucky law as well: "The question of whether an undisputed act or circumstance was or was not a superseding cause is a legal issue for the court to resolve." *House v. Kellerman*, 519 S.W.2d 380, 382 (Ky. 1974).[9]

Here, the motions to dismiss identify a superseding cause—described in the pleadings and the documents attached by the Plaintiffs—that separate the alleged actions of all the Defendants besides Hankison from Hankison's own shots into the Plaintiffs' apartment. After the officers knocked, Walker fired a gun through the door where the officers were positioned. *See* SAC ¶ 86 ("Defendant Mattingly … was shot in the leg by Kenneth Walker …."); ¶ 81 (citing LMPD Investigative Report); LMPD Investigative Report at 4 (Kenneth Walker admitting he fired the first shots at police officers); *id.* ("The … LMPD Narcotics [Unit] … w[as] serving a search warrant at 3003 Springfield Drive #4 when they were fired upon during entry."). As ample precedent explains below, this was a third-party's independent act, which followed almost all of the actions Plaintiffs say caused their injury, and which caused the gunfight as much or more than any preceding factor, in a manner not reasonably foreseeable to a supervisor training officers or an officer procuring or serving a warrant. *See Howard*, 562 S.W.3d at 288. Whatever foreseeable consequences might've otherwise flowed from the prior training, warrant procurement, or on-scene decisions Plaintiffs criticize, this unforeseen development intervened to cut off liability for those actions.

Was it "foreseeable," "substantial," and "direct"—going all the way back to the firearms training in 2017—that citing a Bible verse would lead to anything like Walker shooting through the apartment door when a search warrant was served in 2020? *Crosby*, 921 F.3d at 624. Of course not. Plaintiffs don't even try to connect the two by identifying anything from the scene that related in any way to the training; they just assume the officers acted according to racial and religious bigotry. SAC ¶ 134. The pleadings contain nothing whatever related to foreseeable harms regarding this training. Nor do they plead anything indicating that Conrad, Huckleberry, and the like,[10] had reason to foresee that the type of training and supervision errors

---

[9] Whether an action is a superseding or intervening cause depends on several factors: "1) an act or event that intervenes between the original act and the injury; 2) the intervening act or event must be of independent origin, unassociated with the original act; 3) the intervening act or event must, itself, be capable of bringing about the injury; 4) the intervening act or event must not have been reasonably foreseeable by the original actor; 5) the intervening act or event involves the unforeseen negligence of a third party [one other than the first party original actor or the second party plaintiff] or the intervention of a natural force; 6) the original act must, in itself, be a substantial factor in causing the injury, not a remote cause." *Howard v. Spradlin*, 562 S.W.3d 281, 288 (Ky. Ct. App. 2018).

[10] The pleadings never state which if any officers besides Conrad, Huckleberry, and Mattingly were responsible for training and supervision away from the scene of the shooting.

alleged in the complaint would lead to anything like Walker firing through the door. And although they surmise that the decision to knock gave Walker a chance to grab a gun, they never say how or why the officers *should have known* that he would in fact have shot, and that this would in turn have led to the subsequent firefight the Plaintiffs complain of. The Sixth Circuit, moreover, has said the opposite. It has rejected claims seeking to hold officers liable based on allegations separated—by time and by a suspect's use of force—from injuries caused by officers' later use of force.

In *Estate of Sowards v. City of Trenton*, for example, police officers illegally entered a suspect's home without a warrant, and allegedly hadn't been adequately trained to deal with mentally ill persons. 125 F. App'x 31, 33–34, 41 (6th Cir. 2005). This didn't give rise to liability under § 1983, however, because the Court of Appeals recognized that the subsequent shooting didn't flow directly and foreseeably from those actions. Instead, after the entry, the suspect raised a gun towards the officers, who responded with gunfire that killed the suspect. *Id.* at 34, 42. Even assuming the shooting wouldn't have happened but for the illegal entry and inadequate training, those actions did not proximately cause the injury: the suspect's threatening officers with his gun was an intervening cause that cut off any foreseeable connection between the entry and shooting. *Id.* at 41–42.

The *Sowards* opinion relied on the "persuasive" reasoning of then-Judge Alito in *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995), which explained that a "suspect's [threatening] conduct would constitute a 'superseding' cause ... that would limit the officer's liability" for prior unconstitutional conduct. In a portion of the opinion quoted in full by the Sixth Circuit, *Bodine* explained this distinction in terms that mirror the allegations of this case in many respects:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause that would limit the officer's liability.

*Estate of Sowards*, 125 F. App'x at 41–42 (quoting *Bodine*, 72 F.3d at 400 (internal citations omitted)).

Similarly, in *Whitlow v. City of Louisville*, 39 F. App'x 297, 308 (6th Cir. 2002), the Sixth Circuit explained that a suspect pointing a gun at officers cut off liability for any prior officer negligence that arguably caused the officers' subsequent use of force. The Court of Appeals agreed with the district court's reasoning that even "assuming the officers were negligent in completing the Matrix and deploying the S.W.A.T. Team, the act of [the suspect] pointing the gun at the officers was an intervening cause that resulted in [his] death." *Id.* If pointing a weapon at officers is an unforeseeable action that cuts off liability for gunshots that followed previous illegal actions, then *shooting* a weapon at officers surely does too.

The Plaintiffs have little if anything to say about this intervening cause, instead hammering over and over the footnote in *Malley* reminding us that "a man [is] responsible for the natural consequences of his actions." *See* Response to Mattingly/Cosgrove MTD at 7–8, 14, 18–19, 28–31; Response to Louisville MTD at 14–15, 19–20, 29, 35 (citing *Malley*, 475 U.S. at 344 n.7 (1986) (quoting *Monroe*, 365 U.S. at 187 (1961))). But apart from describing basic proximate-causation principles, *Malley* says very little relevant to this case. There a state trooper submitted a warrant application that lacked information necessary to establish probable cause. *Malley*, 475 U.S. at 337–39. The arrestees said this invalid warrant violated the Fourth Amendment, but the defendants pointed to the judge's intervening approval. The Supreme Court, however, explained that the warrant's issuance—based on the inadequate affidavit—was entirely foreseeable, not an intervening cause that cut of the officers' liability. *Id.* at 344–45 & n.7.

Nothing in *Malley*, therefore, distracts from courts' proper focus on the use of force that *followed* a suspect's shot; certainly it does not support conflating officers' actions before and after an intervening cause. (It does not say anything at all regarding intervening causes). Plaintiffs' theory, of course, is that the warrant procurement, planning, and execution all caused a foreseeable "zone of danger" and "risk of a gunfight." Oral Arg. Tr. at 32:2–22. But the Supreme Court and Sixth Circuit have made clear that courts ask "whether the force used to effect [a] seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to *create the circumstances*" further back up the casual chain that eventually led to the use of force. *Dickerson*, 101 F.3d at 1161 (emphasis added; quotation omitted). The Supreme Court has squarely rejected other circuits' approaches that "conflated distinct Fourth Amendment claims" in the same "objective reasonableness analysis," reasoning that this "provide[d] a novel and unsupported path to liability" by failing to "incorporate the familiar proximate cause standard." *Mendez*, 137 S. Ct. at 1547 ("the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional.") (endorsing the approach set forth in *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)). By accepting Plaintiffs' invitation to look past the intervening cause, the Court would ignore these principles of causation set forth in binding precedent.

19

Even setting aside the intervening cause, moreover, Plaintiffs have not pled facts indicating that Hankison's shots into the apartment *next to* the suspect's apartment were the "direct" and "foreseeable" consequences of the Defendants' prior actions, which focused on Taylor's apartment, not her neighbors' unit. The Supreme Court and the Sixth Circuit have explained that to plausibly plead proximate causation, a plaintiff must allege "some *direct* relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (emphasis added); *see also Ameriquest Mortgage*, 615 F.3d at 502 ("the requirement of a direct injury is a "central element" of proximate cause."); *Crosby*, 921 F.3d at 624–26 (affirming dismissal of complaint for failure to plausibly plead an action's foreseeable, direct, and substantial causal contribution to the injury). The contrast with Walker's own lawsuit is telling. It is one thing to allege that a misbegotten search warrant might lead to harm at the intended apartment. *See generally Kenneth Walker v. Louisville/Jefferson County Metro Gov't*, No. 3:21-cv-161, 2022 WL 301687 (W.D. Ky. Feb. 1, 2022). But it's another entirely to treat "wild" and "random" gunfire into a neighboring apartment as the direct and natural consequence of either a warrant that shouldn't have been designated no-knock or a knock-and-announce search that wasn't required. *See, e.g., Claybrook v. Birchwell*, 199 F.3d 350, 359 (2000) (distinguishing Fourth Amendment claims regarding intended targets from Fourteenth Amendment claims by bystanders injured inadvertently). The effects of Walker's and Hankison's gunfire on the apartment *next* to the one being searched was hardly a direct and foreseeable consequence of the actions of the officers who sought or served the warrant.

*****

The Plaintiffs' chain of causation fractures in several spots between the their injuries and the officers' training and supervision, the procedures utilized to obtain the no-knock warrant, the decision to knock anyway, and the first two officers' decision to return fire. And under § 1983, if these these actions didn't cause the Plaintiffs' injuries, the Defendants are not liable. *See Cameron*, 813 F.2d at 784; *Horn*, 22 F.3d at 659. Of course, this order does not apply to any claims brought against Hankison, whose bullets are the only ones that pierced the Plaintiffs' home.

## IV. CLAIM-BY-CLAIM PLEADING FAILURES

Even if Plaintiffs' casual chain were plausible, each of their theories of liability with respect to the non-Hankison Defendants also fails on the merits.

20

## A. Establishment Clause

The Establishment Clause claim fails for lack of standing and wouldn't plausibly establish liability even assuming the truth of its allegations.[11]

**1. Standing.** Plaintiffs' actual theory of harm (and thus standing to recover for an injury on this claim) is difficult to pinpoint. They have offered at least three different theories of Establishment Clause liability at three different points in the litigation.

**a) Offended Observers.** The Second Amended Complaint alleged without elaboration that the City's "training manuals violated the Establishment Clause." SAC ¶¶ 118, 189, 194–202. In support the Plaintiffs cited a line of "offended-observer" decisions holding that the government's display of religious documents or symbols created a constitutional injury by offending someone who saw them. ¶¶ 196–97; *see also, e.g.*, *Stone v. Graham*, 449 U.S. 39 (1980) (offended-observer challenge to display of Ten Commandments in school); *Edwards v. Aguillard*, 462 U.S. 578 (1987) (offended-observer challenge to creationism curriculum); *American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook*, 375 F.3d 484 (6th Cir. 2004) (offended-observer standing to challenge display of Ten Commandments in judge's courtroom).

But Plaintiffs don't allege they themselves were exposed to the Bible verse contained in this internal police training. So the Plaintiffs weren't "observers" of the verse and the offended-observer precedents are irrelevant. *See Ashbrook*, 375 F.3d at 489 (requiring "direct and unwelcome contact" with a government-sponsored

---

[11] The City styled its motion to dismiss (DN 31) as a motion to strike, given that it asked to both strike and dismiss aspects of the Second Amended Complaint. The motion asks the Court to strike a section of the complaint connecting LMPD and its officers with "white Christian nationalists." *See* Louisville MTD (31-1) at 5–6 (citing SAC ¶¶ 122–24). This allegation, the Defendants contend, is impertinent, offensive, and inappropriate under Federal Rule of Civil Procedure 12(f), which allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." But motions to strike are disfavored and infrequently granted. *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953). Striking material from pleadings is warranted only in the rare situation where an allegation has *no* bearing on the subject matter of the litigation. *See* 2 MOORE'S FEDERAL PRACTICE § 12.37 (3d ed. 2002). Here, the allegations regarding the Bible verse and thin-blue-line flag certainly relate to the Plaintiffs' theory of the case—even if they are far removed from the Plaintiffs' actual injury. *See* above at § III.B (discussing Plaintiffs' butterfly-effect theory of causation). However inflammatory and indirect these allegations may be, they are not so unrelated as to merit a strike under Rule 12(f).

religious object for offended-observer standing); *Washegesic v. Bloomingdale Pub. Schs.*, 33 F.3d 679, 683 (6th Cir. 1994) (same).[12]

    **b) <u>Federal Taxpayers</u>.**  Plaintiffs' response to the motions to dismiss changed course and argued that their status as federal taxpayers complaining about religious spending gave rise to a constitutional injury.  *See* Response to Louisville MTD at 7 ("At an absolute minimum, the Plaintiffs have standing as taxpayers to sue the government to prevent an unconstitutional use of taxpayer funds.").   True, the Supreme Court has in the past authorized some federal taxpayers to assert some Establishment Clause injuries.  *See Flast v. Cohen*, 392 U.S. 83, 88 (1968).  To assert such a claim, however, plaintiffs must assert a logical link between an "exercise[e] of *congressional* power" and their "status of federal taxpayers."  *Id.* at 102 (emphasis added); *see also Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 479–82 (1982).[13]  Plaintiffs point to a $2,904,400 federal grant and assert that $1,203,000 out of the grant was used by the City to train officers, with at least "some" of that portion used to create the offending PowerPoint. Response to Louisville MTD at 8.

    This falls far short of pleading an Establishment Clause violation based on tax expenditures.   Plaintiffs haven't identified any specific *congressional* action authorizing the use of federal funds to effectively establish a religion, in violation of the First Amendment, through LMPD's use of PowerPoint training slides.  *Contra Flast*, 392 U.S. at 103 n.23.  Simply alleging that "some" dollars were spent to copy-and-paste a Bible verse into a lengthy PowerPoint presentation is at most a claim about the "incidental expenditure of tax funds," which the *Flast* Court deemed insufficient to permit a federal-taxpayer suit to continue.  *Id.* at 102.  However one might quantify the in-house production costs of a single slide, the amount would fall

---

[12] Much of Plaintiffs' briefing on the Establishment Clause claim rests on *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and decisions applying the so-called *Lemon* test.  *See* Response to Louisville MTD at 8–9.  But the Supreme Court recently rejected *Lemon*'s inquiry into whether a particular display offends the observer or amounts to an "endorsement" of religion.  *See Kennedy v. Bremerton Sch. Dist.*, --- U.S. ----, 142 S. Ct. 2407, 2427 (2022).   Instead, the Court asked whether a practice or display violates the Establishment Clause in light of the "original meaning and history" of the Clause.  *Id.* at 2428.  The Court in *Kennedy* did not have occasion to address the implications its decision may have for offended-observer standing.  *See American Legion v. American Humanist Association*, --- U.S. ----, 139 S. Ct. 2067, 2101 (2019) (Gorsuch J., concurring in the judgment) ("Lower courts invented offended observer standing for Establishment Clause cases in the 1970s in response to … *Lemon*.").

[13] Municipal taxpayers face a lower bar: to sue a local government they need only allege a "misuse of municipal funds" in violation of the Establishment Clause.  *Smith v. Jefferson County Bd. of Sch. Comm'rs*, 641 F.3d 197, 210 (6th Cir. 2011) (en banc).  But the Plaintiffs have not alleged anything about paying municipal taxes, or that the City spent municipal tax funds on the allegedly unconstitutional PowerPoint slide.

far short of the massive expenditure the Supreme Court found to violate the Establishment Clause in *Flast*. The conjectural use of a sliver of a large federal grant on a single slide in a single training presentation leaves us far afield of *Flast*, and far closer to other decisions addressing the incidental expenditures the Supreme Court and the Sixth Circuit have deemed insufficient to establish standing.[14]

**c) Connection to the Shooting.** Finally, at oral argument, Plaintiffs offered yet another theory of Establishment Clause liability: the training *directly* caused their alleged injuries during this shooting by teaching the officers to "follo[w] God's law" and "brin[g] God's wrath upon wrongdoers." Oral Arg. Tr. at 53:11–22. In other words, Plaintiffs assert the shots rang out as part of a religiously motivated conspiracy to purposefully harm them in service of a "white Christian nationalist" ideology. *Id.* at 52:5–25. This is quite an allegation—and one lacking any support in the pleadings. What "factual allegation indicates" that "when Hankison fired th[e] shots he was thinking about the slide with the Bible verse?" *Id.* at 54:3–8. When pressed at argument, Plaintiffs' counsel admitted he needed "fact discovery" to substantiate this point. *Id.* at 54:7–8. As noted above, this puts the proverbial cart before the horse. "The plaintiff may not use the discovery process to obtain [the facts necessary to state a claim] after filing suit." *New Albany Tractor v. Louisville Tractor*, 650 F.3d 1046, 1051 (6th Cir. 2011). This causal theory, even if Plaintiffs had rooted it in their pleadings, is far too tenuous to support standing to raise an Establishment Clause claim. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992).

**2. Implausibility.** Setting aside standing, none of Plaintiffs' adventurous religion theories would succeed anyway. Even on their own telling, the "God's vengeance" slide had little if anything to do with this dispute or any plausible Establishment Clause violation. At oral argument, counsel took the position that *any* invocation of religious scripture—Christian, Muslim, or Hindu—amounted to a per se Establishment Clause violation. Oral Arg. Tr. at 53:1–3. Except for Lincoln's, apparently: according to counsel's unsupported argument, the President has "discretion" to invoke religion, but other public servants do not. *Id.* at 51–53.[15] Analogizing to the genre of Supreme Court decisions addressing the Ten Commandments in schools, Plaintiffs reasoned that "[w]hen training government

---

[14] *See Doremus v. Bd. of Educ. of Hawthorn,* 342 U.S. 429, 433 (1952) ("[T]he interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish" standing.); *Hein v. Freedom from Religion Found.*, 551 U.S. 587, 593–94, 609 (2007) (plurality op.) (declining to extend *Flast* to discretionary executive-branch expenditures, and describing the precedent as "largely … confined to its facts"); *Pedreira v. Ky. Baptist Homes for Children,* 579 F.3d 722, 730 (6th Cir. 2009) (dismissing federal-taxpayer's "general Establishment Clause challenge" for lack of standing).

[15] *See, e.g.*, President Abraham Lincoln, Second Inaugural Address (March 4, 1865) ("[A]s was said three thousand years ago so still it must be said 'the judgments of the Lord are true and righteous altogether.'" (quoting Psalms 19:9)).

officials, police officers," then yes, "it is a per se Establishment Clause violation to quote scripture." *Id.* at 51.

No precedent supporting that position followed then, and none comes to mind now. Those Ten Commandment decisions considered whether a state actor impermissibly "indoctrinated" schoolchildren, mind you, not adults entrusted with governmental authority and presumably possessed of their own free will in matters of religion and conscience. *Id.* And none of the precedents discussed in Plaintiffs' brief regarding scriptural displays in governmental contexts set forth any per se rule. That the Plaintiffs contend "sectarian police training materials cannot pass the *Lemon* test," Response to Louisville MTD at 10, is of course no longer terribly relevant given the Supreme Court's abandonment of that precedent, *see* above at n.12. Nor have the Plaintiffs offered anything more than conclusory allegations regarding the effect this material may have had *on the Plaintiffs*, even under *Lemon* and their other Ten Commandments caselaw. *See* SAC ¶ 193; Response to Louisville MTD at 8–12. The Court has no reason to doubt that the "Plaintiffs would sleep better knowing that the Louisville police force will protect and serve them, even if they belong to a religion (or none at all) that is **not** the one to which police leadership subscribes." Response to Louisville MTD at 11. But that sort of reassurance is not something this Court can supply by conjuring an Establishment Clause violation.

So even accepting the Plaintiffs' story, they haven't made out an actionable Establishment Clause violation. The unfortunate irony here is that the allegedly offensive verse, read in context, connotes the rule of law—not the vigilantism Plaintiffs suggest. "Let *every person*"—police officers, lawyers, plaintiffs, judges—"be subject to the governing authorities." Romans 13:1 (emphasis added). Did the officers nevertheless take away a different message? The pleadings assume so. Yet nothing supports the inference that the mere mention of this passage in 2017 would cause officers in 2020 to "follow God's law and not the law of the Commonwealth of Kentucky and the United States of America," Oral Arg. Tr. 52:11–12, or that this injured Plaintiffs in any way.

## B. Failure to Train and Supervise

Similarly unsupported is Plaintiffs' argument that the Metro Government is liable for failing to train and supervise officers regarding warrant procurement, warrant service, and the use of excessive force. SAC ¶¶ 142. Section 1983 holds a municipality liable for constitutional violations only if the government itself adopted or ratified a policy or custom that *caused* the harm inflicted by its officers. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978). To prevail on a "failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v.*

24

*Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). A plaintiff must plausibly allege "deliberate indifference to *constitutional* rights," not just any harm. *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017) (emphasis added). And the constitutional right asserted "must be clearly established[,] because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear." *Id.* at 995.

The Second Amended Complaint fails to identify any particular errors or omissions in LMPD's training. *See* SAC ¶ 139. Instead, it simply asserts—in conclusory fashion—that the City *improperly* trained the officers in the process for obtaining search warrants. ¶¶ 139, 142. How exactly the training was inadequate, the Second Amended Complaint does not say. With respect to the alleged SOP violations, the pleadings identify no training omission that would've prevented the incident if only the officers had received it. With respect to supervision, the allegations are effectively (and often literally) coextensive.[16] The training and supervision allegations are entirely conclusory[17] and fail for that reason. The Second

---

[16] Paragraphs 141 and 142 are illustrative:

> 141.  At all times relevant, Defendant LouMetro and the LMPD had a duty to properly train, supervise, and discipline their employees and agents such as individual Defendants.

> 142.  Defendants LouMetro and LMPD breached that duty, in part, by:

>> a.  Improperly training, authorizing, encouraging or directing officers on proper use of force.

>> b.  Failing to investigate allegations of excessive force.

>> c.  Failing to discipline officers for violations of policy related to excessive force.

>> d.  Training officers they are Biblical "avengers who carry out God's wrath"

>> e.  Improperly training, authorizing, encouraging or directing officers to obtain search warrants

>> f.  Improperly training, authorizing, encouraging or directing officers to implement and adhere to LMPD SOP 8.1 Chapter: Field Operations, Subject: Search Warrants

>> g.  Improperly training, authorizing, encouraging or directing officers in CID and SWAT to resolve conflicting policies and goals and allowing a condition of internal conflicting CID and SWAT policies to persist to the point of death and unreasonable risk of death of the Plaintiffs on the night of March, 13, 2020[.]

[17] All, that is, except one: the references to the accusation that the officers received "firearms training alongside religious indoctrination as white Christian nationalists."

Amended Complaint simply says the training was inadequate and was "a direct and proximate cause of the actions of the Defendants." ¶ 149. Federal pleading standards require more: factual allegations rather than legal labels. Never mentioned is who at LMPD allegedly failed to train which individual Defendants in which relevant respects. Lacking factual support, a blanket allegation that training was inadequate is plainly insufficient under ordinary pleading standards. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The lack of a factual allegation indicating how a training inadequacy or supervisory oversight related to the shooting means the *Monell* supervisory claim (even setting aside its causation problems discussed above) cannot survive the motion to dismiss. *See Brown v. Cuyahoga County*, 517 F. App'x 431, 436 (6th Cir. 2013) (dismissing *Monell* failure-to-train claim because plaintiff offered "nothing more than a bare recitation of legal standards").

The pleadings also fail to allege any facts indicating the government was deliberately indifferent to the officers' alleged lack of training or supervision—another required element of a failure-to-train or -supervise claim. But the Second Amended Complaint never explains *how* the government was deliberately indifferent to those omissions. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997) (internal quotation marks omitted).

To meet this standard, a plaintiff may pursue either of two paths. The first and most common is to illustrate deliberate indifference by pointing to "prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).[18] The second is to allege "a single violation of federal rights" in the absence of allegations about specific instances of past unconstitutional conduct that would have put the municipality on notice of its obligation to train. *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quotation omitted). This single violation must be "accompanied by a showing that a

---

¶¶ 122–23. That allegation is at least factually concrete. Yet it fails for the same reasons the 2017 slide fails to plausibly allege an Establishment Clause violation: the appearance of one verse of scripture, without more, does not plausibly allege anything inadequate or erroneous about the officers' training or supervision. *See* above at § IV.A.

[18] In *Leach v. Shelby County*, the Sixth Circuit found obvious the need for additional training and supervision after the plaintiff offered evidence of "14 other [similarly situated plaintiffs who] had received similar deplorable treatment." 891 F.2d 1241, 1248 (6th Cir. 1989). By contrast, in *D'Ambrosio v. Marino*, the Sixth Circuit dismissed a failure-to-train claim premised on three prior instances of similar unconstitutional conduct. 747 F.3d 378, 388 (6th Cir. 2014).

municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Id.*

The Plaintiffs haven't alleged *any* prior instances of unconstitutional conduct. The Second Amended Complaint asserts, without support, that "LMPD and LouMetro acted with deliberate indifference to the ongoing and persistent violation of internal LMPD SOPs by CID which resulted in the deadly events of March 13, 2020." SAC ¶ 99. But the pleadings don't identify any previous violations—much less "ongoing and persistent" ones—that would've alerted supervisors to a need for better training and supervision that they nevertheless ignored. So the only plausible reading of the complaint is that it refers to the alleged SOP violations at issue *in this case*. That means their deliberate-indifference allegation necessarily rests on the single-violation theory. And to identify a "recurring situation" presenting an "obvious potential violation," the Plaintiffs must plausibly "allege 'a complete failure to train the [officers], training that is so reckless or grossly negligent that future … misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" *Karsner v. Hardin County*, No. 3:20-cv-125, 2021 WL 886233, at *15 (W.D. Ky. Mar. 9, 2021) (quoting *Harvey v. Campbell County*, 453 F. App'x 557, 567 (6th Cir. 2011)).

The Second Amended Complaint doesn't allege nearly that much. Its training references are conclusory, as described above, containing a handful of statements that "LMPD [failed] to train individual Defendants in all relevant respects." SAC ¶ 139. Paragraph 142 goes on to allege that LMPD "improperly train[ed], authoriz[ed], [and] encourag[ed] … officers … to resolve conflicting polices and goals," which the complaint alleges caused the shooting on the night in question. ¶ 142. Which policies and goals? This boilerplate doesn't fall within the "narrow range of circumstances," *Connick v. Thompson*, 563 U.S. 51, 63 (2011) (quotation omitted), in which a "single violation of federal rights, accompanied by a showing that the [municipality] had failed to train its employees to handle recurring situations present[ed] an obvious potential for such a violation," *Jackson v. City of Cleveland*, 925 F.3d 793, 836 (6th Cir. 2019) (quotation omitted).

### C. Unreasonable Seizure under the Fourth Amendment

The constitutional violation that lies at the core of Plaintiffs' lawsuit, as described by counsel, is that Hankison's bullets entered the home, causing drywall and wood splinters to hit one of them and terrify the rest. Oral Arg. Tr. at 10:25–11:4; *see also* SAC ¶ 152 ("Hankison's use of force against Plaintiffs was excessive."). Hankison's actions, as noted, are not at issue in this Order. And the Order already addressed why the Plaintiffs haven't alleged that the other officers caused Hankison's to fire the shots in the manner he did. *See* above at § III.

But at least some allegations seek to hold the other officers liable for the bullets that entered the neighboring apartment—either directly, *see* SAC ¶ 133 (Count I) ("The individual Defendants' use of force against Plaintiffs was not reasonable under the circumstances and was excessive."), or on a failure-to-intervene theory.  ¶¶ 150–53 (Count III).

The Fourth Amendment, however, "is not a guarantee against unreasonable or outrageous official conduct generally." *Ewolski v. City of Brunswick*, 287 F.3d 492, 505 (6th Cir. 2002).  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. CONST. amend. IV.  "[E]xcessive force claim[s] asserted against public servants by a *premeditated target* of official compulsion designed to consummate a seizure are analyzed under Fourth Amendment 'reasonableness' strictures." *Scott v. Clay County*, 205 F.3d 867, 876 (6th Cir. 2000).  Even assuming these officers used excessive force that was not reasonable under the circumstances, this Fourth Amendment claim would still fall short: according to their own pleadings, the Plaintiffs were bystanders, rather than suspects, and therefore *they* were not seized within the meaning of the Constitution.

"At the adoption of the Fourth Amendment, a 'seizure' was the 'act of taking by warrant' or 'of laying hold on suddenly'—for example, when an 'officer seizes a thief.'" *Torres v. Madrid*, --- U.S. ----, 141 S. Ct. 989, 995 (2021) (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 67 (1828)).  But touching alone is not automatically a Fourth Amendment seizure.  Instead, the touchstone is the "use of force *with intent to restrain*," regardless of whether the person yields.  *Id.* at 998 (emphasis in original); *see also Cameron v. City of Pontiac*, 813 F.2d 782, 785 (6th Cir. 1987).  The Supreme Court and the Sixth Circuit have long distinguished between force *directed* at a *particular person* and force that *incidentally* restricts a *third-party's* movement.

In *Brower v. County of Inyo*, for example, the Supreme Court explained the critical difference between bystanders and suspects:

> [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even where there is a governmentally caused and governmentally desired termination of an individual's freedom of movement … but only when there is a governmental termination of freedom of movement through means intentionally applied.

489 U.S. 593, 596–97 (1989) (emphasis omitted).

28

The Sixth Circuit applied *Brower* in *Claybrook* to hold that an innocent bystander was not "seized" within the meaning of the Fourth Amendment when she was inadvertently shot by an errant bullet. 199 F.3d at 359. Because the officers were unaware of the victim's presence on the scene, they necessarily could not have *intended* to seize her. "[T]he Fourth Amendment['s] 'reasonableness' standard," the court made clear, "does not apply to section 1983 claims which seek remuneration for physical injuries *inadvertently inflicted upon an innocent third party* by police officers' use of force while attempting to seize a perpetrator." *Id.* (citing *Brower*, 489 U.S. at 596). That is "because the authorities could not 'seize' any person other than the one who was a deliberate object of their exertion of force." *Id.* Instead, a "[v]iolation of the Fourth Amendment requires … [that the] detention or taking itself must be willful." *Brower*, 489 U.S. at 596. In other words, the use of force must amount to an intentional seizure of a suspect or target, not the incidental restraint of a bystander, before courts assess its reasonableness. As the Defendants explain and as the Court discusses below, the application of government force to a third party is appropriately assessed under the heightened standard of a Fourteenth Amendment "substantive due process" claim, not the relatively lower threshold of a Fourth Amendment "unreasonable … seizur[e]" claim.

This accords with the unanimous approach of the courts of appeals, which don't allow bystanders inadvertently harmed by state force to assert Fourth Amendment claims. Those Circuits, like the Sixth, have focused on the *identity* of the target and the *intent* of the officers,[19] limiting Fourth Amendment excessive-force claims to those asserted by someone intentionally targeted and restrained. *See, e.g., Childress v. City of Arapaho*, 210 F.3d 1154, 1156–57 (10th Cir. 2000) (dismissing Fourth Amendment claim brought by hostages because "officers intended to restrain the minivan and the fugitives, not [the hostages]").[20]

---

[19] As to intent, the Supreme Court has clarified that "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context." *Torres*, 141 S.Ct. at 998.

[20] *See also Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990) (hostage injured by police fire was not "seized" because he was not an intended target); *Medeiros v. O'Connell*, 150 F.3d 164, 169 (2d Cir. 1998) (same); *Davis v. Township of Hillside*, 190 F.3d 167, 169 n.1 (3d Cir. 1999) ("Substantive due process analysis is … appropriate … because [bystander] plaintiff's claim is not covered by the Fourth Amendment."); *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991) ("[O]ne is 'seized' within the fourth amendment's meaning only when one is the intended object of a physical restraint.") (emphasis omitted); *Pearce v. Doe*, 849 F. App'x 472, 475 (5th Cir. 2021) (dismissing Fourth Amendment claim brought by the estate of a hostage shot by officers because officers did not intend to shoot him (citing *Brower*, 489 U.S. at 596)); *Campbell v. White*, 916 F.2d 421, 422–23 (7th Cir. 1990) (running over a fleeing suspect is not a Fourth Amendment seizure, but "rather an unfortunate and regrettable accident" by the officer); *Moore v. Indehar*, 514 F.3d 756, 760 (8th Cir. 2008) ("[T]o establish a Fourth Amendment claim," the plaintiff "must show that

This precedent applies directly here.  The Plaintiffs describe themselves as "innocent bystanders," SAC ¶ 143, and expressly acknowledge that their "Unit 3 … was not the target of the Search Warrant," ¶ 108.  Nor do they say Hankison intended to fire at them or their apartment.  *See* ¶ 160 ("Defendant Hankison, without probable cause or articulated suspicion, wildly and randomly shot his gun into Plaintiffs' apartment.").[21]  Rather, the "Defendants were executing … search warrants that night at ... 3003 Springfield Drive *Unit 4*" which was "occup[ied]" by "Breonna Taylor and Kenneth Walker."  ¶¶ 49–50 (emphasis added).  As explained by Plaintiffs' own pleadings, the decision to knock and search Unit 4 was intentional; the shots that entered Unit 3 were not.  The officers decided to "actually knock on the door of Unit 4."  ¶ 56; LMPD Investigative Report at 1 ("The … LMPD Narcotics [Unit] … w[as] serving a search warrant at 3003 Springfield Drive #4 when they were fired upon during entry.").  This is the search that Plaintiffs say the Defendants intentionally (if mistakenly) undertook.

Notably absent is any allegation that Hankison (or anyone else) intentionally shot at Plaintiffs with the intent to seize them.  The Second Amended Complaint does not assert that the officers were aware at all of Plaintiffs' existence, let alone that officers intentionally targeted them.  Rather, the pleadings paint a picture of surprise as officers returned fire from Walker and in so doing sprayed bullets into Plaintiffs'

---

[the] Officer … intended to seize [him] through the means of firing his weapon."); *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990) ("[A]n unarmed suspect shot by a police officer might have a fourth amendment claim against the officer.  However, an innocent bystander struck by a stray bullet from the officer's weapon would not have such a claim.") (internal citations omitted); *Ansley v. Heinrich*, 925 F.2d 1339, 1344 (11th Cir. 1991) (the "unintended consequences of government action [cannot] form the basis for a fourth amendment violation"); *Emanuel v. District of Columbia*, 224 F. App'x 1, 2 (D.C. Cir. 2007) (affirming that officers were not liable under the Fourth Amendment because they did not intend to shoot bystander); *City of El Centro v. United States*, 922 F.2d 816, 822 (Fed. Cir. 1990) (similar).

[21] To be sure, one stray sentence in the pleadings might be read to contradict this allegation by stating that Hankison "intentionally pointed and fired his loaded gun at Plaintiffs." SAC ¶ 158; *see also* Oral Arg. Tr. 11:1–3 (arguing the officers "intended to seize" Plaintiffs by "directing legal force in their direction").  But the claims against Hankison are not at issue.  And that allegation contradicted counsel's position.  *Id.* at 11:8–23 (admitting the complaint does not allege that officers had any intent to seize Plaintiffs); Response to Mattingly/Cosgrove MTD at 14 (arguing the "intent" that matters under the Fourth Amendment is merely the intent to shoo[t] their guns … to terminate *someone*'s freedom of movement that night").  Apparently the "intent" mentioned in ¶ 158, read in light of the remainder of counsel's arguments and pleadings, refers only to Hankison's volitional pulling of his gun's trigger, not any supposed aim to harm unknown people in a neighboring apartment.  And as discussed above, *see* nn.21–22, the Fourth Amendment caselaw speaks in terms of intent with respect to the injured party, not a defendant's mere awareness of his own action.

apartment. *See generally Greathouse v. Couch*, 433 F. App'x 370, 373 (6th Cir. 2011) (addressing "objectively reasonable basis for believing that the person poses a significant risk of serious injury or death"). Regardless, a "wild and rando[m]" shot in someone's direction doesn't intentionally seize them. *See, e.g., Buck v. City of Highland Park*, 733 F. App'x 248, 252 (6th Cir. 2018) (bystander unintentionally shot by officers aiming at fleeing bank robber not seized under Fourth Amendment); *Scott*, 205 F. 3d at 876 ("Constitutional tort claims against state actors undergirded by allegations of excessive force exerted to consummate a person's seizure are properly assessed under Fourteenth Amendment due process guarantees if the plaintiff had been a non-targeted innocent third party collaterally injured."). Perhaps *Walker*, against whom the officers acted intentionally, has a cognizable Fourth Amendment claim for the excessive use of force. *See Kenneth Walker v. Louisville/Jefferson County Metro Gov't*, No. 3:21-cv-161, 2022 WL 301687, at *12–14 (W.D. Ky. Feb. 1, 2022).[22] But these Plaintiffs do not.

At argument, Plaintiffs' counsel did not maintain that the officers actually intended to seize Plaintiffs. Oral Arg. Tr. at 11:8–23. Instead, he admitted that Hankison "didn't know who he was shooting at." *Id.* at 10:12. And when pressed whether the complaint contained any "factual allegation [about officer] intent with respect to" the Plaintiffs," counsel answered "None." *Id.* at 11:19–23. This is effectively dispositive under the governing precedent of the Supreme Court and Sixth Circuit.

What is decidedly *not* relevant is counsel's own disagreement with that binding caselaw—specifically, the Sixth Circuit's decision in *Claybrook* holding that the Fourth Amendment "does not apply to … claims which seek remuneration for physical injuries *inadvertently inflicted upon an innocent third party*." 199 F.3d at 359. The Plaintiffs ask the Court to ignore *Claybrook* as inconsistent with *Brower*, or at least read *Claybrook* narrowly to apply only to purely inadvertent uses of force, like a slipped parking brake, as opposed to intentional uses of force that inadvertently injure a third party. Response to Louisville MTD at 21. But *Claybrook* is binding, published precedent that discussed and followed *Brower*, not earlier precedent that a subsequent Supreme Court decision might theoretically have abrogated. So a district court has no basis to ignore it. And the reasoning of the many precedents cited above reject Plaintiffs' reading of "seizures" to include any volitional force, as opposed to force specific to the plaintiff. Plaintiffs are simply wrong that "[i]t doesn't matter who you seize." Oral Arg. Tr. 10:14. The Fourth Amendment does not provide a claim to

---

[22] Walker has filed a Fourth Amendment suit, which survived a motion to dismiss, against many of the same defendants. Walker's Fourth Amendment claims (regarding unreasonable force and a duty to intervene) asserted that the officers intended to target and use unreasonable force against him. The difference between Walker's case and the neighbors' is both obvious and illustrative under the Fourth Amendment caselaw discussed above: the officers allegedly "use[d] … force *with intent to restrain*" Walker, not the neighbors. *Torres*, 141 S. Ct. at 998.

*any* aggrieved person (target and bystander alike) harmed when an officer uses objectively unreasonable force in an attempt to seize someone. *Id.* at 9:5–10:16. Instead the Fourth Amendment protects someone intentionally seized by government officials. *See Brower*, 489 U.S. at 596; *Claybrook*, 199 F.3d at 359. Contrary arguments are best addressed to the Sixth Circuit sitting en banc or to the Supreme Court, not to a single district judge.[23]

## D. Force that "Shocks the Conscience" under the Fourteenth Amendment

The upshot of *Claybrook* is that courts examine use-of-force claims brought by bystanders under the Fourteenth Amendment instead of the Fourth. As set out by the Supreme Court in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Due Process Clause protects innocent third parties from the arbitrary exercise of government power. *Claybrook*, 199 F.3d at 359. Courts considering these claims ask whether the conduct of a law enforcement officers "shocks the conscience." *Lewis*, 523 U.S. at 846. This is a high bar. According to the Supreme Court, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). To shock the conscience, the alleged governmental action must have been "so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency." *Id.* at 847 (quoting *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957)).

Assessing those circumstances depends greatly on, among other things, how much time the officer had to decide the appropriate force to use. If the officer had a "reasonable opportunity to deliberate various alternatives prior to electing a course of action," the courts will deem harmful actions to shock the conscience if they were taken with "'deliberate indifference' towards the plaintiff's federally protected rights." *Claybrook*, 199 F.3d at 359 (quoting *Lewis*, 523 U.S. at 850–51). But if the officer had no "opportunity to ponder or debate [his or her] reaction to the dangerous actions of [an] armed man," courts ask whether the force was used "maliciously and sadistically for the very purpose of causing harm." *Id.* at 359–60 (quotation omitted); *see also Buck*, 733 F. App'x at 254.

---

[23] The Second Amended Complaint asserts, in conclusory fashion, that the Defendants' "excessive use of force was motivated purposefully by religion and racism." ¶ 134. Courts have consistently held, however, that Fourth Amendment rights are personal to the target seized and may not be asserted by a third party. *See, e.g., United States v. Bailey*, 959 F.2d 236 (6th Cir. 1992) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." (quoting *Rakas v. Illinois,* 439 U.S. 128, 133–34 (1978))); *Scott*, 205 F.3d at 878 (The officer "could not violate the Fourth Amendment rights of any unknown passenger who may have been injured by his" attempted seizure of a suspect.) These Plaintiffs, who describe themselves as white, ¶ 45–46; Response to Mattingly/Cosgrove MTD at 38, don't explain how their own constitutional rights would be affected by any racial animus directed toward their African American neighbors. The alleged religious motivation is addressed above at §§ III.C and IV.A.

The Second Amended Complaint, however, says nothing about shocking the conscience.[24]   This is at least partly due to counsel's misunderstanding of (or disagreement with) the law to allow bystanders to proceed under the Fourth Amendment.  If we measure the seizure allegations against the law that properly applies under the Fourteenth Amendment, this claim would still fail.

The Plaintiffs state that the "individual Defendants' use of force against Plaintiffs was not *reasonable under the circumstances*," SAC ¶ 133, and that the excessive force was the "direct and proximate cause" of "Plaintiffs['] … damages," ¶ 135.  *See also* Oral Arg. Tr. at 12:8–9 ("Their negligent appearance there that night triggered the firing of guns by everyone….").  Reasonableness and negligence, of course, is the language of torts and negligence, not malice and sadism.  *See Lewis*, 523 U.S. at 849 ("[L]liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").   The Fourteenth Amendment standard—at least with respect to a "rapidly evolving, fluid, dangerous predicament," *Claybrook*, 199 F.3d at 359–60—requires intent, about which this milquetoast pleading says nothing with respect to the Defendants besides Hankison.  Plaintiffs cite no caselaw of any sort indicating that a shootout harming third-parties shocks the conscience and creates liability under the Fourteenth Amendment.[25]

Plaintiffs' acknowledged bystander status poses still another problem for their use-of-force claim.  They don't allege the officers were even aware of their presence, SAC ¶¶ 108, 160, and cite no authority indicating that inadvertent harm to a

---

[24] One reference to "extreme and outrageous conduct" describes an intentional-infliction-of-emotional-distress claim that runs only against Hankison.  SAC ¶ 165.

[25] According to Plaintiffs' response briefs, a lower standard may apply to the officers' decision to knock because that occurred not in the heat of the moment but instead during a one-hour pre-raid officers' meeting.  *See* Response to Mattingly/Cosgrove MTD at 7; Oral Arg. Tr. at 18:17–19:12.  Under *Lewis*, the Sixth Circuit has analyzed government actions taken with the benefit of "actual deliberation" under a less-heightened "deliberate-indifference" standard.  *See Ewolski*, 287 F.3d at 511; *cf. Draw v. City of Lincoln Park*, 491 F.3d 550, 555 (6th Cir. 2007) (discussing intent-to-harm instead of deliberate-indifference).  As discussed above in the context of training and supervision, the deliberate-indifference standard requires that the "official knows of and disregards an excessive risk to [the victim's] health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As discussed above, no facts alleged (and no law cited) connect the decision to knock on a suspect's door to "deliberate indifference" or "malice" or "intent to harm" bystanders.  Nor is there any allegation that the officers made that decision aware of any substantial risk of harm or with "callous indifference" toward neighbors.  Instead, the complaint simply alleges that this decision "'on the fly' was a violation of LMPD SOP and evidence of lack of training and supervision…."  SAC ¶ 58.  As explained below at n.26, the two are not the same.

bystander can meet *Lewis*'s malice standard, *see* Oral Arg. Tr. at 11:8–23.  Indeed, the Sixth Circuit's decision in *Claybrook* indicated the opposite: there the Court of Appeals rejected the notion that "the three defendant undercover agents" could have "acted maliciously or sadistically towards [an] unknown individual" during their exchange of gunfire.  199 F.3d at 360–61.  The opinion relied on *Farmer*, 511 U.S. at 835–36, in which the Supreme Court "explain[ed] that malicious or sadistic behavior entails unjustifiable intentional conduct undertaken with the direct purpose of causing harm *to the victim*."  *Claybrook*, 199 F.3d at 360–61 (emphasis added).

The facts and holding of *Claybrook* are again instructive.  The encounter began when a group of plainclothes police officers in an unmarked car surveilled the streets of a high-crime neighborhood.  199 F.3d at 354.  Noticing a man on the street with a gun, a suspiciously parked vehicle, and a recently targeted business, the officers approached and, without identifying themselves, commanded that the man drop his weapon.  *Id.*  He declined and a shootout ensued, with the suspect positioning himself behind the vehicle.  Inside the car was his daughter, who sustained several bullet wounds and required extensive hospitalization for her life-threatening injuries.  *Id.* at 354–55.

The Sixth Circuit rejected her Fourteenth Amendment claim: because the events occurred in a "rapidly evolving, fluid, and dangerous predicament," the heightened "malicious or sadistic" standard of proof applied.  *See id.* at 359–60 (quoting *Lewis*, 523 U.S. at 851–53).  And the plaintiff could not clear that high bar because even if "the actions of the … patrolmen violated departmental policy or were otherwise negligent, no rational fact finder could conclude, even after considering the evidence in the light most favorable to [plaintiff], that those peace enforcement officers acted with conscience-shocking malice or sadism *toward the unintended shooting victim*."  *Id.* at 360 (emphasis added).  The Second Amended Complaint identifies no facts that would distinguish the binding ruling in *Claybrook*—and indeed no facts indicating the Defendants here acted with any malice whatever toward the neighbors.

Even looking beyond the pleadings to the responses to the motions to dismiss, the claims still fail.  Plaintiffs offer two more arguments that the Defendants acted "maliciously and sadistically for the very purpose of causing harm" to the Plaintiffs.  *See* Response to Louisville MTD at 21–23.  Neither work.

*First*, they assert generally that "these Defendants' deliberate choice to stage an ultrahazardous nighttime 'no-knock' raid in direct violation of *multiple* LMPD standard operating procedures—with lethal weapons but none of the special tactics or training needed to safely execute a 'no-knock' search warrant—and its ultimately deadly consequences [i]s an indefensibly unlawful course of conduct that does indeed shock the conscience."  *Id.* at 22.  Plaintiffs point to no precedent, however, that characterizes the choice of police tactics regarding how to execute a warrant (or any

remotely similar policework) as malicious and sadistic. The caselaw points in the other direction. *See Lewis*, 523 U.S. at 855 ("Regardless whether [the Officer's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practices, it does not shock the conscience, and petitioners are not called upon to answer for it under § 1983.").

Nor may Plaintiffs bootstrap their negligence argument onto the Constitution by pointing to LMPD standard operating procedures. Even if "the actions of the [officers] violated departmental policy or were otherwise negligent," that could not establish "conscience-shocking malice or sadism toward the unintended shooting victim." *Claybrook*, 199 F.3d at 360. Both the Sixth Circuit and the Supreme Court have dismissed claims that rest solely on violations of local regulations.[26] To be sure, the LMPD regulations expressly call for "reasonableness" in the use of force in the execution of a search warrant, considered in light of the individual circumstances known before and during the execution. Response to Louisville MTD at 23. Plaintiffs contend this displaces the "shocks the conscience" standard of the Fourteenth Amendment. *Id.* But while standard operating procedures may of course call for a higher or different standard of care than does the Constitution, that does not supplant the Constitution as the source of legal liability under § 1983. Congress made states and localities liable for constitutional violations, not violations of state and local policies. A plaintiff asserting a *Lewis* claim must allege the violation of "the plaintiff's *federally protected rights*." *Claybrook*, 199 F.3d at 359 (emphasis added; quotation marks omitted).

These Plaintiffs haven't. They ignore the law's clear teaching on *when* to assess liability for the use of force: when the officer "react[ed] to the dangerous actions of [an] armed man." *Id.* at 360. The use of force Plaintiffs complain about—the bullets that flew into their apartment—occurred in the context of a fast-evolving firefight following Walker's shooting at police officers. Plaintiffs' own pleadings refer to the events as a "chaotic scene," SAC ¶ 86, and a "wild gunfight," ¶ 114, which ensued after officers knocked and Walker shot at and hit Officer Mattingly with a

---

[26] *See United States v. Caceres*, 440 U.S. 741, 754–55 (1979) (violation of internal regulations does not establish a constitutional violation); *Bird v. Summit County*, 730 F.2d 442, 444 (6th Cir. 1984) ("A § 1983 violation must be predicated on a deprivation of *constitutional* rights." (emphasis added)); *Pruitt v. Brown*, 893 F.2d 1335, 1990 WL 4065, at *1 (6th Cir. Jan. 23, 1990) ("Section 1983 protection does not extend to purely state-guaranteed procedures and rights."); *Latits v. Phillips*, 878 F.3d 541, 553 (6th Cir. 2017) ("It must have been clearly established that the conduct at issue violates the Constitution, not internal policies."); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992) ("[T]he Supreme Court has indicated that the violation of established procedure alone is insufficient to overcome a qualified immunity claim.").

bullet, ¶ 86.[27]  A "[w]ild gunfight" not planned or intended by law enforcement is the sort of prototypical "dangerous action[]" for which the heightened malicious-or-sadistic standard applies.[28]

*Second*, the Plaintiffs hang their hat on a line in the police chief's letter terminating Hankison, stating that his actions were a "shock to the conscience." Response to Louisville MTD at 22–23.  Plaintiffs claim the "Defendants cannot legitimately argue that the proper standard to be applied is the Fourteenth Amendment 'shock to the conscience' and the facts do not rise to that level when the Chief of Police admitted Hankison's actions, at the very least, shock the conscience." *Id.*  There are at least two problems with this allegation.  Hankison's actions, as explained above, are not at issue in this order.  So whether those actions shocked the conscience, consistent with the termination letter as Plaintiffs describe it, is inapposite and unbriefed.  And the words of the police chief alone—which obviously do not establish the meaning of the Constitution—cannot overcome the independent barriers to relief on this claim against the other Defendants (namely intent and causation) discussed above.

## E.  Qualified Immunity for Federal Claims

Regardless, even if the Plaintiffs had plausibly alleged that the Defendants violated the Constitution by violating standard operating procedures, the individual officers would enjoy qualified immunity.

Qualified immunity shields government officials acting within the scope of their official duties from federal civil liability so long as their conduct does not violate clearly established rights that a reasonable person would know about.  *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982).  Overcoming an assertion of qualified immunity requires that officers' conduct violated the Constitution as clearly established by relevant in-circuit precedent.  *See Ashford v. Raby*, 951 F.3d 798, 804

---

[27] The Second Amended Complaint and documents attached to it confirm that the Defendants fired after Walker.  *See* SAC ¶ 86 ("Defendant Mattingly … was shot in the leg by Kenneth Walker …."); ¶ 81 (citing LMPD Investigative Report); LMPD Investigative Report at 4 (Walker admitting he fired the first shots at police officers).

[28] *See, e.g.*, *Claybrook*, 199 F.3d at 359 (holding that an injured bystander in a police shootout must prove not just deliberate indifference on the part of the police officers but must also show that they acted "maliciously and sadistically for the very purpose of causing harm" (quotation omitted)); *Buck*, 733 F. App'x at 254 (applying malicious-or-sadistic standard to situation in which officer fired shots to prevent a suspect who fired upon the officers from escaping); *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 373 (9th Cir. 1998) (holding malicious-or-sadistic standard applied when police encountered a gunfight in a parking lot and inadvertently killed a bystander); *Childress*, 210 F.3d at 1156–57 (applying malicious-or-sadistic standard when police fired upon hijacked van to stop it as it drove through roadblocks).

(6th Cir. 2020). "For a right to be clearly established, 'existing *precedent* must have placed the statutory or constitutional question beyond debate.'" *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022) (quoting *Rivas-Villegas v. Cortesluna*, --- U.S. ----, 142 S. Ct. 4, 8 (2021)).  And courts are "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Qualified immunity is an affirmative defense that occupies a distinct place in the law: it permits government officials to escape liability for constitutional violations, *Harlow*, 457 U.S. at 807, avoid the "costs and burdens of suit, including discovery," *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021), shift the burdens of pleading and proof to the *plaintiff*, *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), and even take an interlocutory appeal following a denial, *id.* at 527.  As binding precedents from the Supreme Court and Sixth Circuit have reiterated, "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Id.*; *see also Crawford*, 15 F.4th at 760 (same).  And the Sixth Circuit has on many occasions affirmed dismissals of claims that did not plausibly plead clearly established substantive due process violations. *See, e.g.*, *Clark v. Stone*, 998 F.3d 287, 299–300 (6th Cir. 2021); *Jasinski v. Tyler*, 729 F.3d 531, 538–40 (6th Cir. 2013).

Here the Plaintiffs cannot overcome qualified immunity.  Even if they'd plausibly alleged a violation of the Constitution, *contra* § IV.C–.D above, they haven't identified any precedent making that violation "clear."  The Plaintiffs fleetingly point to *Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017), for the proposition that Plaintiffs have a clearly established right to be free from the use of force alleged here. *See* SAC ¶ 112.  In that case, a police officer ended a car chase by ramming a suspect's car off the road and then "shooting and killing him as he tried to resume flight." *Latits*, 878 F.3d at 544.  The Sixth Circuit held that the Fourth Amendment prohibits an officer from firing on a fleeing suspect who poses no threat to the officer in the context of a car chase on the open road. *Id.* at 547–50.  But the court granted qualified immunity because the law was not clearly established at the time, as no cases were factually similar. *Id.* at 553.

Similarly, *Latits* does not clearly establish any right that controlled the officers' actions here.

This case concerns a dispute about a shooting that occurred as officers attempted to serve a warrant at an apartment building. SAC ¶¶ 49, 86.  The Plaintiffs were unintended rather than intended targets of police gunshots.  The officers were returning fire rather than shooting at a fleeing suspect.  Much of the alleged harm concerns fear and a perceived inability to leave, rather than a gunshot that physically restrained and indeed killed the suspect. SAC ¶¶ 108, 159.  And the

officers at issue in this order are not the ones whose shots directly violated the constitutional rights of the Plaintiffs—even on their own theory.

These factual and legal distinctions are dispositive—regardless of whether the claim is analyzed under the Fourth or Fourteenth Amendments.  According to the Supreme Court, the qualified-immunity analysis turns on "whether the violative nature of *particular* conduct is clearly established."  *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742).  Decisions from cases that are "too factually distinct to speak clearly to the specific circumstances here" are not enough to deny qualified immunity.  *Id.* at 18.  This "specificity is especially important in the Fourth Amendment context, where … '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"  *Id.* at 12 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).  The same logic applies with equal or greater force in the Fourteenth Amendment context.  *See Sheets v. Mullins*, 287 F.3d 581, 590 (6th Cir. 2002) (granting qualified immunity from substantive due process claim because precedent did not clearly establish the law); *Johnson v. City of Saginaw*, 980 F.3d 497, 515–16 (6th Cir. 2020) (granting qualified immunity on substantive due process claim because "existing law did not place the constitutionality of the officer's conduct beyond debate" (internal citations and quotations omitted)); *Cummings v. Dean*, 913 F.3d 1227, 1241 (10th Cir. 2019) (noting that qualified immunity in the substantive due process context requires courts to be "especially sensitive" to whether contemporaneous precedent "squarely govern[ed]" those "particular circumstances" (internal citations omitted)).

Indeed, more factually analogous caselaw from the Sixth Circuit has made clear that "[w]hen a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death."  *Greathouse*, 433 F. App'x at 373.  On this basis, the court has recognized that the "officer may use deadly force whenever he or she, in the face of a rapidly unfolding situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public."  *Williams v. City of Grosse Point Park*, 496 F.3d 482, 487 (6th Cir. 2007).  And, as already noted, in *Claybrook* the Sixth Circuit dismissed the Fourteenth Amendment claims of a bystander shot by officers engaged in a shootout with a suspect.  199 F.3d at 360–61.  Certainly, Plaintiffs have pointed to no caselaw and have pled no facts that would proscribe, rather than authorize, the type of force they allege the Defendants at issue used.

## F.  Failure to Intervene

Plaintiffs next claim that all the officer Defendants had a duty to intervene and prevent the shooting but failed to do so.  This allegation also fails to establish a basis for liability.

Generally, an officer's "mere presence during [an] altercation, without a showing of some direct responsibility, cannot suffice to subject" him to liability. *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013). But the Sixth Circuit has explained that onlooking officers may have a duty to intervene to prevent an unlawful use of force. *See Barton v. Norrod*, 106 F.3d 1289, 1299 (6th Cir. 1997). This duty applies if (1) an officer "observed or had reason to know that *excessive force* would be or was being used [or the Constitution otherwise violated], and (2) the officer had both *the opportunity and the means* to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (emphasis added). Only then does the Constitution impose liability on a state actor for failing to intervene. Plaintiffs can meet neither prong.

Did officers see or know excessive force was used? In the first place, none of the Defendants at issue used excessive force based on the facts as pled. As explained above, they did not "seize" the Plaintiffs under the Fourth Amendment because these officers didn't target Plaintiffs. *Claybrook*, 199 F.3d at 359. And no Fourteenth Amendment violation occurred because these officers didn't act maliciously and sadistically toward the Plaintiffs. *Id.*

Further, even assuming an underlying constitutional violation by Hankison, did the non-shooting officers—James, Nobles, Campbell, and Hoover—have time and opportunity to intervene and prevent the use of force? *See Burgess*, 735 F.3d at 475. Not according to the pleadings. Plaintiffs haven't said what the officers on the scene should've done, or when, to prevent the shooting once the warrant was executed. Nor have they pointed to any law supporting the notion that officers had a duty to intervene to prevent a warrant execution that might *lead to* an unconstitutional use of force.[29] And with respect to the shooting itself, the Sixth Circuit has recognized "no duty to intervene" "where, as here, an entire incident unfolds in a matter of seconds." *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 348 (6th Cir. 2007) (quotation omitted).[30] Even on Plaintiffs' own telling, the events progressed quickly from the

---

[29] Notably, Plaintiffs' response to the arguments supporting dismissal of this claim mentioned only standard operating procedures, not any use-of-force or other constitutional violation. Response to Louisville MTD at 26 ("Each of the named individual Defendants knew that he was headed to a raid on the home of black people with loaded weapons in a crowded apartment complex in violation of multiple LMPD standard operating procedures—and not one of them spoke up or alerted each other to the violations."). Whether the Plaintiffs' theory rests on a duty to intervene to prevent the execution of this warrant on a third-party's home, or to prevent the violation of standard operating procedures, or not to knock and announce, Plaintiffs have failed to identify any precedent that would support such a claim.

[30] *See also Pineda v. Hamilton County*, 977 F.3d 483, 493 (6th Cir. 2020) ("An excessive use of force lasting ten seconds or less does not give a defendant enough time to perceive the incident and intervene…." (quotation omitted)); *Kowolonek v. Moore*, 463 F. App'x 531, 539

knock to the shooting. *See* SAC ¶ 81 (citing "Summary of Events" from LMPD Investigative Report); LMPD Investigative Report (DN 8-5) at 4 (describing fast timeline between knocks and gunfire); Response to Louisville MTD at 6 (noting that within seconds of police ramming open door, Walker fired on officers and officers immediately returned fire). The facts as pled don't identify the "opportunity and means" Defendants had to intervene in the context of the fast-escalating fire fight described in the complaint and documents attached to it. *See Turner*, 119 F.3d at 429.[31]

### G. State-Law Negligence

Plaintiffs also raise state-law negligence claims against various amalgamations of Defendants. The analysis of these claims overlaps in many ways with the above analysis of the federal claims.

**1. Government Defendants.** Louisville Metro and LMPD, according to Plaintiffs, "breached their duty of care to Plaintiffs by failing to properly supervise, provide training, and take remedial measures … to ensure the safety of Plaintiffs." SAC ¶ 173; *see also* ¶ 74; DN 57 (dismissing LMPD as a defendant). Plaintiffs frame these as negligence claims against the government. *See* SAC at Count V ("Negligence: Negligent Hiring, Negligent Retention, Negligent Supervision, Negligent Infliction of Emotional Distress, Negligence Per Se and Strict Liability against LMPD, LouMetro."). These direct claims against the joint city/county government are explicitly barred by the doctrine of sovereign immunity.

In Kentucky, "[a] county government is cloaked with sovereign immunity." *Schwindel v. Meade County*, 113 S.W.3d 159, 163 (Ky. 2003). Because "Louisville Metro is a county government … [it is] entitled to immunity." *Gaeta v. Louisville*

---

(6th Cir. 2012) (no duty to intervene given rapid sequence of events and relatively short time necessary to use taser); *Ontha v. Rutherford County*, 222 F. App'x 498, 506 (6th Cir. 2007) (six or seven seconds insufficient to intervene).

[31] And in any event, qualified immunity would shield these officers. *See Heine v. Rice*, No. 8:00-cv-2297, 2001 WL 1338780, at *8 (M.D. Fla. Apr. 9., 2001) (dismissing duty-to-intervene claim against onlooking officers, based on information another officer omitted from a search-warrant affidavit, because circuit precedent hadn't clearly established such a duty). The Plaintiffs cite no caselaw, and the Court is aware of none, indicating that clearly established law imposed a duty to intervene to halt officers from returning fire. Plaintiffs point to *Putnam v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981), in which the court discussed a possible duty for bystander officers to prevent a colleague from hitting a pre-trial detainee multiple times with the butt of a gun. This far-afield and out-of-circuit authority, standing alone, doesn't come close to clearly establishing a duty to intervene here. *See Ashford*, 951 F.3d at 804 (Other "circuits' precedents are usually irrelevant to the 'clearly established' inquiry."). That prison-beating precedent did not "plac[e] the … constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

*Metro Police Dep't*, No. 2019-ca-1810, 2021 WL 5264185, at *2 (Ky. Ct. App. Nov. 12, 2021) (citing *Comair, Inc. v. Lexington-Fayette Urban County Airport Corp.*, 295 S.W.3d 91, 99 (Ky. 2009)). And a government officer sued in official capacity is "cloaked with the same immunity as the government or agency he/she represents." *See Schwindel*, 113 S.W.3d at 169.

This "absolute immun[ity]," *Louisville/Metro County Government v. Cowan*, 508 S.W.3d 107, 109 (Ky. Ct. App. 2017), prevents suits against a government for its own torts and "for the ministerial acts of its agents, servants, [or] employees." *Schwindel*, 113 S.W.3d at 163; *see also Jullerat v. United States*, No. 3:16-cv-276, 2016 WL 7480392, at *2 (W.D. Ky. Dec. 29, 2016) (dismissing tort claims against the government on sovereign immunity grounds). Only if the municipality "give[s] its consent or otherwise waive[s] its immunity" may a suit for damages be maintained directly against a sovereign. *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage*, 286 S.W.3d 790, 801 (Ky. 2009).

Plaintiffs point to KRS § 65.2005 as a waiver of sovereign immunity sufficient to directly sue Louisville Metro. Response to Louisville MTD at 37–39. But KRS § 65.2005(1) provides only that a "local government shall *provide for the defense* of any employee by an attorney chosen by the local government in any action in tort arising out of an act or omission occurring within the scope of his employment." And in the case of a judgment against the officer, the statute requires the local government to indemnify some employees for some actions. *Id.*

That statute, the state supreme court has recognized, was "enacted … to shield public employees from the personal expenses incurred in the defense of tort claims." *Richardson v. Louisville/Jefferson County Metro Government*, 260 S.W.3d 777, 781 (Ky. 2008). But, as the court has also recognized, KRS § 65.2005 "did not … change the immunity status of counties," and is not "an implied waiver of immunity." *Schwindel*, 113 S.W.3d at 165. Nothing in KRS § 65.2005 "purports to waive a county government's immunity from suit or from a judgment against itself premised upon vicarious liability." *Id.* at 167. Instead, the law simply requires the municipality to "provide a defense for and pay any judgment rendered against a county employee for damages arising out of the performance of a ministerial act." *Id.*

KRS § 65.2005 is therefore inapplicable to the negligence claims Plaintiffs assert against Louisville Metro, so the Court dismisses these claims and the official-capacity claims as barred by sovereign immunity. *See Gaeta*, 2021 WL 5264185, at *4 (dismissing claims asserted directly against a Louisville Metro as barred by sovereign immunity); *Schwindel*, 113 S.W.3d at 169.

**2. Individual Defendants.** All the Defendant officers, Plaintiffs further claim, are liable under Kentucky's negligence per se statute based on the allegedly unreasonable force used during an arrest. SAC ¶¶ 203–214; Oral Arg. Tr. at 4–6.

Further, the complaint states that the officers who fired at Walker—Mattingly, Cosgrove, and Hankison—are strictly liable for engaging in "ultrahazardous activity" by firing guns.  SAC ¶ 177.  The Plaintiffs also say that *all* the officers are liable for negligently failing to supervise *all* the other officers, ¶ 176, a claim discussed further below at § IV.H.

a) **Negligence per se**.  KRS § 446.070 provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation."  This statute "codif[ies] common law negligence per se," and applies "when the alleged offender violates a statute and the plaintiff comes within the class of persons intended to be protected by the statute."  *St. Luke Hosp. v. Straub*, 354 S.W.3d 529, 534 (Ky. 2011).  But the Plaintiffs neither identify a state statute violated by the individual Defendants nor plead facts showing they fit within the class of persons any such statute would protect.

Plaintiffs point to KRS § 431.025, which provides that "[n]o unnecessary force or violence shall be used in making an arrest."  But the officers didn't show up to arrest the Plaintiffs; they sought to search Walker and Taylor's apartment.  *See* SAC ¶ 49 ("Defendants were executing … [a] search warrant[] at … 3003 Springfield Drive Unit 4."); ¶ 84 ("Defendant[s] serve[d] the Search Warrant upon 3003 Springfield Drive Unit 4.").  On Plaintiffs' read, the use of the indefinite article "an" instead of definite article "the" betrays an intention of the legislature to create a cause of action for anyone—including bystanders—harmed during the arrest of anyone else.  SAC ¶ 206; *see also* ¶ 208 ("'An' arrest contemplates there may be innocent bystanders while 'an' arrest is being made and their safety and security is contemplated by the prohibition against 'unnecessary force or violence.'").

No Kentucky caselaw cited by Plaintiffs adopts this broad interpretation of arrest, which apparently could impose per se liability anytime a search involved unnecessary force and led to an arrest.  To the contrary, the statutory definition uses the same indefinite article, yet clearly speaks to the restraint of the person taken into custody without mentioning any others: "An arrest is made by placing the person being arrested in restraint, or by his submission to the custody of the person making the arrest."  KRS § 431.025; *Harris v. Commonwealth*, No. 2007-SC-671, 2009 WL 735879, at *3–4 (Ky. Mar. 19, 2009) (discussing KRS § 431.025).  The warrant here (attached to the complaint) is explicitly a "search warrant," rather than an "arrest warrant."  Warrant (DN 8-2) at 1–2 ("search warrant" applicable to the "apartment," the "curtilage" of the apartment, the occupants' vehicles, and "any property" on the premises).  The LMPD report attached to Plaintiffs' complaint notes that Walker was arrested only *after* the shooting in question, and without any subsequent use of force. *See* LMPD Investigative Report at 4 (After the shooting "Kenneth Walker[] exited the apartment unarmed with his hands in the air and was taken into custody.").

And in any event, Plaintiffs haven't shown that innocent bystanders fall within the class of persons the statute was designed to protect. Kentucky state courts look to the statute's "plain language" and "legislative intent" in determining a statute's scope of protection. *Vanhook v. Somerset Health Facilities, LP*, 67 F. Supp. 3d 810, 820 (E.D. Ky. 2014); *see also McCarty v. Covol Fuels No. 2, LLC*, 476 S.W.3d 224, 229 (Ky. 2015) (looking to text and legislative intent to ascertain whether plaintiff fell within the class of protected persons).

The text speaks to the person being arrested, not others who happen to be nearby. KRS § 431.025 (emphasis added) provides:

> (1) The person making an arrest shall inform *the person* about to be arrested of the intention to arrest *him*, and of the offense for which *he* is being arrested.

> (2) An arrest is made by placing the *person* being arrested in restraint, or by *his* submission to the custody of the person making the arrest. The submission shall be in the actual presence of the arrester.

> (3) No unnecessary force or violence shall be used in making an arrest.

The statute's text and context are crystal clear, addressing the rights of an *arrestee* during an arrest. Subsection (1) requires officers to inform *the arrestee* of the officers' intention to arrest *the arrestee*. This specific treatment of the arrestee, as opposed to bystanders, undercuts Plaintiffs' broader understanding. *See generally Fox v. Grayson*, 317 S.W.3d 1, 8 (Ky. 2010) ("It is a familiar and general rule of statutory construction that the mention of one thing implies the exclusion of another." (quotation omitted)). Subsection (2) goes on to define "an arrest" as occurring when the "person being arrested" is restrained or submits to the custody of the officer. Yet Plaintiffs read that same phrase in subsection (3)—counterintuitively—to bear a different meaning. If we carry over the definition from subsection (2) to the critical phrase in subsection (3), the result is at odds with Plaintiffs' understanding: "No unnecessary force or violence shall be used in *placing the person being arrested in restraint, or … [securing] his submission to the custody of the person making the arrest*." This provision neither says nor implies anything about the rights of third parties.

Precedent supports that § 431.025 exists to protect the rights of arrestees, not bystanders. In *Haugh v. City of Louisville*, the Kentucky Court of Appeals explained that KRS § 431.025 bars officers from "us[ing] unnecessary force or violence in … tak[ing] *a suspect* into custody." 242 S.W.3d 683, 686 (Ky. Ct. App. 2007) (emphasis added) (citing *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973)). Similarly, in *Lawson v. Burnett*, the Commonwealth's high court said nothing about third parties, explaining instead that "in executing a warrant of arrest, the officer must inform *the person* named in the warrant of his purpose and … has a duty not to use unnecessary force in making *the arrest*." 471 S.W.2d 726, 728 (Ky. 1971) (emphasis added). And

in *Jones v. Ky. Bd. of Claims*, the Kentucky Court of Appeals noted that § 431.025 allowed that "[a]n officer may be held responsible for injuries that result from use of excessive force against *an arrestee*." 2006-ca-2157, 2007 WL 2812612, at *2 (Ky. Ct. App. Sept. 28, 2007) (emphasis added); *see also McNally v. Tabor*, No. 6:18-cv-16, 2019 WL 6044882, at *18 (E.D. Ky. Nov. 15, 2019) (similar).

In any event, both the Western District and the Sixth Circuit have explained that a "negligence claim under Kentucky law cannot coexist with a Fourth Amendment excessive-force claim based on the same conduct." *Hall v. Braun*, 546 F. Supp. 3d 553, 564 (W.D. Ky. 2021), *aff'd sub nom, Kirilova v. Braun*, No. 21-5649, 2022 WL 247751, at *6–7 (6th Cir. 2022). A police officer's purposeful use of force may not be analyzed as a negligence claim. *See Ali v. City of Louisville*, No. 3:05-cv-427, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006). Instead "the use of excessive force by a police officer constitutes the intentional tort of battery." *Browning v. Edmonson County*, 18 F.4th 516, 531 (6th Cir. 2021) (internal brackets and quotation omitted). So a "claim based on an officer's excessive force … is cognizable only as a battery claim." *Kirilova*, 2022 WL 247751, at *7 (quotation omitted). But "there is no such thing as a negligent battery," *id.* (quotation omitted), and counsel abandoned "[a]ll the intentional torts against everyone except Hankison," Oral Arg. Tr. at 5:20–22 (limiting Count IV—alleging assault, battery, false arrest, false imprisonment, and IIED—to Hankison only). So the negligent-use-of-force claim against the other individual Defendants, *see* SAC ¶ 176, fails as a matter of law.

**b) Ultrahazardous Activity.** Relying on a 1956 Kentucky Supreme Court case, Plaintiffs claimed the Defendants are strictly liable for the gunshots because they engaged in "ultrahazardous activity" by firing their weapons. SAC ¶ 177 (citing *Randall v. Shelton*, 293 S.W.2d 559, 561 (Ky. 1956)). In *Shelton*, a woman who'd been struck by a truck hauling rocks won a strict-liability verdict against the truck's driver. 293 S.W.2d at 560. The Kentucky Supreme Court reversed, accepting that plaintiffs could maintain strict-liability claims against those who cause harm while "engaged in extra-hazardous activity," but explaining that transporting rocks was not such an activity. *Id.* at 561–63.

That case has little applicability here, which is perhaps why Plaintiffs' counsel appeared to abandon this theory at argument. Oral Arg. Tr. 5–6. Kentucky has adopted the Restatement (Second) of Torts § 521 (1981), which explains that rules regarding "strict liability for abnormally dangerous activities do not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee." Citing the Restatement, the Kentucky Court of Appeals has explained that "the rules for strict liability for abnormally dangerous activities rarely apply to activities carried on in pursuance of a public duty." *Ky. Utilities Co. v. Auto Crane Co.*, 674 S.W.2d 15, 18 (Ky. Ct. App. 1983). Courts in this District have applied

this rule in multiple cases.[32]  And Plaintiffs have identified no court in Kentucky or anywhere else that has recognized a strict-liability claim against police officers for their official activities.

Such a theory of liability would be in some tension, to put it mildly, with the abundant use-of-force and qualified-immunity precedent discussed above.[33]  And with Kentucky law, too.  It authorizes law enforcement to "preserve the peace, maintain order and prevent … unlawful conduct … and to protect all persons and property … from injury, harm, and damage."  KRS § 164.955.  And it even authorizes the use of "deadly physical force" against suspects whom an officer believes are "likely to endanger human life unless apprehended without delay."  KRS § 503.090(2)(c).  When acting under this authority, police are of course engaged in a paradigmatic public function.  Indeed, the Kentucky Supreme Court has explained that a "policeman is a *public* officer concerned with the administration of *public duties*." *Hopwood v. City of Paducah*, 424 S.W.2d 134, 136 (Ky. 1968) (emphases added).  So a strict-liability claim, to the extent the Plaintiffs still pursue it against these Defendants, cannot run against them for the performance of their official duties.

## H.  Supervisory Liability

Plaintiffs finally allege that the so-called supervisory Defendants—Chief Conrad, Lieutenant Huckleberry, and Officer Mattingly—bear liability for the constitutional, statutory, and tort violations of officers under their command because these Defendants failed to supervise effectively.  These "superior officers," Plaintiffs maintain, should have better supervised "Jaynes and Hankison and the other individual Defendants with respect to procurement and implementation of the search warrant process … as well as the mandatory involvement of SWAT in serving a 'No-Knock' warrant and the use of excess force considering the foreseeable consequences

---

[32] *See Lamb v. Martin Marietta Energy Systems, Inc.*, 835 F. Supp. 959, 971 (W.D. Ky. 1993) ("Kentucky law would not recognize a cause of action for strict liability because the activity is carried on in pursuance of a public necessity."); *G & K Dairy v. Princeton Elec. Plant Bd.*, 781 F. Supp. 485, 490 (W.D. Ky. 1991) (denying strict-liability claim against electricity company for harm caused by escaped electric current); *Johnson v. CSX Transp., Inc.*, No. 3:08-cv-99, 2008 WL 4427211, at *2 (W.D. Ky. Sept. 25, 2008) ("Kentucky law does not recognize a strict liability cause of action for abnormally dangerous activities performed pursuant to a public service or public necessity.").

[33] Were the rule otherwise, and if shooting a gun pursuant to police work were indeed an activity subject to the principle of strict liability, then no Kentucky court would ever analyze an officers' potential entitlement to qualified immunity, but would instead simply go through the ministerial act of entering judgment in favor of any plaintiff ever harmed by an officers' use of a gun.  *Contra Reich v. City of Elizabethtown*, 945 F.3d 968, 982–83 (6th Cir. 2019) (granting state-qualified immunity to Kentucky police officer for shooting suspect who attempted to stab officers); *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. Ct. App. 2007) (granting state qualified immunity to officers who shot knife-wielding suspect).

thereof." SAC ¶ 175. Plaintiffs also allege all the individual Defendants each owed *each other* a duty of supervision and are liable for failing to supervise one another before and during the shooting. ¶ 176. These claims fail for at least three reasons.

*First*, the allegations against the supervisory officers are not well pled. As discussed above, in the related context of the federal failure-to-supervise allegation, the complaint describes no facts about any concrete failures of any supervisory officers. *See* above at § IV(B) (discussing shortcomings in generic allegations that supervisory officers "[i]mproperly train[ed], authorize[ed], encourag[ed] or direct[ed] officers on proper use of force," "search warrants," "excessive force," and "resol[ution] [of] conflicting polices and goals," SAC ¶ 142). The same pleading failures doom the equally terse (and in fact duplicative) state-law supervisory claims, too. "A pleading"—such as this—"that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quotation omitted). Simply blaming supervisors in an organizational hierarchy that included inferior officers accused of malfeasance or negligence does not provide "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

*Second*, the threadbare factual allegations—even accepted as true—wouldn't establish liability on the part of the supervisors. Plaintiffs allege the torts of negligent supervision and negligent training, which Kentucky law recognizes. *See* SAC ¶¶ 141–43; *MV Transp. Inc. v. Allgeier*, 433 S.W.3d 324, 336 n.10. (Ky. 2014). To establish liability under either tort, however, a plaintiff must "allege that the defendant knew or had reason to know of the employee's harmful propensities; that the employee injured the plaintiff; and that the hiring, supervision, or retention of such an employee proximately caused the plaintiff's injuries." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005) (quotation omitted). The allegations make no mention of how or why supervisors would have known of the offending officers' "harmful propensities," or even what those propensities were— alluding only to unstated "complaints of excessive force and/or background checks." SAC ¶ 171. These are assumptions—rather than factual allegations—about past misconduct, not to mention whether and how supervisors may have been aware of such misconduct. And the pleadings mention no facts indicating supervisors ignored any such misconduct. Rather, Plaintiffs are left to incant legalese: "the policy ... of condoned misconduct is tacitly or overtly sanctioned, as evidenced by the conduct of individual defendants ... and the Defendant entities' failure to ... investigate, and discipline any of the officers involved in th[e] incident." ¶ 144.

Of course many of the officers involved have since been investigated and disciplined, as the Plaintiffs' submissions make abundantly clear. Setting that aside, the supervisory Defendants' actions *after* the events in question don't imply flawed LMPD practices *beforehand*. Supervisory liability in Kentucky doesn't work like that. Past negligent acts must pre-date the events in controversy in order for a court to impute knowledge to the supervisor. *See, e.g., Smith v. Norton Hosps., Inc.*, 488

S.W.3d 23, 34 (Ky. Ct. App. 2016) (employee misconduct must occur before plaintiff's claim in order for employer to be on notice for potential negligence); *Youngberg v. McKeough*, 534 F. App'x 471, 477 (6th Cir. 2013) (to make out a claim for negligent supervision, defendant must have been on notice such that he could have or should have *foreseen* that subordinate was likely to injure someone based on past negligent acts).

*Third*, in a single sentence, Plaintiffs assert a rather odd claim against all of the individual officers claiming they "breached their duty of care by not properly supervising *each other* the night of March 13, 2020, when they negligently served a search warrant in the absence of SWAT and in violation of LMPD SOP 8.1." SAC ¶ 176. In Kentucky, a common-law negligence claim requires a plaintiff to plausibly allege "(1) a legally-cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages." *Patton*, 529 S.W.3d at 729. This claim fails on the first prong. In support of their novel theory of negligence, the Plaintiffs have cited no law imposing a duty of peer-supervision on officers and haven't explained how (if at all) this claim differs from their failure-to-intervene theory discussed above. *See* above at § IV.F. Nor do they allege any facts indicating how or when officers were obligated to police one another, and what they did or did not do to breach such a duty.

## I. State Qualified Immunity

Even if Plaintiffs' interpretation of the statute were right, the officers would be entitled to qualified immunity for violations of the negligence-per-se statute. State qualified immunity, which is "essentially identical" to federal qualified immunity, *Jefferson County Fiscal Court v. Peerce*, 132 S.W.3d 824, 837 (Ky. 2004), applies to KRS § 446.070 actions, *Turner v.* Nelson, 342 S.W.3d 866, 874, 878 (Ky. 2011). "[I]mmunity [applies] to the discretionary acts of [police] officers performed in an official capacity." *Haugh*, 242 S.W.3d at 686. This immunity shields the officers from "liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).

The Sixth Circuit has explained that under Kentucky law "the use of deadly force plainly falls within the scope of a police officer's authority" where he "believes that such force is necessary to protect himself against death [or] serious physical injury." *Reich*, 945 F.3d at 983 (quoting KRS § 503.050(1)). So an officer is not liable for any negligence if he "performs (1) a discretionary act[ ] …; (2) in good faith; and (3) within the scope of [his] authority." *Yanero,* 65 S.W.3d at 521–22. Deciding the amount of force to exercise, including deadly force, is a discretionary act under Kentucky law. *Haugh*, 242 S.W.3d at 686 (officers storming violent suspect's home

was discretionary).[34]  And as discussed above, the use of deadly force falls within the scope of a police officer's authority.  *See* KRS § 503.090(1)–(2) (authorizing deadly force if officer "believes that such force is necessary to protect himself against death [or] serious physical injury").

The pleadings leave no doubt that the individual officer defendants who fired their weapons did so in the performance of their discretionary functions.[35]  So the burden shifts to the Plaintiffs to plausibly plead that the discretionary acts were not performed in good faith.  *Yanero*, 65 S.W.3d at 523.  "Good faith" is assessed objectively and subjectively.  *Id.* (citing *Harlow*, 457 U.S. at 815).  Objectively, did the officer's conduct show a "violation of a constitutional, statutory, or other clearly established right" of which a reasonable officer would have known?  *Id.*  Subjectively, did the "officer or employee willfully or maliciously intend[] to harm the plaintiff or act[] with a corrupt motive?"  *Id.*

Objectively, the answer is no.  The officers didn't use excessive or unnecessary force against Plaintiffs, who were neither seized, nor arrested, nor improperly searched.  Largely for the reasons discussed above—regarding the officers' lack of intent to seize Plaintiffs and the Plaintiffs' failure to identify any unconstitutionally excessive force—nothing in the pleadings would support such a violation.  *See Lawson*, 471 S.W.2d at 728–29 (describing the excessive-force inquiry as focusing on whether the officer harms the one named in an arrest warrant); *Reich*, 945 F.3d at 983 (recognizing that the failure to plead a Fourth Amendment violation also precludes a finding of negligence under Kentucky law); *Haugh*, 242 S.W.3d at 686 (conflating Fourth Amendment to Kentucky's unnecessary-force statute).  No force whatsoever was used against Plaintiffs by these two officers; the pleadings state that only Hankison's bullets entered the apartment.  SAC ¶¶ 158, 160.  And as noted for federal qualified immunity, Plaintiffs point to no factually similar case that would clearly establish a right that was violated in this case.

Subjectively, the answer is the same.  As explained above, the Plaintiffs have not plausibly alleged that the officers acted maliciously or sadistically, to harm them

---

[34] *See also Smith*, 488 S.W.3d at 31 ("amount of force required [for] ... investigatory stop or arrest is ... a discretionary act"); *Reich*, 945 F.3d at 982–83 (Under Kentucky law "the use of deadly force" is a "discretionary act" that "plainly falls within the scope of a police officer's authority."); Nichols *v. Bourbon County Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014) (use of force in performing arrest is discretionary under Kentucky law).

[35] The pleadings and briefs spill a great deal of ink arguing that various alleged errors upstream from the warrant execution and gunfire were ministerial rather than discretionary. *See, e.g.*, Response to City MTD at 23–31.  Yet as discussed above, even assuming these actions were ministerial, they cannot be said to have proximately caused the injury (or, arguably with the exception of the decision to knock—which the Plaintiffs do *not* allege was ministerial—were not but-for causes either). *See also* n.6 (noting that the standard operating procedures authorize officers to exercise discretion in executing a warrant).

as bystanders. *See Howell v. Sanders*, 668 F.3d 344, 356 (6th Cir. 2012) ("This inquiry is resolved by determining 'whether the official has behaved with permissible intentions.'" (quoting *Bryant v. Pulaski County Detention Ctr.*, 330 S.W.3d 461, 466 (Ky. 2011))). Other than a few conclusory allegations about the officers being motivated by religious animus and racism, SAC ¶¶ 134, 174, the Second Amended Complaint contains no allegation by which the Court could infer malicious motivation to use unreasonable force against Walker and Taylor (the targets of the warrant) let alone the Plaintiffs, who acknowledge they were "not the target of the Search Warrant." ¶ 108; *see also* ¶¶ 159–60. Instead, the officers returned fire after being fired upon. *See* ¶ 86; LMPD Investigative Report at 4. So qualified immunity applies to the claim of negligence per se based on the failure to plausibly plead bad faith.

And as to the duty-to-train claim, discussed above, even if the claims were well pled, qualified immunity would protect the officers from liability. Under Kentucky law, "[s]upervision and training are discretionary functions." *Nichols v. Bourbon County Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014); *see also Rowan County v. Sloas*, 201 S.W.3d 469, 480 (Ky. 2006); *Doe v. Magoffin County Fiscal Court*, 174 F. App'x 962, 973 (6th Cir. 2006). So liability attaches only if the officers "violat[ed] … a constitutional, statutory, or other clearly established right of which a person in the [officer]'s position presumptively would have known" or "if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Yanero*, 65 S.W.3d at 523. Plaintiffs have alleged neither. They have not pointed to *any* source of law violated by the allegedly negligent supervision, nor have they alleged that the supervisors acted with malice to harm the unknown bystander Plaintiffs.

CONCLUSION

The tragic events on the night of March 13, 2020, have been hotly debated in the public square and the courts alike.  But the questions presented and answered here concern the rights of the neighboring Plaintiffs, not those of Breonna Taylor or Kenneth Walker, whose lawsuit remains pending in this District.  The Plaintiffs here haven't alleged facts showing a deprivation of *their own* constitutional and state-law rights by officers whose bullets never pierced their walls.  The many exceptions Plaintiffs take with the officers' conduct–even accepting those assertions as true—don't connect those earlier actions to the ultimate harm.  Nor do these alleged errors add up to a violation of the laws the Plaintiffs rely on—either because their legal theories are mistaken or because they simply assume the facts necessary to recover.

So the Court grants the motions to dismiss (DNs 29, 31) filed by the Defendants other than Hankison.  The Court will address the stay of the claims against Hankison, as well as the Plaintiffs' further requests to amend their complaint (DNs 68, 111), in separate orders.

Benjamin Beaton, District Judge
United States District Court

July 28, 2022